UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID GAVIN FRANCIS, Individually and on Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| DLOCAL LIMITED, SEBASTIAN KANOVICH, and DIEGO CABRERA CANAY, | |
| Defendants. | |

Plaintiff David Gavin Francis ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding DLocal Limited ("DLocal" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired DLocal securities between

May 2, 2022 and May 25, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      DLocal operates a payment processing platform for merchants worldwide and, as part of its operations, engages in certain foreign exchange transactions.  As a result, the Company is subject to the various foreign exchange regulations and controls of the countries within which it operates, including, *inter alia*, Argentina, which has historically been one of the Company's most important markets.

3.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) DLocal engaged in certain improper conduct and transfers abroad in violation of Argentine laws and/or regulations, including, *inter alia*, foreign exchange regulations; (ii) accordingly, DLocal's compliance controls and procedures, including its disclosure controls and procedures and internal controls over financial reporting, were deficient; (iii) all the foregoing subjected the Company to a heightened risk of governmental and/or regulatory scrutiny in Argentina and/or enforcement action by Argentine authorities; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

4.      On May 26, 2023, Argentine news outlet Infobae published an article reporting that the Argentine government was investigating DLocal for a possible $400 million fraud.  Specifically, Infobae reported that the government was investigating the Company for "improper maneuvers" and transfers abroad, with unnamed sources alleging that DLocal "operates

2

as a mere instrument to take advantage of the exchange rate gap and to take dollars abroad with operations that are not reflected in the accounting."

5.     The same day, DLocal issued a response to the Infobae article, characterizing it as "misleading" and "factually incorrect".   DLocal's response also assured investors that the Company is in "close contact with [Argentine] authorities", that "there is a continuous flow of information" with those authorities, and that, "[a]s of today, we have not been notified by any Argentinian [*sic*] authority regarding a foreign exchange investigation."

6.     Following these developments, DLocal's Class A common share price fell $2.39 per share, or 17.32%, to close at $11.41 per share on May 26, 2023.

7.     On June 5, 2023, DLocal disclosed in an SEC filing that it "received a request for information from Argentine customs authorities, although the Company notes that expatriation rules and foreign exchange operations are regulated by the Argentine Central Bank"; that "[o]n June 1, 2023 . . . the Company confirmed with a local Argentine court that a petition for inquiry had been filed by an Argentine prosecutor on May 30, 2023 in response to the same article published by [Infobae] seeking information using as a basis for the request the above-mentioned article"; and that "[t]he Company intends to respond to any and all requests for information from regulatory authorities to demonstrate that it has acted in accordance with applicable regulations."

8.     Then, on June 15, 2023, DLocal issued a press release revealing that it was in fact "engag[ing] with senior representatives of the Argentine federal government to discuss, among other matters, the manner in which dLocal operates in the country, ***including dLocal's compliance with foreign exchange regulations***" (emphasis added).

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

12.      Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the alleged misstatements entered and subsequent damages took place in this District.  Pursuant to DLocal's most recent annual report on Form 20-F, as of December 31, 2022, there were over 296 million of the Company's common shares outstanding.  DLocal's Class A common shares trade on the Nasdaq Global Select Market ("NASDAQ").  Accordingly, there are presumably hundreds, if not thousands, of investors in DLocal's Class A common shares located in the U.S., some of whom undoubtedly reside in this Judicial District.

13.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.     Plaintiff, as set forth in the attached Certification, acquired DLocal securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.     Defendant DLocal is organized under the laws of the Cayman Islands with principal executive offices located at Dr. Luis Bonavita 1294, Montevideo, Uruguay 11300.   The Company's Class A common shares trade in an efficient market on the NASDAQ under the ticker symbol "DLO".

16.     Defendant Sebastian Kanovich ("Kanovich") has served as DLocal's Chief Executive Officer at all relevant times.

17.     Defendant Diego Cabrera Canay ("Canay") has served as DLocal's Chief Financial Officer at all relevant times.

18.     Defendants Kanovich and Canay are sometimes referred to herein as the "Individual Defendants".

19.     The Individual Defendants possessed the power and authority to control the contents of DLocal's SEC filings, press releases, and other market communications.   The Individual Defendants were provided with copies of DLocal's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.   Because of their positions with DLocal, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then

materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

20.     DLocal and the Individual Defendants are collectively referred to herein as "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background

21.     DLocal operates a payment processing platform for merchants worldwide and, as part of its operations, engages in certain foreign exchange transactions.  As a result, the Company is subject to the various foreign exchange regulations and controls of the countries within which it operates, including, *inter alia*, Argentina, which has historically been one of the Company's most important markets.  The Company serves commerce, streaming, ride-hailing, financial services, advertising, software-as-a-service, travel, e-learning, on-demand delivery, gaming, and crypto industries.

### Materially False and Misleading Statements Issued During the Class Period

22.     The Class Period begins on May 2, 2022, when DLocal filed an annual report on Form 20-F with the SEC during pre-market hours, reporting the Company's financial and operational results for the quarter and year ended December 31, 2021 (the "2021 20-F").  The 2021 20-F contained generic, boilerplate representations regarding DLocal's exposure to regulatory foreign exchange control risks in Argentina, as well as simultaneously downplayed these risks by asserting that such risks merely "may" or "could" materialize and that the Company has generally offset such risks, stating, in relevant part:

> We are subject in certain jurisdictions where we have operations, such as [*inter alia*] Argentina . . . , to the risk that regulatory authorities in or outside such jurisdictions **may** impose exchange controls or restrictions on the movement of capital, including on transactions involving transfers of funds from such

6

jurisdictions, as well as restrictions on repatriation of funds or repatriation of profits on subsidiaries from such jurisdictions, which *may* restrict the amount of funds that can be transferred or dividends that can be paid upstream to us from such jurisdictions . . . . We are in the process of obtaining applicable approvals in these jurisdictions, though there can be no assurance that such approvals will be obtained in a timely manner, or at all, or that we will timely obtain approvals in jurisdictions where we may seek to operate in the future. ***In addition, the Argentine economy has experienced a balance of payment deficits and shortages in foreign exchange reserves, and the government has responded by restricting the ability of companies to convert local currencies into foreign currencies and imposing other exchange controls. From time to time, we net funds, which <u>could</u> be challenged by regulators due to foreign exchange controls. These restrictive exchange control measures prevent or severely restrict the access to exchange for foreign currencies, such as U.S. dollars and the ability to remit them out of the country (which measures include prior approval by the local central bank, which <u>may</u> be denied at its discretion) and also restrict the ability to hold foreign currency in cash within the relevant jurisdiction.*** If we are unable to transfer such amounts from such jurisdictions when and as needed, we will remain subject to foreign exchange risk relating to such retained funds denominated in local currencies (including merchant funds held by us), to the extent we cannot convert such funds into other currencies (whether as a result of foreign exchange restrictions in such jurisdictions, or any restrictions on transferring funds out of such jurisdictions), which *may* adversely impact our ability to settle such transactions and subject us to significant foreign exchange risk, which ***could*** have a material adverse effect on our results of operations, liquidity and financial condition.

\* \* \*

In addition, as the Argentine fiscal deficit has increased and Argentine Central Bank reserves have decreased, the Argentine government has responded . . . by reinstating on foreign exchange controls, to which we ***may*** be subject in the emerging markets in which we operate . . . . Although ***we have generally been able to offset the heightened foreign exchange and exchange control risks in Argentina*** with higher overall fees on transactions conducted through our Argentine operations, the persistently poor economic conditions in Argentina, in particular the significant foreign exchange rate volatility of the Argentine peso and uncertainty regarding exchange control measures ***could*** have an adverse effect on our business, financial condition and results of operations.

(Emphases added.) Plainly, the foregoing risk warnings were generic, catch-all provisions that were not tailored to DLocal's actual known risks regarding its non-compliance with Argentine foreign exchange laws and regulations, much less that the Company was at an increased risk of facing fraud charges under such laws and/or regulations for its foreign exchange practices.

23.     In addition, the 2021 20-F made various representations concerning DLocal's purportedly robust compliance controls and procedures, as well as its investments in maintaining and updating those procedures, stating, *inter alia*, "[i]n order to manage our growth effectively, we must **continue** to . . . improve our internal controls and compliance mechanisms, create and improve our reporting systems, and address issues in a timely manner as they arise" (emphasis added); "we have also had to hire a significant number of new employees in order to support our rapidly growing operations, including employees in . . . legal, finance, accounting and compliance areas"; "dLocal combines payment processing and FX [foreign exchange] management with compliance, tax, and fraud management capabilities into one intuitive, fully integrated platform"; "we offer . . . compliance capabilities that streamline regulatory compliance by helping merchants stay up-to-date with complex and frequently changing local laws and regulations"; and "[w]e believe that . . . our deep understanding of each local market . . . deliver[s] superior benefits for our global merchants", which "include increased . . . risk mitigation[ and] improved level of compliance[.]"

24.     With respect to DLocal's purported "[f]raud solution", the 2021 20-F stated, in relevant part:

> dLocal has developed a robust data-driven fraud prevention engine and a suite of checks and localized strategies for emerging markets that are powered by machine learning, leveraging our proprietary databases and designed to timely and accurately identify fraudulent transactions in the different countries we operate. Our proprietary behavioral algorithms detect subtle patterns and habits, increasing the level of security and ensuring compliance with applicable anti-fraud regulation. dLocal focuses on minimizing false positives and false negatives by combining merchant and industry data to create what we believe is a best-in-class fraud detection model. Each merchant is categorized to enhance the model's performance by adapting it to the merchant's data and characteristics. Additional checks and rules are applied to higher risk or higher value transactions. We believe that dLocal's focus on emerging markets, strong partnership with our merchant base, and local knowledge in each of our markets help us deliver superior fraud management capabilities that improve merchant results.

25. Moreover, in discussing DLocal's successful international expansion, the 2021 20-F represented, in relevant part, that "[f]or each new country where we seek to establish a presence, we . . . gain[] an appreciation for the appropriate local regulatory and compliance frameworks."

26. The 2021 20-F also assured investors that DLocal "ha[s] adopted a code of ethics applicable to the board of directors and all employees, which covers a broad range of matters including . . . compliance issues[.]"

27. In addition, the 2021 20-F touted that DLocal "has completed the implementation of . . . remediation plans designed to improve our internal controls over financial reporting and to remediate . . . control deficiencies that resulted in [a] material weakness", including, *inter alia*, the "design[] and implement[ation of a] three lines of defense model, by adding compliance and risk management as the second line of defense and internal audit as the third line."

28. With respect to the effectiveness of DLocal's disclosure controls and procedures, the 2021 20-F assured investors, in relevant part:

> [O]ur disclosure controls and procedures were effective as of December 31, 2021, the end of the period covered by this report, at a reasonable assurance level and, accordingly, provide reasonable assurance that the information required to be disclosed by us in reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that information required to be disclosed by us in the reports we file or submit under the Exchange Act is accumulated and communicated to our management, including [the Individual Defendants], or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

29. Appended as exhibits to the 2021 20-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that "the [2021 20-F] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and

that "the information contained in the [2021 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

30.     On April 5, 2023, DLocal filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2022 (the "2022 20-F").   The 2022 20-F contained substantively the same statements as referenced in ¶ 22, *supra*, containing generic, boilerplate representations regarding DLocal's exposure to regulatory foreign exchange control risks in Argentina, and which simultaneously downplayed those risks by asserting that such risks merely "may" or "could" materialize and that the Company has generally offset such risks.   These risk warnings were generic, catch-all provisions that were not tailored to DLocal's actual known risks regarding its non-compliance with Argentine foreign exchange laws and regulations, much less that the Company was at an increased risk of facing fraud charges under such laws and/or regulations for its foreign exchange practices.

31.     Moreover, the 2022 20-F contained the same statements as referenced in ¶¶ 23-26, *supra*, regarding DLocal's purportedly robust compliance controls and procedures, investments in maintaining and updating those procedures, purported "[f]raud solution", successful international expansion as a result of its appreciation for the appropriate local regulatory and compliance frameworks, and code of ethics covering compliance issues.

32.     With respect to the effectiveness of DLocal's disclosure controls and procedures, the 2022 20-F stated, in relevant part:

> [O]ur disclosure controls and procedures were effective as of December 31, 2022, the end of the period covered by this report, at a reasonable assurance level and, accordingly, provide reasonable assurance that the information required to be disclosed by us in reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that information required to be disclosed by us in the reports we file or submit under the Exchange Act is accumulated and communicated to our

management, including [the Individual Defendants], or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

33.    The 2022 20-F also represented that DLocal "maintained effective internal control over financial reporting as of December 31, 2022."

34.    Appended as exhibits to the 2022 20-F were substantively the same SOX certifications as referenced in ¶ 29, *supra*, signed by the Individual Defendants.

35.    On May 18, 2023, DLocal filed a report of foreign issuer on Form 6-K the SEC, appended to which as an exhibit were the Company's "Unaudited Consolidated Condensed Interim Financial Statements as of March 31, 2023 and for the three-month periods ended March 31, 2023 and 2022". Those financial statements detailed certain developments in Argentine foreign exchange regulations, which the Company asserted it was closely monitoring, stating, in relevant part:

Developments in foreign exchange regulations in Argentina

On April 20, 2023, the Central Bank in Argentina issued Comunicacion "A" 7746, which amends certain foreign exchange regulations and establishes procedures to obtain foreign currency for the settlement of certain professional, advertising services and other business services.

On April 27, 2023, General Resolution No. 5351 was published, modifying Argentina's System for Imports and Payments of Services Abroad (Sistema de Importaciones de la República Argentina y Pagos de Servicios al Exterior) ("SIRASE") regime and establishing that all SIRASE applications must be approved by the Secretary of Commerce. The approval of the Company's expatriation requests submitted after April 20 are outstanding as of the date of the issuance of these condensed interim financial statements. ***Management continues to monitor the situation in close communication with our merchants.***

(Emphasis added.)

36.    The statements referenced in ¶¶ 22-35 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically,

Defendants made false and/or misleading statements and/or failed to disclose that: (i) DLocal engaged in certain improper conduct and transfers abroad in violation of Argentine laws and/or regulations, including, *inter alia*, foreign exchange regulations; (ii) accordingly, DLocal's compliance controls and procedures, including its disclosure controls and procedures and internal controls over financial reporting, were deficient; (iii) all the foregoing subjected the Company to a heightened risk of governmental and/or regulatory scrutiny in Argentina and/or enforcement action by Argentine authorities; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

37.     On May 26, 2023, Argentine news outlet Infobae published an article entitled "The Government investigates the only Uruguayan unicorn for alleged fraud against the Argentine State and analyzes denouncing it in the US" (the "Infobae Article").[1]   The Infobae article stated, in relevant part:

> Previously accused of fraudulent activities, the fintech dLocal is now being investigated by the Argentine Government for improper maneuvers in the foreign exchange market and foreign transfers made with the purpose of "leak currency." The maneuvers, which would directly constitute a scam, have a floor of USD 400 million, according to official sources estimated before **Infobae** . [*sic*]

> "The company functions as a mere instrument to take advantage of the exchange gap and take dollars abroad with operations that are not reflected in the accounting. In their balance sheet they practically do not have fixed assets and they only declare rents that would be from the operating address," the Government highlighted to this medium.

> "It receives invoices from outside its parent company, makes B invoices to foreign clients to justify income and invoices companies in the same group. By making this type of invoices you avoid having to settle foreign currency from the export of services," they detailed.

---

[1] All quotations from the Infobae Article herein have been translated into English using Google Translate.

> Sources from Customs . . . indicated that they are evaluating notifying the alleged fraud to the [SEC], the Wall Street regulator, through the United States embassy in Buenos Aires. They will also seek to obtain information through FinCEN, the Financial Crimes Control Network of the American Treasury, and Homeland Security Investigations (HSI) to establish the effective beneficiaries of the transfers and determine the route of the money that left Argentina.
>
> In addition to Customs, the Central Bank, the Ministry of Commerce, the AFIP and the Financial Crimes Unit (UIF) also participate in the investigation.
>
> This Friday after noon, one of the founders of the company, **Sergio Fogel** , assured in statements to Montevideo Portal that EL Observador reproduced: "There is no open case. We checked with the lawyers and there is nothing in the official records. We are a company that is audited and looked at under a microscope and if there is an investigation we will collaborate. Today there is none. We found out from the press, but we are functioning and operating normally and we are going to continue like this."
>
> The company is based in Malta, has a market value of about USD 4 billion and its local activity "is plagued by *intercompany* operations ," [*sic*] according to local authorities. In other words, she sells services to herself. "98% of its income comes from services provided to dLocal Corp. LLP and dLocal LTD. The currency transfers are mainly to Malta and Great Britain and the main beneficiaries are dLocal Corp. LLP, dLocal Limited and Dlocal LLP," it was explained.
>
> As this media learned, the AFIP sent a request on May 19 to the management of dLocal Argentina SA, a first floor on 1600 Thames Street, in the heart of Palermo Soho. "That first floor that is not well identified from the outside... and does not look like the address of a company," official sources stated.
>
> In this requirement, the company was required to provide details of the requests for transfers abroad for the importation of services carried out in 2022 (date, amount, recipient, country, etc.) and documentation that proves these requests (invoices and contracts with recipients. ). The five business days they were given to present the papers have not yet been completed.

(Emphases in original and internal images omitted.)

38.     The same day, during intraday trading hours, DLocal issued a press release responding to the Infobae Article, characterizing it as "misleading" and "factually incorrect", stating, in relevant part:

> Today we were subject to a set of misleading allegations in an article published by Infobae, who has not reached out to the company for comments, about alleged non

compliance with expatriation rules in Argentina. dLocal operates in the payments industry and is regulated by government authorities across its 40 geographies. The referred article is factually incorrect:

dLocal processes payments for global merchants. Our activities are subject to government regulations specific to each currency being exchanged. In Argentina, expatriation of funds are conducted through regulated parties that follow the Central Bank of Argentina rules, containing detailed information at a payment transaction level. Funds expatriated from Argentina are settled to global merchants, net of taxes.

As part of our day to day activities, we are in close contact with authorities and there is a continuous flow of information. To the extent we are notified by authorities in Argentina (or any other geography), we engage meaningfully and cooperate with any requests from regulatory authorities. As of today, we have not been notified by any Argentinian authority regarding a foreign exchange investigation.

We continue to process payments normally in Argentina. We have been operating in the country since 2016 and have a solid local presence with over 150 employees across numerous offices.

We will maintain our focus on delivering outstanding service and results for our customers, shareholders and other stakeholders. We will not be distracted by misleading allegations. dLocal is committed to the integrity of all its business activities and will continue to focus on providing the best and most comprehensive solution for our global merchants in each market in which we operate.

39.     Following these developments, DLocal's Class A common share price fell $2.39

per share, or 17.32%, to close at $11.41 per share on May 26, 2023.

## Post-Class Period Developments

40.     On June 5, 2023, DLocal filed a report of foreign issuer on Form 6-K with the SEC,

disclosing that the Company had received several inquiries from the Argentine government

concerning its business practices in the county, stating, in relevant part:

On May 26, 2023, Dlocal . . . was the subject of an article published by Argentine news outlet Infobae. The article, on which we were not contacted for comment prior to publication, alleged that the Company failed to comply with certain expatriation rules in Argentina and, as a result, was being investigated by the Argentine government. The Company issued a public response the same day, explaining, among other things, that the Company was continuing to process payments

14

normally in Argentina, and that, it operates in close contact with regulatory authorities and engages meaningfully and cooperatively with any requests for information received therefrom. As Argentine foreign exchange regulations have changed numerous times in recent years in light of the scarcity of U.S. dollars, the Company has sought to adapt its operations in response to those changes. The Company continues to process payments normally, and intends to continue to operate, in Argentina.

* * *

**The Company received a request for information from Argentine customs authorities, although the Company notes that expatriation rules and foreign exchange operations are regulated by the Argentine Central Bank.**

**On June 1, 2023, at the close of business, the Company confirmed with a local Argentine court that a petition for inquiry had been filed by an Argentine prosecutor on May 30, 2023 in response to the same article published by the Argentine news outlet seeking information using as a basis for the request the above-mentioned article.**

The Company intends to respond to any and all requests for information from regulatory authorities to demonstrate that it has acted in accordance with applicable regulations.

(Emphases added.)

41.     Then, on June 15, 2023, DLocal issued a press release revealing that it was in fact "engag[ing] with senior representatives of the Argentine federal government to discuss, among other matters, the manner in which dLocal operates in the country, ***including dLocal's compliance with foreign exchange regulations***" (emphasis added).

42.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

acquired DLocal securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

44.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, DLocal securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by DLocal or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

46.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

47.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of DLocal;

- whether the Individual Defendants caused DLocal to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of DLocal securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

48.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

49.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- DLocal securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold DLocal securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

50.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

51.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

52.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

53.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

54.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of DLocal securities; and

(iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire DLocal securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

55.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for DLocal securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about DLocal's finances and business prospects.

56.     By virtue of their positions at DLocal, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

57.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of DLocal, the Individual Defendants had knowledge of the details of DLocal's internal affairs.

58.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of DLocal.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to DLocal's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of DLocal securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning DLocal's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired DLocal securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

59.     During the Class Period, DLocal securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of DLocal securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of DLocal securities was substantially lower than the prices paid by Plaintiff and the other

members of the Class.  The market price of DLocal securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

60.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

61.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

62.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

63.     During the Class Period, the Individual Defendants participated in the operation and management of DLocal, and conducted and participated, directly and indirectly, in the conduct of DLocal's business affairs.  Because of their senior positions, they knew the adverse non-public information about DLocal's misstatement of income and expenses and false financial statements.

64.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to DLocal's financial condition and results of operations, and to correct promptly any public statements issued by DLocal which had become materially false or misleading.

65.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which DLocal disseminated in the marketplace during the Class Period concerning DLocal's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause DLocal to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of DLocal within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of DLocal securities.

66.     Each of the Individual Defendants, therefore, acted as a controlling person of DLocal.  By reason of their senior management positions and/or being directors of DLocal, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, DLocal to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of DLocal and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

67.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by DLocal.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated:  October 6, 2023                      Respectfully submitted,

                                            POMERANTZ LLP

                                            */s/ Jeremy A. Lieberman*
                                            Jeremy A. Lieberman
                                            J. Alexander Hood II
                                            James M. LoPiano
                                            600 Third Avenue, 20th Floor
                                            New York, New York 10016
                                            Telephone: (212) 661-1100
                                            Facsimile: (917) 463-1044
                                            jalieberman@pomlaw.com
                                            ahood@pomlaw.com
                                            jlopiano@pomlaw.com

                                            *Attorneys for Plaintiff*

# CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.     I, <u>DAVID GAVIN FRANCIS                              </u>, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.     I have reviewed a Complaint against dLocal Limited ("dLocal") and authorize the filing of a comparable complaint on my behalf.

3.     I did not purchase or acquire dLocal securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.     I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired dLocal securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.     The attached sheet lists all of my transactions in dLocal securities during the Class Period as specified in the Complaint.

6.     During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.     I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.


**Executed** 9/14/2023
_____
         **(Date)**



DocuSigned by:

Mr.David Gavin Francis
_____
**(Signature)**
49E56DB428EA462...

DAVID GAVIN FRANCIS
_____
     **(Type or Print Name)**

**dLocal Limited (DLO)**                                                                                          **David Gavin Francis**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
| --- | --- | --- | --- |
| Purchase | 5/1/2023 | 35 | $13.7985 |
| Purchase | 5/1/2023 | 0.51086956 | $13.8000 |