UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PAULETTE LAURENZI and EDUARDO ARIEL ABERLE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>DLOCAL LIMITED, SEBASTIAN KANOVICH, DIEGO CABRERA CANAY, JACOBO SINGER, ALBERTO EDUARDO AZAR, ANDRES BZUROVSKI BAY, SERGIO ENRIQUE FOGEL KAPLAN, LUIZ O. RIBEIRO, MARTIN ESCOBARI, TEREZA GROSSI, and JITENDRA GUPTA,<br><br>Defendants. | No. 23-CV-07501-NGG-JRC |

## AMENDED CLASS ACTION COMPLAINT

{00596212;29 }

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ........................................................................................ 1

II.     JURISDICTION AND VENUE ................................................................................... 5

III.    PARTIES .................................................................................................................... 6

IV.     FORMER EMPLOYEE ............................................................................................. 8

V.      COMPANY BACKGROUND .................................................................................... 8

VI.     DLOCAL'S IPO AND SECONDARY OFFERING ................................................. 10

VII.    FALSE AND MISLEADING STATEMENTS IN THE IPO PROSPECTUS AND
        REGISTRATION STATEMENT ............................................................................... 13

        A.    The IPO Prospectus Failed to Disclose a Known Material Trend that the
              Company's Take Rates Were Decreasing Ahead of the IPO ............................. 13

        B.    DLocal Overstated its Take Rates and Revenues ................................................ 19

        C.    DLocal's Heightened Risk of Regulatory Scrutiny and Deficient Internal Controls
              ............................................................................................................................ 23

        D.    DLocal's Lack of Fraud Detection and Internal Controls Allowed Academiland to
              Use its Platform to Illegally Wire Funds from Argentina to the United States .... 26

        E.    DLocal's Materially Misleading Risk Warnings in the Prospectus ...................... 26

VIII.   POST-IPO MATERIAL MISREPRESENTATIONS AND MISSTATEMENTS .......... 28

IX.     THE TRUTH BEGINS TO EMERGE BUT DEFENDANTS CONTINUE TO
        MISLEAD INVESTORS ............................................................................................ 31

X.      POST-CLASS PERIOD DEVELOPMENTS ............................................................. 39

XI.     CLASS ACTION ALLEGATIONS ........................................................................... 41

COUNT I ............................................................................................................................. 43

COUNT II ............................................................................................................................ 44

COUNT III ........................................................................................................................... 45

COUNT IV ........................................................................................................................... 48

PRAYER FOR RELIEF ....................................................................................................... 49

JURY DEMAND ................................................................................................................. 50

Lead Plaintiff Paulette Laurenzi and Named Plaintiff Eduardo Ariel Aberle, on behalf of themselves and all others similarly situated (collectively, "Plaintiffs"), allege the following based upon personal knowledge as to their own acts and upon information and belief as to all other matters based on the investigation conducted by counsel for Lead Plaintiff, which included a review of, *inter alia*, U.S. Securities and Exchange Commission ("SEC") filings by DLocal Limited ("DLocal" or the "Company"), press releases and other public statements by DLocal and its officers and directors (collectively, the "Defendants"), Defendants' conference calls and announcements, media and analyst reports and advisories about the Company, interviews with former employees, and other public information. Plaintiffs believe that substantial evidentiary support for the allegations set forth herein will be revealed after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all persons other than Defendants who (i) purchased or otherwise acquired DLocal Class A common stock pursuant and/or traceable to the IPO Registration Statement (defined below) issued in connection with the Company's initial public offering conducted on or about June 2, 2021 ("IPO") and/or (ii) purchased or otherwise acquired DLocal securities between June 2, 2021 and June 5, 2023, both dates inclusive (the "Class Period")[1], seeking to recover damages caused by Defendants' violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") and Sections 10(b) and

---

[1] Excluded from the Class are Defendants; the present and former officers of the Company at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any Defendant or any other excluded person has or had a majority ownership interest at any time.

20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Founded in 2016, DLocal is headquartered in Montevideo, Uruguay. DLocal operates a payment processing platform for merchants worldwide and, as a part of its operations, engages in certain foreign exchange transactions. As a result, the Company is subject to the various foreign exchange regulations and controls of the countries within which it operates, including, *inter alia*, Argentina.

3.      DLocal's Class A common stock was offered in the IPO and thereafter traded on the NASDAQ under the ticker symbol "DLO." DLocal's IPO was conducted on June 2, 2021 pursuant to a registration statement (defined below as the "IPO Registration Statement") and prospectus (defined below as "IPO Prospectus"). In the IPO Registration Statement and IPO Prospectus, and in the months following the IPO, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies, and failed to disclose known material information that would have a material impact on its continuing operations and that would cause reported financial information not to be necessarily indicative of future operating results.

4.      Specifically, Defendants failed to disclose that (i) the Company had engaged in certain improper conduct and transfers abroad in violation of Argentine laws and regulations, including, *inter alia*, foreign exchange regulations, with respect to at least one customer, an online educational services company, known as Academiland LLC and/or Be U Institute ("Academiland"); (ii) this misconduct subjected the Company to a heightened risk of governmental and/or regulatory scrutiny in Argentina and/or enforcement action by Argentine authorities; (iii) DLocal lacked internal controls over its fraud-detection and legal and regulatory

compliance processes, (iv) the Company misrepresented its 2020 revenues and take rates; and (v) the Company failed to disclose the material trend that at the time of the IPO, its "take rates" had been declining due to the Company's shift to the lower profit margin business of local-to-local customers.

5.    In the IPO, the Defendants collectively sold approximately 22.1 million shares of DLocal, for gross proceeds of over $436 million.

6.    On November 16, 2022, a due diligence based investment firm, Muddy Waters, released a report titled "DLO: History Never Repeats Itself, but it Does Often Rhyme" (the "Muddy Waters Report") in which it offered an extensive critique of the Company's previously reported revenues and take rates and suggested that they were likely fraudulent. The Muddy Waters Report also questioned the adequacy of the Company's internal controls, saying the Company's global treasury functions "rely heavily on manual operations and expose the company to high risk of material errors across all its key operations areas, ranging from payment amounts, duplicate payments, FX rate calculations, withholding taxes, etc. as well as an increased likelihood of control deficiencies."

7.    On the same day, the Company denied the allegations in the Muddy Waters Report, stating that:

> The report contains numerous inaccurate statements, groundless claims and speculation. Short seller reports are often designed to drive the stock price downwards to serve the short seller's interests to the detriment of the company's shareholders. We caution shareholders from making investment decisions based on this report. DLocal will rebut the allegations in the appropriate forum in due course.

8.    Following the Muddy Waters Report's release, DLocal's share price fell from $20.74 to $10.46, or more than 45%, on November 16, 2022 – about 50% below the IPO price.

9.    On December 20, 2022, DLocal issued a press release in which it announced that the Company had reviewed the allegations of the Muddy Waters Report. In the press release, the

Company stated that the Muddy Waters Report contained "numerous factual errors or inflammatory, misleading statements … which collectively demonstrate a fundamental lack of understanding of our financial statements and business." Specifically, as it related to the take rates, DLocal stated only that the allegations in the Muddy Waters Report drew "comparisons between DLocal and other companies, which are inaccurate and unsubstantiated."

10.    On May 26, 2023, Argentine news outlet Infobae published an article reporting that the Argentine government was investigating DLocal in connection with a possible $400 million fraud. Specifically, Infobae reported that the government was investigating the Company for "improper maneuvers" and transfers abroad, with unnamed sources alleging that DLocal operates "as a mere instrument to take advantage of the gap in exchange rates to take dollars abroad with operations that aren't reflected in its accounting."

11.    That same day, DLocal issued a response to the Infobae article, characterizing it as "misleading" and "factually incorrect." DLocal's response also assured investors that the Company was in "close contact with [Argentine] authorities," that "there is continuous flow of information" with those authorities, and that, "[a]s of today, we have not been notified by any Argentinian authority regarding a foreign exchange investigation."

12.    On May 30, 2023, Infobae published an article confirming that the Argentine Ministry of Justice was investigating DLocal for "possible fraud and money laundering."

13.    On June 5, 2023, only days after denying any investigation, DLocal confirmed in an SEC filing that, in fact, the Company had "received a request for information from Argentine customs authorities, although the Company notes that expatriation rules and foreign exchange operations are regulated by the Argentine Central Bank"; that "[o]n June 1, 2023 . . . the Company confirmed with a local Argentine court that a petition for inquiry had been filed by an Argentine

prosecutor on May 30, 2023 in response to the same article published by [Infobae] seeking information using as a basis for the request the above-mentioned article"; and that "[t]he Company intends to respond to any and all requests for information from regulatory authorities to demonstrate that it has acted in accordance with applicable regulations."

14.     Following these developments, DLocal's Class A common shares closed at $9.82, which was $11.18 or 53.24% lower than its IPO price.

15.     Then, on June 15, 2023, DLocal issued a press release revealing that the Company was in fact "engag[ing] with senior representatives of the Argentine federal government to discuss, among other matters, the manner in which DLocal operates in the country, *including DLocal's compliance with foreign exchange regulations*" (emphasis added).

16.     On September 15, 2023, Infobae published an article in which it reported that, as a part of a lateral investigation into DLocal, Argentinian authorities had uncovered that Academialand used DLocal's platform as part of a money laundering scheme.

17.     As a result of the Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

18.     Plaintiffs assert claims under Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

19.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and Section 21D of the Securities Act (15 U.S.C. § 77v).

20.     Plaintiffs also assert claims under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

21.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

22.     Venue is proper in this District under Section 21D of the Securities Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as a significant portion of Defendants' actions took place in this District.

23.     In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

24.     Lead Plaintiff Paulette Laurenzi purchased DLocal securities during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

25.     Named Plaintiff Eduardo Aberle purchased DLocal securities pursuant to or traceable to the IPO and was damaged upon the revelation of the alleged corrective disclosures.

26.     Defendant DLocal is incorporated under the law of the Cayman Islands with its principal executive offices located at Dr. Luis Bonavita 1294, Montevideo, Uruguay 11300. DLocal's Class A common shares trade on the NASDAQ exchange under the symbol "DLO." DLocal was founded in 2016 by Andres Bzurovski and Sergio Fogel.

27.     Defendant Sebastian Kanovich ("Kanovich") was the Company's Chief Executive Officer ("CEO") and a Director on the Company's Board of Directors ("Board") at all relevant times. Defendant Kanovich reviewed, contributed to the drafting of, and signed the Registration Statement.

28.     Defendant Jacobo Singer ("Singer") was the Company's President and a Director on the Company's Board at all relevant times. Singer reviewed, contributed to the drafting of, and signed the Registration Statement.

29.    Defendant Diego Cabrera Canay ("Canay") was the Company's Chief Financial Officer ("CFO") at all relevant times. Defendant Canay reviewed, contributed to the drafting of, and signed the Registration Statement.

30.    Defendant Alberto Eduardo Azar ("Azar") was the Chairman of the Company's Board at all relevant times. Azar reviewed, contributed to the drafting of, and signed the Registration Statement.

31.    Defendant Andres Bzurovski Bay ("Bzurovski") was a Director on the Company's Board at all relevant times. Bzurovski reviewed, contributed to the drafting of, and signed the Registration Statement.

32.    Defendant Sergio Enrique Fogel Kaplan ("Fogel") was a Director on the Company's Board at all relevant times. Fogel reviewed, contributed to the drafting of, and signed the Registration Statement.

33.    Defendant Luiz O. Ribeiro ("Ribeiro") was a Director on the Company's Board at all relevant times. Ribeiro reviewed, contributed to the drafting of, and signed the Registration Statement.

34.    Defendant Martin Escobari ("Escobari") was a Director on the Company's Board at all relevant times. Escobari reviewed, contributed to the drafting of, and signed the Registration Statement.

35.    Defendant Tereza Grossi ("Grossi") was a Director on the Company's Board at all relevant times. Grossi reviewed, contributed to the drafting of, and signed the Registration Statement.

36.     Defendant Jitendra Gupta ("Gupta") was a Director on the Company's Board at all relevant times. Gupta reviewed, contributed to the drafting of, and signed the Registration Statement.

37.     Defendants Kanovich, Canay, Singer, Azar, Bzurovski, Fogel, Ribeiro, Escobari, Grossi, and Gupta are sometimes referred to herein as the "Individual Defendants."

## IV.     FORMER EMPLOYEE

38.     Former Employee 1 ("FE 1") worked at the Company from March 2021 to January 2022 as a Regional Accounting Senior Analyst, from January 2022 to May 2022 as a Regional Reporting Coordinator, and from May 2022 to November 2022 as a Reporting & Consolidation Team Leader.

## V.     COMPANY BACKGROUND

39.     DLocal operates a payment processing platform for merchants worldwide with a focus on emerging markets. DLocal enables global merchants to connect with over 600 local payment methods for both cross-border and local-to-local payment processing services in over 30 countries including Mexico, Argentina, Colombia, Brazil, and Chile in Latin America; India and Indonesia in Asia; and Egypt, Nigeria and South Africa in Africa. DLocal's customers span a wide range of industries, including retail, streaming, ride hailing, financial services, advertising, traveling, e-learning, and gaming.

40.     DLocal's services include both cross-border transactions and local-to-local transactions. Cross-border transactions occur when the merchant and the customer are located in different countries. In such cases, DLocal processes the payments where the customer is located and then settles the payments in the jurisdiction and currency of the merchant. Local-to-local transactions occur when the merchant and the customer are located in the same country. In such cases, DLocal helps merchants settle transactions in the local currency.

41.     DLocal's multicurrency platform allows merchants to receive and settle cross-border transactions in the currencies of their choice. Its currency exchange application programming interface provides merchants foreign exchange transparency and a real-time view into all exchange rates needed to work on a global setup with local capabilities across emerging markets. DLocal processes substantially all of its cross-border payments through one of its primary operating subsidiaries: DLocal Ltd. (Malta), DLocal LLP (UK), and DLocal Corp (UK).

42.     DLocal earns revenue from fees charged to merchants in connection with payment processing services for cross-border and local payment transactions in emerging markets. These fees are primarily generated on a per approved transaction basis as either a fixed fee per transaction or fixed percentage per transaction.

43.     The Company's total processing value ("TPV") is the aggregate value of all payments successfully processed through DLocal's payment platform. It is a vital metric for the Company because it measures how much business the Company is generating. The Company's new merchant TPV is a vital metric because it measures new business the Company was able to bring in for a given year.

44.     The Company's "take rate" is the proportion of the Company's TPV that the Company actually earns as gross profit. Take rates are a critical metric for understanding how much money the Company actually makes on a given transaction.

45.     Although the Company does not expressly disclose its take rate in any SEC filings, the rate can be calculated based on information that the Company does disclose. Specifically, the take rate is calculated by dividing revenue by TPV. For example, in 2020, the Company reported $104,143,000 in revenue and $2,064,789,000 in TPV for a reported take rate of 5.04% ($104,143/$2,064,789).

46.     As a company which operates in over 30 countries, DLocal is subject to complex and evolving tax regimes and foreign exchange regulations. As DLocal acknowledged in its Prospectus, "because we are a multinational company conducting a complex business in many markets worldwide, we are subject to legal and operational risks related to staffing and management, as well as a broad array of local legal and regulatory requirements that could adversely affect our operations."

47.     The Company's Prospectus also acknowledges that the complex nature of its business puts a strain on its internal controls such that the Company may be adversely affected if its internal controls are not implemented or adapted to the changing regulatory environments.

## VI.    DLOCAL'S IPO AND SECONDARY OFFERING

48.     On March 2, 2021, DLocal filed a draft registration statement and preliminary prospectus. The registration statement was subsequently amended several times, with the final amended registration statement filed and declared effective on June 2, 2021 (collectively, the "IPO Registration Statement"). The IPO Registration Statement was signed by Defendants Kanovich, Canay, Singer, Azar, Bzurovski, and Fogel. The final prospectus (the "IPO Prospectus") was filed on June 4, 2021 and was signed by Defendants Kanovich and Canay.

49.     The Company closed its IPO on June 2, 2021, selling 33,823,530 Class A common shares at an offering price of $21.00 per share for gross proceeds of over $710 million.

50.     In the IPO, the Company sold approximately only 4.4 million shares for gross proceeds of $92.6 million. After underwriting fees and expenses, the Company netted proceeds of $82.6 million.

51.     By contrast, the Defendants sold 22.1 million shares in the IPO for gross proceeds of over $436 million.

52.     Defendant Kanovich sold approximately 1.5 million shares in the IPO at the offering price (net of underwriting discounts) of $19.74 per share, for gross proceeds of $28.8 million.

53.     Defendant Singer sold approximately 700,000 shares in the IPO at the offering price (net of underwriting discounts) of $19.74 per share, for gross proceeds of $14.1 million.

54.     Defendant Azar sold approximately 2.1 million shares in the IPO at the offering price (net of underwriting discounts) of $19.74 per share, for gross proceeds of $40.6 million.

55.     Defendant Bzurovski sold approximately 5.6 million shares in the IPO at the offering price (net of underwriting discounts) of $19.74 per share, for gross proceeds of $111.0 million.

56.     Defendant Fogel sold approximately 5.6 million shares in the IPO at the offering price (net of underwriting discounts) of $19.74 per share, for gross proceeds of $111.0 million.

57.     Defendant Ribeiro was a principal at General Atlantic (a private equity firm headquartered in New York), which owned 24.3% of the Company's Class A common stock before the IPO (and 21.3% after). Defendant Escobari was a managing director of General Atlantic DO B.V. (a Dutch subsidiary of General Atlantic). General Atlantic sold approximately 6.6 million shares in the IPO at the offering price (net of underwriting discounts) of $19.74 per share, for gross proceeds of $130.6 million.[2]

58.     In October 2021, the Company announced and completed a secondary offering of Class A common stock (the "Secondary Offering") in which it raised $1.6 billion. The Secondary Offering registration statement was filed on October 20, 2021 (the "Secondary Offering

---

[2] Ribeiro and Escobari disclaimed beneficial ownership of the shares held by General Atlantic except to the extent of their respective pecuniary interests therein.

Registration Statement") and was signed by Defendants Kanovich, Canay, Azar, Bzurovski, and Fogel. The final prospectus for the Secondary Offering (the "Secondary Offering Prospectus") was filed on October 21, 2021 and was signed by Defendants Kanovich and Canay.

59.    In the Secondary Offering, which closed on October 25, 2021, the Defendants sold 15.5 million Class A common shares at the public offering price of $52.25 per share, for gross proceeds of over $866 million. The Company did not sell any shares as part of the Secondary Offering

60.    Defendant Kanovich sold approximately 1.1 million shares in the Secondary Offering at the offering price (net of underwriting discounts) of $50.94 per share, for gross proceeds of $57.2 million. Between the IPO and the Secondary Offering, Defendant Kanovich sold a total of 2.6 million shares for approximately $86 million.

61.    Defendant Singer sold approximately 500,000 shares in the Secondary Offering at the offering price (net of underwriting discounts) of $50.94 per share, for gross proceeds of $27.9 million. Between the IPO and the Secondary Offering, Defendant Singer sold a total of 1.2 million shares for approximately $42 million.

62.    Defendant Azar sold approximately 1.6 million shares in the Secondary Offering at the offering price (net of underwriting discounts) of $50.94 per share, for gross proceeds of $80.7 million. Between the IPO and the Secondary Offering, Defendant Azar sold a total of 3.7 million shares for approximately $121.3 million.

63.    Defendant Bzurovski sold approximately 4.3 million shares in the Secondary Offering at the offering price (net of underwriting discounts) of $50.94 per share, for gross proceeds of $220.5 million. Between the IPO and the Secondary Offering, Defendant Bzurovski sold a total of 9.9 million shares for approximately $331.5 million.

64.     Defendant Fogel sold approximately 4.3 million shares in the Secondary Offering at the offering price (net of underwriting discounts) of $50.94 per share, for gross proceeds of $220.5 million. Between the IPO and the Secondary Offering, Defendant Fogel sold a total of 9.9 million shares for approximately $331.5 million.

65.     General Atlantic sold approximately 5.1 million shares in the Secondary Offering at the offering price (net of underwriting discounts) of $50.94 per share, for gross proceeds of $259.4 million. Between the IPO and the Secondary Offering, General Atlantic sold a total of 11.7 million shares for approximately $390 million.

66.     All told, the Defendants sold a combined total of 37.6 million shares of DLocal common stock in the IPO and Secondary Offering, for combined gross proceeds of approximately $894.4 million.

67.     Following the announcement of the Secondary Offering, DLocal's Class A common shares fell $3.33 per share, or 6.55%, to close at $47.50 on October 22, 2021.

## VII.    FALSE AND MISLEADING STATEMENTS IN THE IPO PROSPECTUS AND REGISTRATION STATEMENT

### A.    The IPO Prospectus Failed to Disclose a Known Material Trend that the Company's Take Rates Were Decreasing Ahead of the IPO

68.     The IPO Prospectus was materially false and misleading because it failed to "provide such other information that the registrant believes to be necessary to an understanding of its financial, changes in financial condition and results of operations" and to [d]escribe any known trends or uncertainties that have had or are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or incoming from continuing operations," as mandated by Item 5(D) of SEC Form 20-F ("Item 5 and the SEC's related interpretative releases thereto).

69.     The SEC has interpreted Item 5(D) as calling for the same disclosure as Item 303 of Regulation S-K (17 C.F.R. § 229.303) which requires that the Management's Discussion and

Analysis of Financial Condition and Results of Operation "must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

70.     In particular, the SEC has clarified that "companies should identify and discuss key performance indicators, including non-financial performance indicators, that their management uses to manage the business and that would be material to investors."[3]

71.     In violation of this requirement, the Company failed to disclose the known material trend that starting in 2019, the Company's business had begun to significantly shift from cross-border transactions to less profitable local-to-local transactions and as a result, at the time of the IPO, the Company's take rates were showing a downward trend.

72.     The IPO Prospectus was also materially false and misleading in that it failed to provide a discussion of all "material factors" that made an investment in the Company "speculative or one of high risk" as mandated by Item 3(D) of SEC Form-F ("Item 3") and the SEC's related interpretative releases thereto.

73.     The SEC has interpreted Item 3 as calling for the same disclosures as Item 105 of SEC Regulations S-K (17 C.F.R. §229.105) which requires, in the "Risk Factors" section of the registration statement and prospectus, a "discussion of the material factors that make an investment in the registrant or offering speculative or risky."

74.     In violation of this requirement, the Company failed to disclose the material facts that (i) at the time of the IPO, because the Company's take rates had been on a significant

---

[3] Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities and Exchange Commission Release Nos. 33-8350; 34-48960; FR-72, 68 Fed. Reg. 75056 (Dec. 29, 2003).

downward trend, and because the Company's less profitable local-to-local business was increasing at the expense of cross-border business, that downward trend was likely to continue and would materially impact the Company's profitability and (ii) as will be discussed below, the Company was at a heightened risk of violating regulatory authority in one of the nations in which it did business, including Argentina. These material known factors made an investment in the Company "speculative or risky" and should have been disclosed by the Company.

75.    Take rates are an important metric in the industry for evaluating the strength of a company's performance. The Company's reported take rate was a driver in influencing interest in the Company's common shares both before and after the IPO.[4] In a Pre-IPO analyst report titled "dLocal: IPO Preview: Go Global with dLocal," Susquehanna Financial Group highlighted take rates as a key metric when stating that DLocal was "uniquely positioned with attractive services and growth markets". Following the IPO, analysts continued to monitor DLocal's take rate. On November 16, 2021, Morgan Stanley released an analyst report titled "3Q21 Results and Conference Call Highlights" in which Morgan Stanley commented that the "market is excessively focused on take rate".

76.    The Company's take rate is calculated by dividing the Company's reported revenue by the Company's reported TPV. The Company's management regularly discussed quarterly and annual take rates during earnings calls.

77.    According to the Muddy Waters Report, which cited to interviews with a former DLocal account manager (the "Account Manager") and a former DLocal senior executive responsible for sales (the "Senior Executive"), "in 2020, [DLocal's] management was looking for volume, seemingly without regard to profitability."

---

[4] Lucy Ingham, *dLocal shows profitability in run up to IPO*, FXCintelligence (June 1, 2021).

78.    During 2020, prior to the IPO, "large global merchants were increasingly setting up local operations in DLO's core markets to avoid paying FX and other costs," which was a "shift by large MNC merchants from using DLO as a cross-border payments service to increasingly a local-to-local payment service provider." The shift in local-to-local payments had started as recently as 2019.

79.    The Muddy Waters Report claimed that by 2020, local-to-local payments had already accounted for at least 20-25% of the Company's business and was continuing to grow, a trend that was not disclosed in the Prospectus.

80.    Citing interviews with the Account Manager and the Senior Executive, the Muddy Waters Report stated that Google started processing payments with DLocal in 2020. Google's business with DLocal provided "scant profitability" because it primarily uses DLocal for local-to-local transactions. The Account Manager and the Senior Executive also explained that Google's transactions gave DLocal extremely small profits, stating that "DLO's relationship with Google started out operating at a loss, and later was running on wafer thin net margins of just a few basis points at best" (footnotes omitted).

81.    The Account Manager and the Senior Executive also told Muddy Waters that the ride sharing company Didi also became one of DLocal's largest merchants during this time. Like Google, Didi also exclusively used DLocal's less profitable local-to-local business.

82.    As a result, at the time of the IPO, the Company's take rates were on a prolonged downward trend. The following chart reflects Company's gross take rate for each quarter leading up to and including the IPO, as calculated from the revenue and TPV reported by the company in its SEC filings:

| Reporting Period | Revenue (in thousands) | TPV (in thousands) | Take Rate |
|---|---|---|---|
| 1Q20[5] | $17,995 | $388,155 | 4.64% |
| 2Q20[6] | $20,645 | $348,000 | 5.92% |
| 3Q20[7] | $30,900 | $572,000 | 5.40% |
| 4Q20[8] | $34,700 | $757,000 | 4.58% |
| 1Q21[9] | $40,256 | $925,874 | 4.35% |
| 2Q21[10] | $58,961 | $1,456,000 | 4.05% |
| 3Q21[11] | $68,600 | $1,812,000 | 3.79% |

83.    As the chart above shows, at the time of the IPO, which took place during the second quarter of 2021, the Company's quarterly take rates had been on a steady decline for a year. The Company's gross take rates had fallen 8.7% quarter-over-quarter in third quarter 2020, by 15.1% in fourth quarter 2020, and by 5.1% in the first quarter 2021, right before the IPO. The Company's net take rates had fallen quarter-over-quarter by 10.9% in third quarter 2020, by 7.5% in fourth quarter 2020, and by 8% in first quarter 2021.

84.    Notably, while the Company was aware of the decline in this important metric, it did not reveal this trend in the IPO Prospectus. Moreover, of the results described in the above

---

[5] IPO Registration Statement at 23.

[6] Form 6-K Second Quarter 2021 Financial Results filed August 19, 2021.

[7] Form 6-K Third Quarter 2021 Financial Results filed November 17, 2021.

[8] Form 6-K Fourth Quarter 2021 and Full Year Financial Results filed March 15, 2022.

[9] IPO Registration Statement at 23.

[10] Form 6-K Second Quarter 2021 Financial Results filed August 19, 2021.

[11] Form 6-K Third Quarter 2021 Financial Results filed November 17, 2021.

chart, the Prospectus only disclosed revenue, gross profit and TPV for 2020 (full year), the first quarter of 2020 and the first quarter of 2021. The Prospectus did not disclose the quarterly results for second quarter 2020, third quarter 2020, and fourth quarter 2020, even though they were known at the time of the IPO.

85.    In addition, the risk factors disclosed in the IPO Prospectus did not sufficiently and clearly explain the risk the Company was under, considering the known trend that the Company's largest merchants were increasingly using the less profitable local-to-local business. For example, the IPO Prospectus stated that:

> We have a limited operating history with financial results that may not be indicative of future performance, and our revenue growth rate is likely to slow down as our business matures.
>
> We began operations in 2016. As a result of our limited operating history, we have limited financial data that can be used to evaluate our current business, and such data may not be indicative of future performance. In particular, we have experienced periods of high revenue growth since we began selling our products and services, and we do not expect to be able to maintain the same rate of revenue growth as our business matures….

86.    These statements were false and misleading, and in violation of the requirements under Item 3(D) because the IPO Prospectus Statement failed to disclose that (1) the Company's quarterly take rates had already been declining significantly each quarter since 2Q20, and (2) the take rates were likely to continue falling due to the increasing amount of TPV coming from Google and other major merchants who were increasingly using the Company's less profitable local-to-local business.

87.    The IPO Registration Statement also stated that "[o]ur success is reflected in our rapid growth and strong profitability," and stated that the Company's revenues experienced "a growth rate of 123.7% when comparing the three months ended March 31, 2021 to the three months ended March 31, 2020 and a growth rate of 88.4% when comparing 2020 and 2019."

88.     This statement was false and misleading because it failed to disclose that although the Company's revenues were rising during that time period, its take rates, and thus, its profitability were falling because its largest merchants were increasingly using the less profitable local-to-local business.

89.     Well after the IPO, the Company acknowledged that the 2020 decline in take rates had been caused by the shift to lower margin customers. In the Company's 2021 fourth-quarter earnings call, held on March 15, 2022, Sumita Pandit, the Company's Chief Operating Officer, explained that "[t]he drop in our average take rate from 5% in 2020 to 4% in 2021 is mainly explained by changes in the underlying business. The cohorts that grew the most in 2021 were the 2018 and 2020 vintages. And these cohorts came with a lower take rate mainly driven by the business mix of higher payouts and local to local payment flows."

### B.    DLocal Overstated its Take Rates and Revenues

90.     The IPO Prospectus also misstated the Company's 2020 total revenue and take rates. In the IPO Registration Statement, the Company stated: "Our success is reflected in our rapid growth and strong profitability … Our total revenues were … $104.1 million … for 2020." The Company also reported the following:

**Key business metrics**

We review the following key metrics to evaluate our business, measure our performance, identify trends affecting our business, formulate business plans and make strategic decisions:

| | For the Three Months Ended March 31, | | For the Year Ended December 31, | |
|---|---|---|---|---|
| | **2021** | **2020** | **2020** | **2019** |
| | | (in thousands of US$) | | |
| TPV(1) | 925,874 | 388,155 | 2,064,789 | 1,287,713 |
| Revenues | 40,256 | 17,995 | 104,143 | 55,289 |

91.    This statement was false because it overstated the Company's 2020 revenues and made it appear that the Company was receiving more revenue than it actually was.

92.    Based on the financial results reported in the Registration Statement, the Company's overall take rate for 2019 was 4.29% (total revenue of $55.3 million divided by TPV of $1,288 million). That number increased to 5.04% in 2020 (total revenue of $104.1 million divided by TPV of $2,065 million).

93.    The 5.04% take rate for 2020 was a complete outlier in the payments industry. For example, Adyen NV, a Dutch payment company and DLocal's direct competitor, reported a 2020 take rate of just 1.20%.

94.    DLocal's overall take rate as reported in the Registration Statement from 2019 to 2020 is inconsistent with the Company's shift towards the less profitable local-to-local business and leads to the conclusion that DLocal was inflating its revenues in order to give the appearance of a higher take rate than it was actually achieving. Moreover, the Company's reported increase in take rate from 2019 to 2020 is inconceivable, because starting in 2020, DLocal's largest cohorts shifted from cross-border business to the less profitable local-to-local business. Accordingly, given this trend in DLocal's business, the Company's take rate should have *decreased* from 2019 to 2020, not increased.

95.    The Company's inflated take rate is likely caused by the Company having inflated its reported foreign exchange fees to be $46.7 million and its total revenue to be $104.1 million. These amounts do not accord with the Company's reporting for its 2020 foreign exchange fees and gains attributable to the Company's three main subsidiaries. These three subsidiaries reported a total of $17.6 million in foreign exchange fees, not $46.7 million, resulting in a material $29.1 million overstatement. This overstatement would have a considerable impact on the Company's

2020 take rate. When subtracting the $29.1 million overstatement from the reported revenue of $104.1 million, the Company's true take rate in 2020 was actually 3.63% (total revenue of $75 million divided by TPV of $2,065 million), not 5.04%.

96.     On August 18, 2021, the Company filed its 2021 Q2 earnings report and held an earnings call. On the earnings call, Defendant Canay discussed the Company's take rate and stated, "In 2020, pay-ins[12] had swung to a larger portion of our overall business, resulting in a higher revenue of over TPV ratio of 5%."

97.     On March 15, 2022, the Company filed its 2021 4Q and 2021 full-year earnings report, which was signed by Defendant Canay (the "March 15, 2022 Filing"), and held an earnings call. In the March 15, 2022 Filing, the Company reported revenues of $244.1 million in 2021, an increase from $104.1 million in 2020. In that same filing, the Company reported TPV of $6.049 billion in 2021, an increase from $2.065 billion in 2020.

| | Three months ended | | Twelve months ended | |
| --- | --- | --- | --- | --- |
| | December 31, 2021 | December 31, 2020 | December 31, 2021 | December 31, 2020 |
| | (in millions of US$ except for %) | | | |
| Key Performance Metrics | | | | |
| TPV | 1,856 | 757 | 6,049 | 2,065 |
| TPV growth YoY | 145% | 90% | 193% | 60% |
| Revenue | 76.3 | 34.7 | 244.1 | 104.1 |

[12] "Pay-in" means a payment transaction whereby dLocal's merchant customers receive payment from their customers.

98.    Despite a substantial increase in reported revenue and TPV from 2020 to 2021, during the subsequent earnings presentation, DLocal showed a drop in the Company's year over year take rate to 4.04% in 2021 from 5.01% in 2020. During the earnings conference call, DLocal explained the decrease in take rate was driven by its larger merchants shifting from the cross-payments services to the less profitable local-to-local payment service. The company further explained that the "cohorts that grew the most in 2021 were the 2018 and 2020 vintages. These cohorts came with a lower take rate mainly driven by their business mix of higher payouts and local to local payment flows."

99.    However, the same shift had already begun prior to the reported increase in take rates in 2020. According to Ms. Pandit, the Company's TPV brought in from 2018 and 2020 cohorts increased from 42.6% of total TPV in 2019 to 58.8% of total TPV in 2020. As explained above, these cohorts came with a lower take rate mainly driven by local-to-local payment flows.

100.    Accordingly, if take rates decrease based on an increase in local-to-local business, as the Company claimed during the 4Q21 earnings conference call, the 2020 take rate should have decreased, not increased.

101.    Further evidence that the Company inflated its revenues is the fact that it reported a disproportionate ratio of gross receivables in relation to total revenue. An often-considered indication that a Company is overstating its revenue is when there is the accumulation of accounts receivables on the balance sheet, and/or a disproportionate rate of increase between accounts receivables and revenues, since there is no cash collection for fabricated revenues. An analysis of revenue/receivables ratios suggests that DLocal's receivables were growing out of proportion with revenue.

102.    As shown in the chart below, the Company's reported gross receivables as a proportion of its revenue ballooned from just 47% in 2019 to 78% in 2021[13]:

|  | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|
| Total revenue |  | 55,289 | 104,143 | 244,120 |
| Receivables | 14,971 | 25,939 | 72,785 | 190,966 |
| Ave receivables/ revenue |  | 37% | 47% | 54% |
| Gross receivables/ revenue |  | 47% | 70% | 78% |

103.    Together with the inconsistencies of the increasing take rates and the accumulation of accounts receivables on the balance sheet, there is ample evidence that DLocal was inflating its revenues to make it appear that its business was more profitable than it was.

### C.    DLocal's Heightened Risk of Regulatory Scrutiny and Deficient Internal Controls

104.    During the Class Period, DLocal engaged in certain improper conduct and transfers abroad in violation of Argentine laws and/or regulations, including, *inter alia¸* foreign exchange regulations, which greatly increased the Company's exposure to governmental and/or regulatory scrutiny in Argentina. For example, the Company engaged in improper maneuvers in the foreign exchange market, overbilling for its digital services by creating invoices between its parent company and subsidies to avoid having to settle foreign currency from the export of its services.

105.    Throughout the Class Period, DLocal's compliance controls and procedures, including its fraud detection procedures, disclosure controls and procedures, and internal controls over financial reporting were severely deficient, which subjected the company to a heightened risk of violating applicable regulations which in turn subjected the Company to governmental and regulatory scrutiny.

---

[13] The Company's 2021 Annual Report, pages F-3 - F-4

106.    In the IPO Prospectus, the Company admitted that it had identified "material weaknesses" in its internal controls over financial reporting, because prior to the Offering, DLocal had been "a private company with limited accounting personnel and other resources to address our internal control over financial reporting and procedures." However, the Company claimed that it was implementing a remediation plan designed to improve those weaknesses:

As of December 31, 2020, we are in the process of implementing a remediation plan designed to improve our internal controls over financial reporting and to remediate the control deficiencies that resulted in the material weakness, including performing a risk-assessment process on a regular basis to identify, design, implement and re-evaluate our control activities related to internal control over financial reporting. We cannot assure you that the measures we have taken to date, and the actions we may take in the future, will be sufficient to remediate the control deficiencies that led to our material weakness in our internal controls over financial reporting or that they will prevent potential future material weaknesses. In addition, neither our management nor an independent registered public accounting firm has performed an evaluation of our internal controls over financial reporting in accordance with the provisions of the Sarbanes-Oxley Act because no such evaluation has been previously required. Had we or our independent registered public accounting firm performed an evaluation of our internal controls over financial reporting in accordance with the provisions of the Sarbanes-Oxley Act, additional material weaknesses may have been identified. If we are unable to successfully remediate our existing material weakness, or identify and remediate any future, material weaknesses in our internal control over financial reporting, the accuracy and timing of our financial reporting may be adversely affected, and consequently we may be unable to timely file periodic reports in compliance with securities laws and applicable stock exchange listing requirements, investors may lose confidence in our financial reporting and our share price may decline as a result.

107.    In the 2021 Annual Report, the Company stated that its management had completed the implementation of the remediation plans to improve its control deficiencies that resulted in a material weakness in its internal controls over financial reporting:

**Remediated Material Weakness**

As of the date of this annual report, our management has completed the implementation of the remediation plans designed to improve our internal controls over financial reporting and to remediate the control deficiencies that resulted in the material weakness, as follows:

• We designed and implemented the three lines of defense model, by adding compliance and risk management as the second line of defense and internal audit as the third line. All of these areas performed training and awareness programs to the board of directors, senior management and the rest of our staff on risk, compliance and internal controls topics.

• We hired additional finance, administration, accounting, assurance, and IFRS & SEC reporting specialists who possess public company accounting and reporting technical expertise. A portion of their job responsibilities is to perform reviews, reconciliations and other financial reporting monitoring controls.

• We conducted a project for the design, implementation and maintenance of our internal control system over financial reporting in accordance with COSO, and best practice.

• We performed a risk-assessment process on a regular basis to identify, design, implement and re-evaluate our control activities related to internal control over financial reporting.

108.    While touting its remediation plan over its internal controls of financial reporting to the public, DLocal failed to disclose its continuing lack of internal controls over compliance, which exposed the Company to a higher risk of regulatory scrutiny.

109.    The Company's global treasury functions rely heavily on manual operations which expose the Company to a high risk of material errors across all its key operational areas as well as an increased likelihood of control deficiencies.

110.    Instead of investing heavily in its information technology systems, DLocal instead relied on manual operations in a complex platform which reconciled large volumes of pay-ins and pay-outs on spreadsheets. As the Muddy Waters Report explained, DLocal has "poor controls including an over-reliance on manual processes." According to FE 1, there were "a lot of problems with reconciliation, because all transactions were manual." FE 1 observed that this deficiency could have resulted in incorrect TPV reporting.

**D.    DLocal's Lack of Fraud Detection and Internal Controls Allowed Academiland to Use its Platform to Illegally Wire Funds from Argentina to the United States**

111.    In the IPO Prospectus and subsequent SEC filings, DLocal touted its fraud detection systems, stating that it believed it had created "a best-in-class fraud detection model" which included "additional checks and rules … to higher risk or higher value transactions."

112.    However, during the Class Period, Academiland, which purported itself as an online educational services company, was using DLocal's platform to register users who had never contracted its services. Academiland would then wire money to the U.S. again using DLocal's platform.

113.    While admitting that it had weak internal control over financial reporting, the Company did not disclose that its internal controls over fraud detection and regulatory compliance were severely deficient. This misled investors into believing that the Company had robust internal controls in terms of detecting fraud.

**E.    DLocal's Materially Misleading Risk Warnings in the Prospectus**

114.    In the IPO Prospectus, DLocal made boilerplate representations regarding the Company's exposure to regulatory foreign exchange control risks in Argentina and downplayed those risks by asserting that such risks merely "may" or "could" materialize, stating in relevant part:

> We are subject in certain jurisdictions where we have operations, such as Argentina, …, to the risk that regulatory authorities in or outside such jurisdictions **_may_** impose exchange controls or restrictions on the movement of capital, including on transactions involving transfers of funds from such jurisdictions, as well as restrictions on repatriation of funds or repatriation of profits on subsidiaries from such jurisdictions, which **_may_** restrict the amount of funds that can be transferred or dividends that can be paid upstream to us from such jurisdictions . . . **_In addition, the Argentine economy has experienced balance of payment deficits and shortages in foreign exchange reserves, and the government has responded by restricting the ability of companies to convert local currencies into foreign currencies and imposing other exchange controls. From time to time, we net_**

***funds, which <u>could</u> be challenged by regulators due to foreign exchange controls. These restrictive exchange control measures prevent or severely restrict the access to exchange for foreign currencies, such as U.S. dollars and the ability to remit them out of the country (which measures include prior approval by the local central bank, which may be denied at its discretion) and also restrict the ability to hold foreign currency in cash within the relevant jurisdiction***. If we are unable to transfer such amounts from such jurisdictions when and as needed, we will remain subject to foreign exchange risk relating to such retained funds denominated in local currencies (including merchant funds held by us), to the extent we cannot convert such funds into other currencies (whether as a result of foreign exchange restrictions in such jurisdictions, or any restrictions on transferring funds out of such jurisdictions), which ***may*** adversely impact our ability to settle such transactions and subject us to significant foreign exchange risk, which ***could*** have a material adverse effect on our results of operations, liquidity and financial condition.

…

In addition, as the Argentine fiscal deficit has increased and Argentine Central Bank reserves have decreased, the Argentine government has responded by increasing tax rates, and by reinstating on foreign exchange controls, to which we ***may*** be subject in the emerging markets in which we operate.... Although we have generally been able to offset the heightened foreign exchange and exchange control risks in Argentina with higher overall fees on transactions conducted through our Argentine operations, the persistently poor economic conditions in Argentina, in particular the significant foreign exchange rate volatility of the Argentine peso and ***uncertainty regarding exchange control measures <u>could</u> have an adverse effect on our business, financial condition and results of operations***.

(Emphasis added.)

115.    Additionally, the Company reported that it "cannot assure … that we will continue to be found in operating in compliance with all applicable financial services regulations, foreign exchange controls, anti-money laundering and compliance regulations … to which we ***may*** be subject" (emphasis added).

116.    These risk warnings were false and misleading because they only warned that risks "may" materialize, when in fact, because of the Company's deficient compliance and internal controls, the Company was at heightened risk of regulatory scrutiny and/or charges of improper conduct relating to its foreign exchange practices.

117.    In addition, the IPO Prospectus claimed that the Company would "continue to invest in our existing infrastructure, develop and improve our internal controls and compliance mechanisms, create and improve our reporting systems, and address issues in a timely manner as they arise." The IPO Prospectus also added "[i]n order to manage our growth effectively, we must continue to … improve our internal controls and compliance mechanisms, create and improve our reporting systems, and address issues in a timely manner as they arise."

118.    These representations were false and misleading because the Company's fraud detection, internal controls and compliance systems were severely deficient, the Company was not, in fact, continuing to invest in its infrastructure and internal controls, and as a result, the Company was at a heightened risk of regulatory scrutiny for violating laws and/or regulations, as well as facilitating fraud in the countries in which it operates, such as Argentina.

## VIII.    POST-IPO MATERIAL MISREPRESENTATIONS AND MISSTATEMENTS

119.    In the October 21, 2021 Secondary Offering Prospectus, the Company made boilerplate statements regarding the Company's exposure to regulatory foreign exchange control risks in Argentina, but downplayed those risks by asserting that such risks merely "may" or "could" materialize, stating in relevant part:

> We are subject in certain jurisdictions where we have operations, such as Argentina, … to the risk that regulatory authorities in or outside such jurisdictions **may** impose exchange controls or restrictions on the movement of capital, including on transactions involving transfers of funds from such jurisdictions, as well as restrictions on repatriation of funds or repatriation of profits on subsidiaries from such jurisdictions, which **may** restrict the amount of funds that can be transferred or dividends that can be paid upstream to us from such jurisdictions … **In addition, the Argentine economy has experienced balance of payment deficits and shortages in foreign exchange reserves, and the government has responded by restricting the ability of companies to convert local currencies into foreign currencies and imposing other exchange controls. From time to time, we net funds, which could be challenged by regulators due to foreign exchange controls. These restrictive exchange control measures prevent or severely restrict the access to exchange for foreign currencies, such as U.S. dollars and the ability to remit them out of the country (which measures include prior approval by the local**

**central bank, which may be denied at its discretion) and also restrict the ability to hold foreign currency in cash within the relevant jurisdiction.** If we are unable to transfer such amounts from such jurisdictions when and as needed, we will remain subject to foreign exchange risk relating to such retained funds denominated in local currencies (including merchant funds held by us), to the extent we cannot convert such funds into other currencies (whether as a result of foreign exchange restrictions in such jurisdictions, or any restrictions on transferring funds out of such jurisdictions), which **may** adversely impact our ability to settle such transactions and subject us to significant foreign exchange risk, which **could** have a material adverse effect on our results of operations, liquidity and financial condition.

(Emphasis added.)

120.    Additionally, the Company reported that it "**may** not be operating in compliance with all financial services regulations, foreign exchange controls, anti-money laundering and compliance regulations … to which we **may** be subject" (emphasis added).

121.    The above statements were false and misleading because they warned only that the described risks "may" materialize, when in fact, those risks had already come to fruition and the Company was already at heightened risk of regulatory scrutiny relating to its foreign exchange practices, including for violations of applicable law.

122.    In addition, the Secondary Offering Prospectus touted that the Company would "continue to invest in our existing infrastructure, develop and improve our internal controls and compliance mechanisms, create and improve our reporting systems, and address issues in a timely manner as they arise." The Secondary Offering Prospectus also added "[i]n order to manage our growth effectively, we must continue to … improve our internal controls and compliance mechanisms, create and improve our reporting systems, and address issues in a timely manner as they arise."

123.    The Secondary Offering Prospectus assured investors that the Company's "innovative, technology-focused, and data-driven approach" to help global merchants get paid and make payments would not "compromis[e] risk management and fraud detection."

124.    These representations were false and misleading because the Company's fraud detection, internal controls and compliance systems were severely deficient, and therefore the Company was at a heightened risk of violating laws and/or regulations as well as facilitating fraud in one of the number of countries it did business in, including Argentina.

125.    On May 2, 2022, the Company filed the 2021 Annual Report which was signed by Defendant Canay. In the 2021 Annual Report, the Company repeated the above false and misleading statements about the Company's exposure to regulatory foreign exchange control risks in Argentina, but downplayed those risks by asserting that such risks merely "may" or "could" materialize.

126.    Additionally, the Company reported that it "***may*** not be operating in compliance with all financial services regulations, foreign exchange controls, anti-money launder and compliance regulations … which we ***may*** be subject" (emphasis added).

127.    These risk warnings failed to disclose actual known risks that because of the Company's deficient compliance and internal controls, the Company was at heightened risk of regulatory scrutiny and/or charges of improper conduct relating to its foreign exchange practices.

128.    In addition, the 2021 Annual Report touted that the Company would "continue to invest in our existing infrastructure, develop and improve our internal controls and compliance mechanisms, create and improve our reporting systems, and address issues in a timely manner as they arise." The 2021 Annual Report also added "[i]n order to manage our growth effectively, we must continue to … improve our internal controls and compliance mechanisms, create and improve our reporting systems, and address issues in a timely manner as they arise."

129.    The 2021 Annual Report assured investors that the Company's "innovative, technology-focused, and data-driven approach" to help global merchants get paid and make payments would not "compromise[e] risk management and fraud detection."

130.    These representations were misleading in that the Company's fraud detection, internal controls and compliance systems were severely deficient, and therefore the Company was at a heightened risk of violating laws and/or regulations as well as facilitating fraud in one of the number of countries it did business in, including Argentina.

131.    Following the 2021 Annual Report, DLocal's Class A common shares rose over a period of two days $1.52 per share, or 6.6%, to close at $25.52 on May 4, 2022.

## IX.    THE TRUTH BEGINS TO EMERGE BUT DEFENDANTS CONTINUE TO MISLEAD INVESTORS

132.    On November 16, 2022, the Muddy Waters Report was released. The Report detailed numerous deficiencies in the Company's internal controls:

> DLO's choice on governance and operations seems less-than-ideal if the goal is to operate an efficient global payment processing business, capable of handling many billions of dollars per year in transactions. If, on the other hand, the goal is to milk the munificence of the public markets while presenting significant risks of fraudulent financial reporting and/or co-mingling of client and company funds, then DLO makes much more sense. DLO strikes us as being unduly complex, having ***poor controls including an over-reliance of manual processes, deficiently governed, and a regulatory arbitrageur***."

> …

> [I]ts financial operations including its global treasury functions rely heavily on manual operations and ***expose the company to high risk of material errors*** across all its key operations areas, ranging from payment amounts, duplicate payments, ***FX rate calculations***, withholding taxes, etc. as well as an increased likelihood of control deficiencies.

(Emphasis added.)

133.    The Muddy Waters Report also asserted that DLocal's 2020 take rates did not make sense given the composition of the Company's customers. It identified the inflated foreign

exchange service fee, which makes up the majority of the Company's revenues, as the likely culprit for the inconsistent reporting. The Muddy Waters Report stated that the fact that the Company's 2020 take rates didn't compress was highly suspect, stating that the Company's take should have fallen because:

> DLO's lowest take rate cohorts, 2018 and 2020, increased their collective share of TPV from 43% in 2019 to 59% in 2020. Each cohort has a 2020 Take Rate significantly lower than DLO's reported overall Take Rate.
>
> …
>
> In 2020, DLO apparently began strongly ramping up its local-to-local business, which has a much lower margin.… We understand Google began using DLO in mid-2020, and it quickly became its largest customer by TPV. However, we also understand that Google negotiated very low fees, and that is principally uses DLO for local-to-local transactions.

134.    Following the release of the Muddy Waters Report, DLocal's Class A common share price fell $10.76 per share, or 50.71%, to close at $10.46 per share on November 16, 2022.

135.    On December 20, 2022, the Company published a press release (the "December 20 Release"), which was signed by Defendant Canay, purporting to refute certain aspects of the Muddy Waters Report, which in relevant part stated:

> Montevideo, Uruguay, December 20, 2022 – Dlocal Limited ("dLocal," the "Company," "we," "us," and "our") (Nasdaq: DLO), a technology-first payments platform enabling global enterprise merchants to connect with billions of consumers in emerging markets, today announced a response to allegations made in a report by short seller Muddy Waters Capital, dated November 16, 2022 (the "Report"), as well as a share buyback program and proposed share purchases by key shareholders and senior management team.
>
> We value corporate governance and transparency, and in that spirit have engaged in a thorough, fully resourced set of processes to review the short seller's allegations. Our Board of Directors requested that management with the assistance of the Company's professional advisors, including a global investigations and advisory services firm, conduct an internal review of the allegations made by the Report.
>
> In addition, our Audit Committee, consisting solely of independent directors, is conducting a review of the allegations in the Report with the assistance of

independent counsel and an independent global expert services and forensic accounting advisory firm. That review is substantially complete.

We will not engage in a tit-for-tat rebuttal of the numerous factual errors or inflammatory, misleading statements set forth in the Report, which collectively demonstrate a fundamental lack of understanding of our financial statements and business. However, based on the two separate reviews, we do wish to set the record straight with respect to the following:

• **Take Rates/FX Fees.** The Report draws comparisons between dLocal and other companies, which are inaccurate and unsubstantiated.

\* \* \* \* \*

The Company will continue its focus on delivering outstanding service and results for its customers, shareholders and other stakeholders.

136.    The December 20th Release was false and/or misleading because it led the public to believe that the Muddy Waters Report lacked any factual basis, and that the Company's 2020 take rates and revenues had not been inflated.

137.    Importantly, the December 20 Release did not directly address how the Company's 2020 take rate increased from 2019 when a larger percentage of its business was coming from the less profitable local-to-local transactions.

138.    Following the December 20 Release, DLocal's Class A common share price rose $1.41 per share, or 10.69%, to close at $14.60 per share on December 20, 2022.

139.    On April 5, 2023, the Company filed its annual report for the year 2022 (the "2022 Annual Report"), which was signed by Defendant and Canay.

140.    In the 2022 Annual Report, the Company made boilerplate statements regarding the Company's exposure to regulatory foreign exchange control risks in Argentina and downplayed those risks by asserting that such risks merely "may" or "could" materialize, stating in relevant part:

We are subject in certain jurisdictions where we have operations, such as Argentina, … to the risk that regulatory authorities in or outside such jurisdictions **may** impose

exchange controls or restrictions on the movement of capital, including on transactions involving transfers of funds from such jurisdictions, as well as restrictions on repatriation of funds or repatriation of profits on subsidiaries from such jurisdictions, which *may* restrict the amount of funds that can be transferred or dividends that can be paid upstream to us from such jurisdictions … ***In addition, the Argentine economy has experienced a balance of payment deficits and shortages in foreign exchange reserves, and the government has responded by restricting the ability of companies to convert local currencies into foreign currencies and imposing other exchange controls. During 2022, the Argentine central bank unexpectedly limited the amount of funds that could be expatriated from Argentina, based on the volumes expatriated in previous years which created certain operational problems until we were able to reach a resolution with the central bank. Similar actions may occur in the future, including by central banks of other countries, and we may not be unable to adequately address such restrictions.*** From time to time, we net funds, which *could* be challenged by regulators due to foreign exchange controls .… If we are unable to transfer such amounts from such jurisdictions when and as needed, we will remain subject to foreign exchange risk relating to such retained funds denominated in local currencies (including merchant funds held by us), to the extent we cannot convert such funds into other currencies (whether as a result of foreign exchange restrictions in such jurisdictions, or any restrictions on transferring funds out of such jurisdictions), which **may** adversely impact our ability to settle such transactions and subject us to significant foreign exchange risk, which *could* have a material adverse effect on our results of operations, liquidity and financial condition.

(Emphasis added.)

141.    Additionally, the Company reported that it "***may*** not be operating in compliance with all financial services regulations, foreign exchange controls, anti-money laundering and compliance regulations … to which we ***may*** be subject" (emphasis added).

142.    These risk warnings failed to disclose actual known risks that because of the Company's deficient compliance and internal controls, the Company was at heightened risk of regulatory scrutiny and/or charges of improper conduct relating to its foreign exchange practices.

143.    In addition, the 2022 Annual Report touted that the Company would "continue to invest in our existing infrastructure, develop and improve our internal controls and compliance mechanisms, create and improve our reporting systems, and address issues in a timely manner as they arise." The 2022 Annual Report also added "[i]n order to manage our growth effectively, we

must continue to … improve our internal controls and compliance mechanisms, create and improve our reporting systems, and address issues in a timely manner as they arise."

144.    The 2022 Annual Report assured investors that the Company's "innovative, technology-focused, and data-driven approach" to help global DLocal merchants get paid and make payments would not "compromis[e] risk management and fraud detection."

145.    These representations were misleading in that the Company's fraud detection, internal controls and compliance systems were severely deficient, and therefore the Company was at a heightened risk of violating laws and/or regulations as well as facilitating fraud in one of the number of countries it did business in, including Argentina.

146.    Following the 2022 Annual Report, DLocal's Class A common shares rose over a period of two trading days $1.70 per share, or 13.6%, to close at $14.19 on April 10, 2023.

147.    On May 26, 2023, the Argentine news outlet Infobae published an article titled "The Government is investigating only Uruguayan unicorn for allegedly defrauding the Argentine State; they are considering denouncing it to US authorities" (the "May 26 Infobae Article").[14] The May 26 Infobae Article stated in relevant part:

> This involves the only Uruguayan unicorn, as tech companies are called when they reach a market value of over 1 billion USD. It's also the only Uruguayan company traded on Wall Street. Previously accused of fraudulent activities, fintech dLocal is now being investigated by the Argentine government for improper maneuvers in the foreign exchange market and transactions made for the purpose of "currency leakage." These maneuvers, which would directly constitute a scam, are worth at least 400 million USD, as official sources estimated to Infobae.
>
> "The company works as a mere instrument to take advantage of the gap in exchange rates to take dollars abroad with operations that aren't reflected in its accounting. There are practically no fixed assets on the company's balance sheets and they only

---

[14] All quotations from the Infobae and Clarín articles herein have been translated into English from their original format in Spanish.

list rents for what would be their operating address," sources from the government told this media outlet.

"They receive overseas invoices from their parent company, issue b-type invoices to foreign clients to justify income, and invoice companies within the same group. By issuing such invoices, they avoid having to settle foreign exchange from that export of services," they detailed.

Sources from Customs, the control entity lead by Guillermo Michel, reported that they are considering notifying the Securities and Exchange Commission (SEC), which regulates Wall Street, of the presumed fraud through the US Embassy in Buenos Aires. They also seek to obtain information vía FinCEN, the control network of financial crimes at the US Treasury, and from Homeland Security Investigations (HSI) to establish the beneficiaries of the transfers and determine the route taken by the money that left Argentina took.

In addition to Customs, Argentina's Central Bank, the Commerce Secretary, the AFIP and the Financial Crime Unites also participated in this investigation.

This Friday after 12 PM, one of the company's founders, Sergio Fogel, made statements to Montevideo Portal that were republished in EL Observador, assuring that: "There is no open case. We checked with the attorneys and there in nothing in the official registers. We are a company that's audited and reviewed with a microscope, and if there's an investigation we're going to cooperate. Today, there isn't. We heard of this through the press, so we're functioning and working as normal and will continue to do so."

The company is registered in Malta, it has a market value of some 4 billion USD and its local activity "is rife with intercompany operations," according to local authorities. In other words, it sells services to itself. "98% of its income comes from services provided to dLocal Corp LLP and dLocal LTD. The currency transfers are primarily to Malta and Great Britain and the main beneficiaries are dLocal Corp. LLP, dLocal Limited and Dlocal LLP," as was explained.

As far as this media outlet could verify, the AFIP sent an inquiry on May 19 to the address of dLocal Argentina SA, on the first floor on the 1600 block of Thames Street, in the middle of the Palermo Soho neighborhood. "That first floor is not easily identifiable from outside… and it doesn't look like the address of a business," stated official sources.

This inquiry obligated the company to provide details about the request of transfers abroad for importation of services rendered in 2022 (date, amount, beneficiary, country, etc) and documentation accrediting these requests: (invoices and contracts with beneficiaries). The five business days the company was given to present these papers have not yet passed.

(Internal images omitted.)

148.    The same day, during intraday trading hours, DLocal issued a press release in response to the May 26 Infobae Article, characterizing it as "misleading" and "factually incorrect" and stating, in relevant part:

> Today we are subject to a set of misleading allegations in an article published by Infobae, who has not reached out to the company for comments, about an alleged noncompliance with expatriation rules in Argentina. dLocal operates in the payments industry and is regulated by government authorities across its 40 geographies. The referred article is factually incorrect:
>
> dLocal processes payments for global merchants. Our activities are subject to government regulations specific to each currency being exchanged. In Argentina, expatriation of funds are conducted through regulated parties that follow the Central Bank of Argentina rules, containing detailed information at a payment transaction level. Funds expatriated from Argentina are settled to global merchants, net of taxes.
>
> As part of our day-to-day activities, we are in close contact with authorities and there is a continuous flow of information. To the extent we are notified by authorities in Argentina (or any other geography), we engage meaningfully and cooperate with any requests from regulatory authorities. As of today, we have not been notified by any Argentinian authority regarding foreign exchange investigation.
>
> We continue to process payments normally in Argentina. We have been operating in the country since 2016 and have a solid local presence with over 150 employees across numerous offices.
>
> We will maintain our focus on delivering outstanding service and results for our customers, shareholders and other stakeholders. We will not be distracted by misleading allegations. dLocal is committed to the integrity of all its business activities and will continue to focus on providing the best and most comprehensive solution for our global merchants in each market in which we operate.

149.    This statement was false and misleading because by claiming that the Company was "in close contact with authorities" and denying any investigation, the Company implied that it was not in fact being investigated, and moreover, led the public to believe that it was in compliance with Argentinian laws and regulations.

150.    Following these developments, DLocal's Class A common share price fell $2.39 per share, or 17.32%, to close at $11.41 per share on May 26, 2023.

151.    On May 30, 20223, Infobae published an article titled "The Justice Department confirmed it is investigating the unicorn dLocal for allegedly defrauding the State and money laundering" (the "May 30 Infobae Article"), in which Infobae confirmed the allegations in the May 26 Infobae Article that the Argentine authorities were investigating DLocal. The May 30 Infobae Article stated in relevant part:

> Days ago, Infobae exclusively recounted how the Argentine government targeted the fintech dLocal for allegedly defrauding the Argentine State and that it was analyzing denouncing it in the US. It is estimated that the overbilling of digital services operations would be at least USD 400 million.
>
> Today, it was revealed that the Argentine justice system is investigating the company for possible fraud and money laundering. "Without meaning to exhaust the possible legal consequences of the events that still need to be investigated, I consider that the actions carried out by individuals at the dLocal firm constitute the crime of defrauding public administration…" states the complaint accessed by this media outlet.
>
> In this context, the prosecutor has requested a series of evidentiary measures, including lifting the startup's banking and fiscal confidentiality.
>
> Finally, Marijuan requests that "once this information is collected and the individuals responsible for the company and the registered operations conducted in our country are identified, a patrimonial report on the company and individuals in our country (declared movable and immovable assets, income, holdings, etc.) should be prepared."

152.    On June 5, 2023, DLocal filed a Form 6-K, which was signed by Defendant Canay, with the SEC, disclosing that the Company had received several inquiries from the Argentine government concerning its business practices in the country, stating, in relevant part:

> On May 26, 2023, Dlocal . . . was the subject of an article published by Argentine news outlet Infobae. The article, on which we were not contacted for comment prior to publication, alleged that the Company failed to comply with certain expatriation rules in Argentina and, as a result, was being investigated by the Argentine government. The Company issued a public response the same day, explaining, among other things, that the Company was continuing to process payments normally in Argentina, and that, it operates in close contact with regulatory authorities and engages meaningfully and cooperatively with any requests for information received therefrom. As Argentine foreign exchange regulations have changed numerous times in recent years in light of the scarcity of U.S. dollars, the

Company has sought to adapt its operations in response to those changes. The Company continues to process payments normally, and intends to continue to operate, in Argentina.

…

***The Company received a request for information from Argentine customs authorities, although the Company notes that expatriation rules and foreign exchange operations are regulated by the Argentine Central Bank.***

***On June 1, 2023, at the close of business, the Company confirmed with a local Argentine court that a petition for inquiry had been filed by an Argentine prosecutor on May 30, 2023 in response to the same article published by the Argentine news outlet seeking information using as a basis for the request the above-mentioned article.***

The Company intends to respond to any and all requests for information from regulatory authorities to demonstrate that it has acted in accordance with applicable regulations.

(Emphases added.)

153.    On June 5, 2023, following the press release, DLocal's Class A common shares closed at $9.82, which was $11.18, or 53.24% lower than its IPO price.

## X.    POST-CLASS PERIOD DEVELOPMENTS

154.    On June 15, 2023, DLocal issued a press release revealing that it was in fact "engag[ing] with senior representatives of the Argentine federal government to discuss, among other matters, the manner in which dLocal operates in the country, ***including dLocal's compliance with foreign exchange regulations***" (emphasis added).

155.    Then, on September 15, 2023, Infobae published an article titled "The government denounced an alleged fraud to access official dollars and transfer them to the US via unicorn dLocal" in which it provided further specifics of the investigation into DLocal, which implicated the Company in facilitating a fraud by one of its customers, Academiland:

Now, as part of side investigations linked to the fintech company, a case has emerged involving an alleged online educational services company known as Academiland LLC and/or Be U Institute, which recorded transactions under the

names of users who never purchased their services. According to official sources, there were even 20 individuals who had died before the date of purchase.

"The Delaware-based firm transferred the money to the U.S. through dLocal Argentina S.A. The objective was to access official dollars and take them out of the country. It simulated the purchase of services that not only were not provided but were sustained through the use of a database with peculiarities that suggest a lack of legality. Customs raided the homes of the alleged owners of Academiland LLC, the educational company, and seized documentation and computer equipment," it was reported.

Customs analyzed 9,304 payment transactions conducted by the alleged educational institution, totaling $395 million. It is estimated that each of these transactions corresponded to payments from local students, but all of them were made using credit cards. All other transactions were paid in cash at payment centers and against an account with dLocal. Agents took a sample of 800 users, analyzed the data of the individuals who purportedly paid for services, and contacted them through a circular to verify the information provided. All respondents confirmed that they never purchased any goods or services from Academiland.

"There was never any service; they made everything up. And we have other bigger cases, around ten at least. We continue to investigate these fake companies and those who allowed the transfers abroad. Additionally, the code used for these transactions was S22, corresponding to 'other business services,' a category that does not relate to the nature of these funds, which were meant for education," stated Customs sources suspecting a connection between Academiland and dLocal.

156.    On September 17, 2023, the Uruguayan news site Clarín published an article titled

"Uruguayan unicorn dLocal in the government's sights: accused of "leaking" $400 million,"

adding more insight into the investigation involving DLocal and Academiland:

The Argentine government's investigation against the Uruguayan unicorn dLocal has advanced in recent days: now Customs has found alleged "fraudulent payments abroad associated with educational services company." The case against the Uruguayan fintech … had started earlier this year, when the Argentine government had filed a criminal complaint for an overbilling of digital services that would reach US$ 400 million. Recently, Customs agents analyzed the drafts associated with the platform and discovered that one of their clients, a company called Academiland LLC, had made payments to people who had never hired their services. In fact, **at least 20 deceased people appeared on the** list of beneficiaries of these payments.

…

According to sources close to the case, an analysis of the sample of 800 users shows that about twenty of them are inheritances, whose date of death is prior to the date

of acquisition of the services. In addition, a list of supposed students includes Customs employees, a member of the Federal Justice Department, and people working in the media. All of them, when questioned by the Courts, said that they had not hired the company's services. The National Prosecutor's Office for Criminal and Correctional Matters No. 1, headed by Dr. Ramiro Gonzalez, denounced the two members of Academiland LLC for illegitimately accessing or violating confidentiality systems to a personal data bank, for fraud to the detriment of a public administration and for money laundering. The thesis for the Prosecutor's Office is that this company was set up to acquire dollars at the official value and transfer them to the United States, "simulating the acquisition of services that not only were not rendered but were sustained through the use of a database with particularities that make us presume its lack of legality."

…

Recently, the Argentinian Pedro Arnt, formerly of Mercado Libre, took over as CEO of [DLocal]. In a statement, the company assured that "it is collaborating in a constructive manner and sharing key information, with the investigation carried out by the Direccion General de Aduanas (DGA) on the operation that a client carried out through the platform until it was detected by the alarms raised by the company's controls." "As an affected party, dLocal is fully interested in getting to the bottom of this investigation and will continue to actively collaborate as it has been doing with the authorities involved, submitting essential evidentiary material for the resolution of the case."

## XI. CLASS ACTION ALLEGATIONS

157.    Lead Plaintiff brings this action as a class action under Federal Rules of Civil Procedure 23(a) and (b)(3), individually and on behalf of all those who purchased or otherwise acquired DLocal securities pursuant and/or traceable to the IPO, and/or purchased DLocal securities during the Class Period. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

158.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, DLocal securities were actively traded on the NASDAQ. While the exact number of Class members is unknown at this time and can be

ascertained only through discovery, Lead Plaintiff believes there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from the records maintained by DLocal or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

159.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

160.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interest antagonistic to or in conflict with those of the Class.

161.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the Defendants violated the Securities Act of 1933;

(b)    Whether the Defendants participated in and pursued the wrongful activities complained of herein;

(c)    Whether the Prospectus and Registration Statement issued in connection with the IPO were materially false and misleading or omitted to state material facts about DLocal;

(d)    Whether Defendants acted with due care in misrepresenting or omitting to state material information concerning DLocal;

(e)    Whether Defendants violated the Securities Exchange Act of 1934;

(f)      Whether Defendants' press releases, earnings call statements and SEC filings contained materially false and misleading statements about DLocal and its business; and

(g)      The extent of damages sustained by the members of the Class and the appropriate measure of damages.

162.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

163.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

164.    The questions of law or fact common to the Class predominate over any questions affecting individual members of the Class, such that a class action is superior to other available methods for fairly and efficiently adjudicating this controversy. There will no difficulty in managing this action as a class action.

## COUNT I

**(Violations of Section 11 of the Securities Act against all Defendants)**

165.    Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

166.    The claims set forth herein do not sound in fraud.

167.    This count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

168.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statement of material facts, omitted to state other facts necessary to make statements made not misleading, and omitted to state material facts required to stated therein.

169.     These Securities Act claims expressly do not make any allegations of fraud or scienter. These Securities Act claims are not based on any allegation that any Defendant engaged in fraud or any other deliberate and intentional misconduct.

170.     DLocal was the registrant for the IPO. Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

171.     As issuer of the shares, DLocal is strictly liable to Plaintiff and the Class for the misstatements and omissions.

172.     None of the Individual Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

173.     By reasons of the conducted herein alleged, each Individual Defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

174.     Named Plaintiff acquired DLocal securities pursuant and/or traceable to the Registration Statement for the IPO.

175.     As a result of Defendants' false and misleading statements, Class members have sustained damages. The value of DLocal securities has declined substantially due to Defendants' violations.

## COUNT II

**(Violations of Section 15 of the Securities Act against the Individual Defendants)**

176.     Lead Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

177.    Individual Defendants, by virtue of their offices, directorship, and specific acts, were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of DLocal within the meaning of Section 15 of the Securities Act. Individual Defendants had the power and influence and exercised the same to cause DLocal to engage in the acts described herein.

178.    Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Lead Plaintiff and the Class.

179.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Lead Plaintiff and the Class for damages suffered.

180.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

### COUNT III

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Company, and Defendants Kanovich and Canay)

181.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

182.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of DLocal

securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire DLocal securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

183.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for DLocal securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about DLocal's finances and business prospects.

184.    By virtue of their positions at DLocal, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

185.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers

and/or directors of DLocal, the Defendants Kanovich and Canay had knowledge of the details of DLocal's internal affairs.

186.    Defendants Kanovich and Canay are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of DLocal. As officers and/or directors of a publicly-held company, Defendants Kanovich and Canay had a duty to disseminate timely, accurate, and truthful information with respect to DLocal's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of DLocal securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning DLocal's business and financial condition, which were concealed by Defendants, Lead Plaintiff and the other members of the Class purchased or otherwise acquired DLocal securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

187.    During the Class Period, DLocal securities were traded on an active and efficient market. Lead Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of DLocal securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiff and the

Class, the true value of DLocal securities was substantially lower than the prices paid by Lead Plaintiff and the other members of the Class. The market price of DLocal securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and Class members.

188.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

189.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT IV

**(Violations of Section 20(a) of the Exchange Act Against Defendants Kanovich and Canay)**

190.    Lead Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

191.    During the Class Period, Defendants Kanovich and Canay participated in the operation and management of DLocal, and conducted and participated, directly and indirectly, in the conduct of DLocal's business affairs. Because of their senior positions, the Individual Defendants knew the adverse non-public information about DLocal's misstatement of income and expenses and false financial statements.

192.    As officers and/or directors of a publicly owned company, Defendants Kanovich and Canay had a duty to disseminate accurate and truthful information with respect to DLocal's

financial condition and results of operations, and to correct promptly any public statements issued by DLocal that had become materially false or misleading.

193.    Because of their positions of control and authority as senior officers, Defendants Kanovich and Canay were able to, and did, control the contents of the various reports, press releases and public filings that DLocal disseminated in the marketplace during the Class Period concerning DLocal's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause DLocal to engage in the wrongful acts complained of herein. Defendants Kanovich and Canay, therefore, were "controlling persons" of DLocal within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of DLocal securities.

194.    Defendants Kanovich and Canay, therefore, acted as a controlling person of DLocal. By reason of their senior management positions and/or being directors of DLocal, Defendants Kanovich and Canay had the power to direct the actions of, and exercised the same to cause, DLocal to engage in the unlawful acts and conduct complained of herein. Defendants Kanovich and Canay exercised control over the general operations of DLocal and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

195.    By reason of the above conduct, Defendants Kanovich and Canay are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by DLocal.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Federal Rule of Civil Procedure 23, and certifying Lead Plaintiff as Class Representative;

B.      Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the action and transaction alleged herein;

C.      Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.


Dated: March 18, 2024                    Respectfully submitted,

                                         POMERANTZ LLP

                                         */s/ Murielle J. Steven Walsh*
                                         Jeremy A. Lieberman
                                         Murielle J. Steven Walsh
                                         Jared Rabinowitz
                                         600 Third Avenue, 20th Floor
                                         New York, New York 10016
                                         Telephone: (212) 661-1100
                                         Facsimile: (917) 463-1044
                                         Email: jalieberman@pomlaw.com
                                         Email: mjsteven@pomlaw.com
                                         Email: jrabinowitz@pomlaw.com

                                         *Counsel for Paulette Laurenzi and Proposed*
                                         *Lead Counsel for the Class*

                                         PORTNOY LAW FIRM
                                         Lesley F. Portnoy
                                         1800 Century Park East, Suite 600
                                         Los Angeles, California 90067
                                         Telephone: (310) 692-8883
                                         Email: lesley@portnoylaw.com

                                         *Additional Counsel for Paulette Laurenzi*