**Davis Polk**

Antonio J. Perez-Marques
+1 212 450 4559
antonio.perez@davispolk.com
davispolk.com

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017

April 30, 2024

The Honorable Nicholas G. Garaufis
United States District Court for the Eastern District of New York
United States Courthouse
Room 1426 S
225 Cadman Plaza East
Brooklyn, NY 11201

Re: *Laurenzi et al. v. dLocal Limited et al.*, Case No. 1:23-cv-07501-NGG-JRC

Dear Judge Garaufis:

We represent defendants dLocal Limited ("dLocal" or the "Company") and Martin Escobari[1] in the above-captioned action.  We write pursuant to Section IV.A.2 of Your Honor's Individual Rules and the Court's Orders of March 4 and April 26, 2024 (Dkt. Nos. 27, 38) to request a pre-motion conference and set forth the principal bases for our anticipated motion to dismiss the amended complaint (Dkt. No. 28) (the "AC").

**_Background_**.  dLocal is a Uruguay-based fintech company that provides online payment processing services connecting global merchants to emerging markets around the world.  (¶¶ 2, 39.)  It operates a proprietary platform that allows global enterprise merchants to receive online payments from customers and to make online payments to local vendors, employees, and contractors.  (¶¶ 2, 39–41.)  The Company earns revenue predominantly from transaction fees that it negotiates and charges to merchant clients in connection with both "cross-border" and "local-to-local" payments.  (¶¶ 42.)  In addition to revenue, adjusted EBITDA, and adjusted EBITDA margin, dLocal's only "[k]ey business metric[ ]" is total processing volume ("TPV")—the aggregate value of payments successfully processed through the Company's platform.  (¶ 43; Ex. A (Excerpts of IPO Offering Materials) at 89.)

This putative securities class action commenced on October 6, 2023.  The original placeholder complaint focused exclusively on allegations that dLocal had engaged in purported violations of Argentine foreign exchange laws or regulations, precipitating an inquiry by Argentine authorities as reported in a local press outlet, Infobae, in late May 2023.  (*See generally* Dkt. No. 1.)  Having evidently found little to buttress these initial accusations, however, Plaintiffs take their operative AC in a very different direction.  Specifically, the AC, filed on March 18, 2024, now overwhelmingly recycles unrelated allegations from a November 16, 2022 short-seller report (the "Muddy Waters Report") and a May 2023 putative class action based thereon before the Honorable Andrea Masley in New York State Supreme Court (*see In re DLocal Sec. Litig.*, Index No. 151778/2023 (Sup. Ct. N.Y. Cty.)), which is currently pending decision on a fully briefed motion to dismiss.  Relying extensively on the Muddy Waters Report, the AC principally alleges that dLocal's June 2021 initial public offering registration statement ("IPO Offering Materials") failed to disclose that the Company had been experiencing declines in so-called "take rates"—a non-GAAP ratio of revenue or profits over TPV expressed as a percentage that dLocal undisputedly does *not* report (¶¶ 44–45)—during the lead-up to the IPO as a result of a purported shift in focus to lower-profit-margin local-to-local transactions, and somehow "overstated" the Company's FY 2020 revenues (and, thus, necessarily, its implied "take rates").  (*See, e.g.*, ¶¶ 4, 6, 64–103, 133.)  Plaintiffs' original Argentina-related allegations

---

[1] The other named defendants have neither been served nor appeared as of the date of this filing.  Unless otherwise noted, all case citations omit any internal citations, quotation marks, emphases, and/or alterations.  Citations in the form "¶ _" are to the AC.

**Davis Polk**      The Honorable Nicholas G. Garaufis

receive second billing, with the AC generally alleging that all dLocal's major SEC filings between June 2021 and April 2023—including the IPO Offering Materials, dLocal's October 2021 secondary public offering registration statement ("SPO Offering Materials"), and its Form 20-F annual reports for FY 2021 and 2022—failed to disclose that (i) dLocal was engaging in improper FX transfers in Argentina, subjecting it to "heightened risk" of regulatory scrutiny and enforcement actions, and (ii) it lacked sufficient internal controls over its fraud-detection, compliance, and financial reporting mechanisms.  According to the AC, all of this was "revealed" when Argentine media outlets reported in late May/June and September 2023 that Argentine authorities had commenced investigations of dLocal at some unspecified point in time and that one dLocal customer, Academiland, might have used the Company's platform in Argentina to pursue a money-laundering scheme (with no allegation of dLocal's knowledge or involvement).  (¶¶ 104–131, 138–56.)  Plaintiffs assert claims under the Securities Act of 1933 and Securities Exchange Act of 1934 against dLocal and a number of its individual executives and/or directors.  (¶¶ 26–37, 165–95.)

***The Securities Act Claims Are Time-Barred***.  As an initial matter, Plaintiffs' Securities Act claims are time-barred.  Securities Act claims are subject to a one-year statute of limitations that begins to run upon "the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m.  "The corrective disclosure date is the same as the constructive notice date for purposes of limitations."  *Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 416 (2d Cir. 2011).  According to the AC itself, the Muddy Waters Reports, released on **November 16, 2022**, examined "the Company's previously reported revenues and "take rates" and suggested that they were likely fraudulent," and specifically accused dLocal of inflating its FY 2020 revenues and implied "take rates," and concealing from investors that it was increasingly pivoting toward its lower-margin local-to-local business, which precipitated a 45% drop in stock price.  (¶¶ 6, 8, 77–81, 132–33.)  This is precisely the gravamen of Plaintiffs' Securities Act theory, as first articulated in the AC on **March 18, 2024**.  (*See, e.g.*, ¶ 71, 74, 82–86, 90–103.)  Because the Muddy Waters Report thus publicized the very allegations forming the basis of Plaintiffs' Securities Act claims more than a year before their filing, those claims are untimely.  *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 138–39 & n.2 (2d Cir. 2013) ("corrective disclosure" revealed the "alleged untruths and omissions" more than a year before suit); *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 521 (S.D.N.Y. 2016) (limitations period began upon publication of articles that "describe[d] the allegedly misrepresented facts undergirding the [c]omplaint").

***No Actionable Misstatement or Omission***.  All of Plaintiffs' claims also warrant dismissal on the merits.

*No Undisclosed Risk or Trend re: Take Rates*.  Plaintiffs fail to plead an actionable omission or misstatement concerning "take rates."  The AC claims that dLocal should have disclosed a "trend" of declining "take rates" prior to the IPO.  (*See, e.g.*, ¶¶ 68–89.)  The Company did not report on, or discuss, "take rates" in its IPO Offering Materials or identify them as a metric tracked or utilized by dLocal at any point prior to the IPO.  Even so, as recognized in the AC and made clear by its own demonstrative, "the [take] rate can be calculated based on information that the Company does disclose."  (¶ 45; *see also* ¶¶ 76, 82.)  Any investors who cared to do the necessary arithmetic would have easily observed that the Q1 2021 "take rates" reflected in the prospectus had declined relative to both Q1 and FY 2020.  (*See, e.g.*, ¶¶ 82, 92.)  Plaintiffs cannot plead nondisclosure when they "could have 'discovered'" the purported "truth" about dLocal's "take rates" from the Offering Materials "purely through simple arithmetic."  *Emerson v. Mut. Fund Series Tr.*, 393 F. Supp. 3d 220, 248 (E.D.N.Y. 2019).

The IPO Offering Materials also discussed dLocal's expectation that it would not "be able to maintain the same rate of revenue growth" going forward (¶ 86) and that the Company was prioritizing TPV increases as the primary driver of its overall growth (Ex. A at 12–13, 89–90).  In other words, dLocal affirmatively told the market that it was predicting *slower growth in revenue*—which is the numerator of the take rate fraction—while actively working to grow the denominator, transaction volumes.  These are precisely the

**Davis Polk**   <span style="color:blue">The Honorable Nicholas G. Garaufis</span>

conditions under which any reasonable investor would expect to see declining "take rates."  (¶ 45.)

Additionally, the IPO Offering Materials disclosed the very business dynamics that the AC contends were driving the alleged decline in "take rates" (*see, e.g.*, ¶¶ 77–81), including that: (i) local-to-local transactions were an increasingly significant part of the payments processing landscape across dLocal's operating jurisdictions; (ii) local-to-local services had become important to the Company's acquisition and retention of large, global merchant customers (including many of the individual companies identified in the AC); and (iii) individual local-to-local transactions were generally less lucrative for the Company than cross-border transactions.  (*See, e.g.*, Ex. A at 2–5, 7–8, 11, 50–51, 119–20, 123, 125–26, 140–45.)

Plaintiffs fail to identify any duty to disclose more on these subjects under either Item 5(d) or Item 3(d) of SEC Form 20-F.  (*See, e.g.*, ¶¶ 68–71.)  Item 5(d), which is co-extensive with Item 303 of Regulation S-K, does not require companies to disclose "business strategy decision[s]," including any supposed move by dLocal to "'ramp[ ] up'" (*id.* ¶¶ 71, 94, 133) its local-to-local business in response to emergent market conditions.  *Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494, 496–98 (2d Cir. 2019).  Nor does the AC plausibly allege the requisite legal "trend" to implicate Item 5(D).  As Plaintiffs' own demonstrative shows, "take rates" *rose* quarter-over-quarter in Q2 2020 and then remained higher in Q3 2020 than they had been in Q1 2020.  (*Id.* ¶ 82.)  Such fluctuation precludes any finding of a trend as a matter of law.  *Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 620 (S.D.N.Y. 2021) (no trend where plaintiffs' "own allegations, drawn from the Registration Statement itself, make plain that there were significant fluctuations in both metrics on a *quarter-to-quarter* basis").  Additionally, any alleged declining "trend" only occurred during, at most, two purportedly undisclosed pre-IPO quarters—Q3 and Q4 2020— which is insufficient to constitute a trend for Item 5(D) purposes.  *Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 245 (S.D.N.Y. 2015) ("five-month period[ ]" is "insufficient").

Item 3(D), which is similar to Item 105 of Regulation S-K, requires disclosure of the "most significant" factors making an offering speculative or risky.  *Wandel v. Gao*, 590 F. Supp. 3d 630, 646 (S.D.N.Y. 2022).  But Plaintiffs plead no facts suggesting that purportedly declining "take rates"—a logical outgrowth of dLocal's disclosed strategy to focus on growing volume, even with lower per-transaction profits—were even *a risk* from the Company's perspective, let alone one serious enough to trigger Item 105.  That it was not a risk is consistent with the undisputed facts that dLocal does not use "take rates" as a key operating metric, profits and revenue rose during the relevant period, and earnings call transcripts incorporated into the AC by reference make clear that the Company did not manage, or base its internal modeling on, "take rates" precisely because they are too volatile and tend to jump around over time with dLocal's evolving business mix.  (¶¶ 96, 98, 100; Ex. B (Q4 2021 Earnings Call Transcript) at 7, 13.) [2]

<u>*No "Overstate[ment]" of Revenues*</u>.  Plaintiffs' claim that the IPO Offering Materials "overstated" the Company's 2020 revenue—and, as a consequence, its "take rates" (¶¶ 87–88, 90–103)—is wild speculation unsupported by even a single well-pled "objective fact[ ]."  *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 170 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016).  The AC identifies no accounting violation, no restatement, no internal whistleblower charge, or anything else that could conceivably render such allegations plausible, let alone particularized.  Instead, it offers a hodgepodge of Plaintiffs' own conjectural "concerns," amounting to the very sort of "naked assertions" that courts routinely reject as insufficient to plead financial fraud.  *Id.*

Plaintiffs hypothesize, for example, that the Company's "take rates" "should have" decreased from 2019 to 2020 because dLocal's largest customers supposedly "shifted" starting in 2020 "to the less profitable local-to-local business," and accordingly dLocal's revenues must have been inflated during that period.  (*See, e.g.*, ¶¶ 94, 98–100.)  That is the height of illogic.  Decreases in per-transaction margins (the metric for which "take rates" are supposedly a proxy) do not necessarily imply lower revenue: many businesses

---

[2] Additionally, the United States Supreme Court recently held squarely that pure omissions, even in violation of an SEC rule like Item 303, do not give rise to claims under Section 10(b) and Rule 10b-5 of the Exchange Act.  *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 144 S. Ct. 885, 889 (2024).

**Davis Polk**   The Honorable Nicholas G. Garaufis

may generate increased revenue by selling additional volume at a lower price.  This is particularly true for a business that, like dLocal, is focused first and foremost on driving revenue growth through overall transaction volume.  Indeed, the AC's own demonstrative reflects that revenue actually *rose* across 2021—which Plaintiffs do not allege to be inaccurate—even as "take rates" recorded declines during the same period.  (*See id.* ¶ 82.)  Plaintiffs' speculation appears to be based solely on comments by dLocal's COO in March 2022 about the performance of certain groups of dLocal's customers *during 2021*.  (*Id.* ¶¶ 98–99.)  But there is simply no reason to infer that those cohorts performed the same way in *2020*.

The AC's entirely uncited, unexplained notion that "a disproportionate ratio of gross receivables in relation to total revenue" suggests fraud (*id.* ¶ 101) fares no better.  It is not enough to allege "in a conclusory fashion" that a company engaged in some speculative "technique" to inflate reported financial results.  *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 394 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 52 (2d Cir. 2015).  In any event, receivables growing faster than total revenue is exactly what any reasonable investor should expect from a company with dLocal's business model.  As explained in the IPO Offering Materials, much of dLocal's reported "receivables" represent merchant-owned funds that are held by the Company for only "a short period" before being paid out to merchants.  (Ex. A at 103.)  The actual "revenue" recorded by dLocal comprises only comparatively small fees charged in connection with processing these payments—essentially, percentage points on the Company's "receivables."  (*Id.* at 2, 88, 90, 103.)  There is no reason, accordingly, to expect receivables and revenues to move in lockstep.

Plaintiffs' identification of a purported discrepancy between dLocal's "reported foreign exchange fees" for 2020 and those of its "three main subsidiaries" (¶ 95) similarly falls flat because, quite simply, no such discrepancy exists.  The AC claims that that the Company's three primary operating subsidiaries earned just $17.6 million in total FX fees for 2020, but the financial statements filed by these very entities with local regulators show that this amount in fact corresponds to only *one of the three*.  (*See* Ex. C at 19; Ex. D at 18; Ex. E at 22 (2020 financial statements for subsidiaries identified in AC).)  Not only is it conceptually "[un]reasonable," as courts have recognized, "to infer that [a company's] SEC filings must be false based upon a comparison to less than a complete set of its subsidiaries' [ ] filings," particularly in a foreign market, *In re China XD Plastics Co. Ltd. Sec. Litig.*, 2016 WL 1241522, at *6 (S.D.N.Y. Mar. 23, 2016), but accurately aggregating the reported FX fee revenues for *all three* subsidiaries in question here ties out precisely to the total that the AC ascribes to the parent entity.

Finally, Plaintiffs' comparison of dLocal's 2020 "take rates" to those of a single competitor without providing any information about the comparator, including any of the myriad factors that might make it similar to or different from dLocal in terms of expected results (¶ 93), is likewise insufficient to allege that the Company misstated its financials.  *See In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 540–41 (S.D.N.Y. 2009), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009).

*No Misstatement or Omission re: Argentine Regulations or Related Controls*.  Plaintiffs' allegations that dLocal failed to disclose that it had engaged in improper conduct violative of Argentine laws and regulations, that this purported misconduct had subjected the Company to a heightened risk of regulatory scrutiny or enforcement action in Argentina, or that dLocal lacked adequate internal controls all, fail as a matter of law.  For one, the AC includes no allegation that any Argentine inquiry was known to dLocal—or, for that matter, *even existed*—at any point until the reporting by Infobae in late May or June 2023 at the very earliest, post-dating the challenged SEC filings submitted between June 2021 and April 2023.  (*See, e.g.*, ¶¶ 147–56.)  Securities claims do not lie unless the statements at issue were allegedly "false at the time [they] w[ere] made."  *In re Philip Morris Int'l Sec. Litig.*, 437 F. Supp. 3d 329, 349 (S.D.N.Y. 2020); *see also Chapman v. Mueller Water Products, Inc.*, 466 F. Supp. 3d 382, 414 (S.D.N.Y. 2020).  Regardless, the law is clear that there is no duty on the part of securities issuers: (i) to "accuse [themselves] of wrongdoing," *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004); (ii) to "disclose uncharged, unadjudicated misconduct," *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,* 752 F.3d 173, 184 (2d Cir. 2014*)*; or (iii) to disclose the mere pendency of a "government investigation," *In re Lions Gate Entertainment Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12–13 (S.D.N.Y. 2016).  And, in any case, when dLocal *did* learn of certain investigative activity in late May and early June of 2023, it undisputedly provided affirmative updates to the market in a 6-K and a subsequent

**Davis Polk**    The Honorable Nicholas G. Garaufis

press release.  (¶¶ 152, 154.)  If all that were not enough, the Company repeatedly disclosed throughout the class period that it faced heightened risk that regulatory authorities in Argentina specifically had imposed and might continue to impose increasingly restrictive FX controls and could challenge payment transactions facilitated by dLocal.  (*See, e.g.*, ¶¶ 114, 110, 140.)

As for statements regarding dLocal's regulatory compliance and fraud detection controls, the AC simply alleges no facts showing any actual "severe[ ] deficien[cies]" (¶¶ 105–13, 118, 124, 130, 145) in real time.  *See, e.g.*, *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *9 (S.D.N.Y. Mar. 30, 2012) ([dismissing where] Plaintiffs "failed to allege specific facts concerning the purportedly deficient internal controls, including how they were deficient, when and why"); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 648 (S.D.N.Y. 2017) (existence of alleged bribery scheme did not render control-related statements fraudulent because defendants did not guarantee that "controls will perform perfectly in every instance[.]); *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 253 (S.D.N.Y. 2019) ("[N]or does a subsequent circumvention of [internal] controls support an inference that descriptive statements about the implementation of such controls were false.").  In any event, and as recognized in the AC, dLocal's challenged SEC filings repeatedly warned of the regulatory compliance risks at issue, including regarding FX controls in Argentina.  (¶¶ 106, 114, 119–20, 122, 126, 128, 140–41, 143.)  Securities liability cannot attach "when a registration statement warns of the exact risk that later materialized."  *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013); *In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, 675 F. Supp. 3d 273, 292–93 (E.D.N.Y. 2023) (company "gave ubiquitous warnings to investors regarding the possibility of future compliance failures" and the limits of internal controls).

***Plaintiffs Fail to Raise a Strong Inference of Scienter***.  Plaintiffs' Exchange Act claims independently fail because the AC does not adequately allege scienter.  "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  The requisite scienter may be established at the pleading stage by alleging facts (i) showing that defendants had both the motive and opportunity to commit fraud or (ii) constituting strong circumstantial evidence of conscious misbehavior or recklessness.  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  Where, as here, the defendant is a corporation, plaintiffs must plead facts showing that someone whose intent could be imputed to the corporation acted with the requisite scienter.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

The AC includes no allegations suggesting that any individual Company employee had a motive to commit fraud.  At *most*, Plaintiffs observe that various individual defendants sold stock during the IPO and SPO (AC ¶¶ 50–66), but that is wholly inadequate to support an inference of scienter absent something "'unusual' or 'suspicious'" about the transactions.  *Rice v. Intercept Pharms., Inc.*, 2022 WL 837114, at *19 (S.D.N.Y. Mar. 21, 2022) ("mere fact that insider stock sales occurred does not suffice").  Further, all of the alleged sales occurred more than a year before the first purported corrective disclosures and in connection with registered public offerings—a point in time at which it is common for corporate executives to sell shares.  *See, e.g.*, *Lozada v. TaskUs, Inc.*, 2024 WL 68571, at *23 (S.D.N.Y. Jan. 5, 2024).

Plaintiffs' scienter case thus rests solely on the "conscious misbehavior or recklessness" prong.  Given the absence of cognizable motive allegations, however, the "strength" of the circumstantial evidence in this regard "must be correspondingly greater."  *ECA*, 553 F.3d at 198–99.  Indeed, Plaintiffs must allege "a state of mind approximating actual intent."  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015).  The AC falls far short.  Plaintiffs do not "specifically identify"—whether by confidential witness allegations or otherwise—any internal documents, reports, data, meetings, or other matters involving or received by dLocal executives purportedly contradicting any public statements in real time.  *See, e.g.*, *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299–300 (S.D.N.Y. 2010) (collecting cases).  Vague references to individual defendants' high-level corporate positions (¶¶ 184–85, 188) are insufficient.  *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 529 (S.D.N.Y. 2020).  So, too, are the AC's "boilerplate" characterizations of certain alleged metrics, results, or trends as passively "known" to dLocal at large (*see, e.g.*, ¶¶ 74, 84–85, 127, 142).  *Steinberg v. Ericsson LM Tel. Co.*, 2008 WL 5170640, at *12–13 (S.D.N.Y. Dec. 10, 2008).

**Davis Polk**     The Honorable Nicholas G. Garaufis

Respectfully submitted,

*/s/ Antonio J. Perez-Marques*

Antonio J. Perez-Marques

cc:     All Counsel of Record (via ECF)