# EXHIBIT A

Case 1:23-cv-07501-NGG-CHK   Document 42-1   Filed 04/30/24   Page 2 of 50 PageID #: 288

**Table of Contents**

**Filed Pursuant to Rule 424(b)1**
**Registration No. 333-255793**

**PROSPECTUS**

# 29,411,765 Class A Common Shares

## d·local

# DLocal Limited

*(incorporated in the Cayman Islands)*

This is an initial public offering of the Class A common shares, US$0.002 par value per share of DLocal Limited, or dLocal. dLocal is offering 4,411,765 Class A common shares to be sold in this offering. The selling shareholders identified in this prospectus are offering 25,000,000 Class A common shares to be sold in the offering. We will not receive any proceeds from the sale of Class A common shares by the selling shareholders.

Prior to this offering, there has been no public market for our Class A common shares. The initial public offering price per Class A common share is US$21.00. Our Class A common shares have been approved for listing on the Nasdaq Global Select Market, or Nasdaq, under the symbol "DLO."

Upon consummation of this offering, we will have two classes of common shares: our Class A common shares and our Class B common shares. The rights of the holders of Class A common shares and Class B common shares will be identical, except with respect to voting, conversion and transfer restrictions applicable to the Class B common shares. Each Class A common share will be entitled to one vote. Each Class B common share will be entitled to five votes and will be convertible into one Class A common share automatically upon transfer, subject to certain exceptions. Holders of Class A common shares and Class B common shares will vote together as a single class on all matters unless otherwise required by law. Following this offering, our issued and outstanding Class B common shares will represent approximately 83.8% of the combined voting power of our outstanding common shares, assuming no exercise of the underwriters' option to purchase additional shares, and approximately 83.2% assuming exercise in full of the underwriters' option to purchase additional shares.

**We are an "emerging growth company" under the U.S. federal securities laws as that term is used in the Jumpstart Our Business Startups Act of 2012 and will be subject to reduced public company reporting requirements. Investing in our Class A common shares involves risks. See "Risk Factors" beginning on page 26 of this prospectus.**

| | Per Class A common share | Total |
|---|---|---|
| Initial public offering price | US$21.00 | US$617,647,065 |
| Underwriting discounts and commissions | US$ 1.26 | US$ 37,058,824 |
| Proceeds, before expenses, to us(1) | US$19.74 | US$ 87,088,241 |
| Proceeds, before expenses, to the selling shareholders(1) | US$19.74 | US$493,500,000 |

(1)    See "Underwriting" for a description of all compensation payable to the underwriters.

The selling shareholders have granted the underwriters an option for a period of 30 days from the date of this prospectus to purchase up to 4,411,765 additional Class A common shares to cover over-allotments, if any, at the initial public offering price, less underwriting discounts and commissions.

Prior to the date hereof, Fidelity Management & Research Company LLC, or the cornerstone investor, has, on behalf of entities managed by it or its affiliate, indicated an interest in purchasing up to 20% of our Class A common shares sold in this offering (excluding the underwriters' option to purchase additional shares) at the initial public offering price. Because this indication of interest is not a binding agreement or commitment to purchase, the cornerstone investor could determine to purchase more, less, or no shares in this offering or the underwriters could determine to sell more, less, or no shares to the cornerstone investor. The underwriters will receive the same discount on any of our shares of Class A common shares purchased by the cornerstone investor as they will from any other shares of Class A common shares sold to the public in this offering.

**Neither the U.S. Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

The underwriters expect to deliver the Class A common shares against payment in New York, New York on or about June 7, 2021.

*Global Coordinators*

| **J.P. Morgan** | **Goldman Sachs & Co. LLC** | **Citigroup** | **Morgan Stanley** |
|---|---|---|---|

*Joint Bookrunners*

| **BofA Securities** | **HSBC** | **UBS Investment Bank** |
|---|---|---|

The date of this prospectus is June 2, 2021.

Table of Contents

**SUMMARY**

*This summary highlights information contained elsewhere in this prospectus. This summary may not contain all the information that may be important to you in making your investment decision, and we urge you to read this entire prospectus carefully, including the "Risk Factors," "Business" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" sections and our consolidated financial statements and notes to those statements, included elsewhere in this prospectus, before deciding to invest in our Class A common shares.*

**Our Mission**

Our mission is to enable global merchants to connect seamlessly with billions of emerging market users.

**Overview**

dLocal is focused on making the complex simple, redefining the online payments experience in emerging markets. Through one direct API, one technology platform, and one contract, which we collectively refer to as the *One dLocal* model, we enable global enterprise merchants to get paid (pay-in) and to make payments (pay-out) online in a safe and efficient manner. Merchants on our platform consistently benefit from improving acceptance and conversion rates, reduced friction, and improved fraud prevention, leading to enhanced potential interaction with nearly 2 billion combined internet users in the countries we serve (excluding China). Our proprietary, fully cloud-based platform has the ability to power both cross-border and local-to-local transactions in 29 countries as of the date of this prospectus (which includes seven new countries where we have recently made our services available but have not yet processed volume). Our solutions are built to be both payment method-agnostic and user friendly. We enable global merchants to connect with over 600 local payment methods (some of which are financial institutions) across our different geographies, thus expanding their addressable markets. Furthermore, our proprietary technology architecture is highly scalable and flexible, allowing us to constantly and rapidly innovate in response to market demand, expand to new countries and enhance our value proposition for our merchant clients. Agility is in our DNA. We believe our product offering makes us the most comprehensive online payments infrastructure currently available for global enterprise merchants operating across emerging markets.

Our focus on merchants' demands drives us to develop solutions that address the complex payments issues they face in emerging markets.
- For Microsoft, we offer a reliable, country-specific solution that facilitates payments, enabling merchants to sell their suite of products and services in Nigeria.
- For one of the largest video streaming companies in the world, we enable acceptance of local payment methods from viewers eager to access their content in Peru.
- For Didi, we facilitate a pay-out solution that enables bank transfers, split payments, and tax withholding functionalities for its drivers in Argentina to collect fares.
- For one of the leading global internet search engines, we developed dynamic transaction routing capabilities in Brazil to automatically direct traffic to payments providers with the highest probability of success, thus enabling more reliable processing.

As global enterprise merchants continue to face payments complexities, we believe they will seek to engage with partners that have demonstrated high acceptance rates of alternative payment methods, or APMs and have expertise in local payments; foreign exchange, or FX, management; local regulations; and compliance, tax, and fraud management capabilities across the relevant emerging markets, as opposed to engaging providers they may

1

Table of Contents

already use in developed markets where the payment and infrastructure dynamics are different. Capitalizing on this opportunity, we have continued to expand our presence globally, with the goal of becoming the online payments partner of choice for global merchants in emerging markets.

We are an enterprise-focused company, targeting large global merchants that operate in different verticals and geographies. Our key verticals include retail, streaming, ride hailing, financial institutions, advertising, SaaS, travel, e-learning and gaming. We have built our global platform from the ground up to be accessible through a single direct API and to meet the rapidly evolving needs of these fast-growing global merchants. We believe simplicity, scalability, transparency, agility and innovation are keys to our continued success. We partner with over 330 merchants, including leading global enterprises such as Amazon, Didi, Microsoft, Spotify, Mailchimp, Wix, Wikimedia and Kuaishou. In addition, we cater to the needs of leading marketplaces to help their SMB clients and partners expand their geographic reach. Our global merchants benefit from maintaining direct relationships with their end users while facilitating a faster, safer, more reliable and compliant payments experience. On average, our global merchants used dLocal's platform in nearly six different countries and 44 payment methods in 2020 and in five countries and 35 payment methods in 2019, in each case for merchants with at least US$6 million of annual TPV on our platform. Such merchants comprised 92% of our TPV in 2020 and 93% in 2019. As a result, we believe that dLocal has become a trusted partner forging resilient relationships with global enterprise merchants.

We benefit from an attractive business model with improving economies of scale. We are often subject to rigorous vetting processes with global enterprise merchants that invest significant time and resources in the selection, diligence, and on-boarding of technology and payments providers. This on-boarding process can often take several months as these merchants assess our technological capabilities, ability to comply with their data security protocols, and adherence to regulatory, tax and compliance requirements. However, once we establish a direct connection (meaning there are no third party intermediaries between us and the merchant in the payment flow and technical integration), global merchants have the ability to access the full breadth of our solutions and the countries where we have a presence instantly through one direct API and one contract. Merchants can also choose to route all or a portion of their applicable pay-in and pay-out volume through us. Our direct connections with merchants serve as a strong competitive advantage and barrier to entry for competing providers, and makes incremental volume that flows through our platform highly margin accretive for dLocal.

Our single integrated platform provides a merchant-friendly alternative to the numerous legacy providers that global merchants were previously forced to rely upon for their payments needs in emerging markets. The breadth of our online payments infrastructure and expertise, allowing merchants to transact in 29 markets as of the date of this prospectus, the direct connections with global merchants, our relationships with APMs, local financial institutions and acquirers, our understanding of the countries in which we operate, and our differentiated compliance, tax, and fraud management capabilities are attributes that in combination are difficult for competitors to replicate and create strong barriers to entry. Our technology DNA (we have been a "technology-first" business from inception), execution-driven culture and agile innovation mindset keep us at the forefront of the industry.

Our success is reflected in our rapid growth and strong profitability. dLocal earns revenue from fees charged to our merchants in connection with payment processing services for cross-border and local payment transactions in emerging markets. These fees are primarily generated on a per approved transaction basis as either a fixed fee per transaction or fixed percentage per transaction. The fees include a Merchant Discount Rate, or MDR, to compensate us for our services, as well as an FX service fee earned on payments involving conversion and expatriation of funds to and from various currencies, including the U.S. dollar and the Euro. Our TPV was US$925.9 million and US$388.2 million for the three months ended March 31, 2021 and 2020, respectively, and US$2.1 billion and US$1.3 billion for the full years of 2020 and 2019, respectively, representing a growth rate of 138.5% when comparing the three months ended March 31, 2021 to the three months ended March 31, 2020 and

2

Table of Contents

a growth rate of 60.3% when comparing the full year of 2020 to 2019. Our total revenues were US$40.3 million and US$18.0 million for the three months ended March 31, 2021 and 2020, respectively, and US$104.1 million and US$55.3 million for 2020 and 2019, respectively, representing a growth rate of 123.7% when comparing the three months ended March 31, 2021 to the three months ended March 31, 2020 and a growth rate of 88.4% when comparing 2020 and 2019. Our net revenue retention rate, or NRR, was 171% for the year ended December 31, 2020 and the revenue growth attributable to new merchants, which represents merchants that did not process volume with dLocal prior to January 1, 2020, was 17%. Excluding the effect in 2019 of a warrant with a merchant, the NRR would have been 159%. For the three months ended March 31, 2021 and 2020, our NRR was 186% and 216% (or 139% excluding the effect of the warrant), respectively, and our growth attributable to new merchants was 38%. The NRR includes the merchants that generated revenues in the same period of the prior year. For the year 2020, 167 merchants were included, and for the three month period ended March 31, 2021 and 2020, 179 and 135 merchants were included, respectively. Our asset-light operating model with low capital expenditures facilitates continuous reinvestment to drive topline growth. Our strong profitability and cash flow generation is due in large part to our solving of the complex payments problems on behalf of our merchants in underserved geographies. Our Adjusted EBITDA Margin was 44.3% and 41.3% for the three months ended March 31, 2021 and 2020, respectively, and 40.3% and 36.3% during the full years of 2020 and 2019, respectively. As we continue to deepen the relationship with the global merchants we serve, and improve and expand our current solutions and increase our presence in emerging markets, we expect to continue growing as existing and new merchants further rely on our capabilities.

**Our History and Evolution**

We started our journey in 2016 as a technology-first company seeking to disrupt online payments and to unlock opportunities for global enterprise merchants in emerging markets. We believe that we were among the first providers to recognize that, while large global merchants want to grow their business by selling their products and services online in emerging markets, they did not have the right online payments infrastructure to do so efficiently.

Since our inception, we have harbored global ambitions. We started with a single product to support a single payment method in one market, specifically pay-in cross-border payments in Brazil. Our early success empowered us to expand to other emerging markets, leading to our presence today in 29 countries including Mexico, Argentina, Colombia, and Chile in Latin America; India and Indonesia in Asia; and Egypt, Nigeria, and South Africa in Africa.

From the outset, our founding management team leveraged its technical expertise and entrepreneurial acumen to construct our flexible, scalable platform from scratch. The addition of strong commercial and financial talent complemented their technical proficiency, which has allowed dLocal to scale the business. Over the years, we have been able to continuously and rapidly introduce new solutions and capabilities in response to our global merchant's dynamic needs and payments ecosystems, further develop and enhance our technology platform, and evolve our business model.

Today, dLocal is a key enabler of online commerce in emerging markets serving different high-growth, technology-related verticals across key sectors in the economy. In addition to pay-in cross-border solutions, we have successfully developed fast-growing pay-out solutions, as well as local-to-local capabilities for both pay-in and pay-out transactions. We have also developed marketplace capabilities, having on-boarded one of the world's largest e-commerce platforms in 2018 as our first marketplace merchant. Our roster of market-leading global enterprise merchants and their reliance on our platform are the strongest testament to the strength of our overall value proposition.

We benefit from the support of our investors, including our strategic shareholders, General Atlantic and Mastercard, and the opportunities our scalable platform offers us. Moreover, Sebastián Kanovich and Jacobo Singer, our CEO and President, respectively, and members of our founding management team hold a meaningful combined ownership in dLocal and are deeply committed to our continued success. See "Principal and Selling

Case 1:23-cv-07501-NGG-CHK    Document 42-1    Filed 04/30/24    Page 6 of 50 PageID #: 292

Table of Contents

Shareholders" and "Management". With this support and commitment, we intend to continue expanding into new markets, developing new products, and retaining and expanding our merchant base while growing their overall volume processed through our platform, all of which are drivers that will continue to propel our growth in the years to come.

**Our Market Opportunity**

The global payments industry is experiencing a rapid, secular shift towards digital payment methods, particularly driven by the growing prevalence of online and mobile channels. In 2020, consumers and businesses worldwide made over 454 billion purchase transactions on global network cards, according to Nilson Report. The share of e-commerce as a percentage of total global retail payments volume expanded to 21% in 2020, compared to 16% in 2019, according to Digital Commerce 360, aided by the accelerated shift to online purchasing during the ongoing COVID-19 pandemic.

In order to capitalize on this trend, global merchants continue to seek international expansion, thus raising their need to facilitate payment transactions from a wide array of methods and channels across what we believe to be complex and fragmented payments ecosystems. We believe that global enterprise merchants recognize the growing importance of emerging market economies as a key driver of growth. According to the International Monetary Fund, or the IMF, in 2019 emerging markets represented 57% of aggregate global GDP (measured on a per person basis), a significant increase from 43% in 2000. Emerging markets are expected to continue growing faster than developed markets overall.

However, global merchants face many challenges when trying to gain access or further penetrate emerging markets. Banking penetration remains low in these countries, falling below 20% of the adult population in some cases, according to a report commissioned by us and prepared by Americas Market Intelligence, or AMI. As opposed to developed economies where card-based transactions relying on international card schemes are prevalent, local card, bank transfer-based payment methods, digital wallet, and cash-like payments, such as using Boleto in Brazil or UPI in India, and making payments at Oxxo in Mexico, are the predominant payment methods for end users in emerging markets. Furthermore, in order to gain access to emerging markets, merchants also need to:
- adhere to local compliance, regulatory, and tax frameworks,
- offer transparency and security for their end users,
- address inherent fraud risk while maximizing acceptance and conversion,
- gain insights from their transaction data, and
- identify and engage with partners that can scale as their emerging markets operations expand.

Through the *One dLocal* model, we address these needs.

The payments industry is complex, cumbersome, and varies in structure in each country. In many instances the interaction between parties varies substantially from jurisdiction to jurisdiction. For example, a payments service provider, or PSP, may compete with other providers in one market and collaborate in another (under a sub-acquirer relationship or otherwise). This results in different unit economics for PSPs in each market largely depending on the services offered and the role that they play in the payments value chain. This complexity has created the demand for next-gen providers that integrate directly with global merchants and act as a single point of interaction that can engage with a large ecosystem of participants, offer them integrated solutions, and thus limit disintermediation.

4

Table of Contents

We believe we have a large market opportunity in pay-out transactions, for both cross-border and local-to-local payments, which is currently underserved by what we believe to be a fragmented set of industry participants, most of them legacy payments companies.

According to AMI, there is an estimated US$1.2 trillion in total e-commerce pay-in and pay-out volume in the countries in which we operate, excluding China. Of the estimated US$428 billion pay-in volume for 2020, 86% corresponded to local-to-local transactions, and only 14% corresponded to cross-border transactions. Overall, pay-in volume is expected to grow up to US$1.1 trillion by 2024, implying a CAGR of 27% from 2020 to 2024, according to AMI. AMI also expects the share of pay-outs *vis-a-vis* pay-ins to increase in the coming years on the back of strong tailwinds associated with an expected recovery in the next 24 months from the COVID 19 pandemic, which fueled a rise in remote work and initially dampened travel, ride hailing and remittances, but which are expected to recover following the pandemic.

The chart below shows 2020 pay-in and pay-out volumes and the projected growth of the total pay-in volume in the countries in which we currently operate, excluding China:

**Payment volumes in the countries in which we currently operate, excluding China (in US$ trillions)**



Payments in emerging markets are still dominated by local payment methods. Whereas in the United States and Europe, credit and debit cards are widely held and used online, this is not the case in emerging markets where, according to AMI, banking penetration can fall below 20% of the adult population and cash-based payment methods, local digital wallets, and bank transfers are prevalent. According to AMI, local payment methods represented 83% of total e-commerce expenditure in 2020 in the 14 core markets analyzed by them. In Brazil, for instance, according to AMI, internationally-enabled credit cards only represented 10% of the aggregate e-commerce payment volumes, whereas domestic-only credit cards and cash-based methods represented 55% and 14% of the aggregate e-commerce payment volumes in 2020, respectively, and the remaining 21% were alternative payment methods. Similarly, in India, internationally-enabled credit cards only represented 30% of the aggregate e-commerce payment volumes in 2020, whereas debit cards and bank transfers represented 19% and 14%, respectively. In Nigeria, internationally-enabled credit cards only represented 13% of the aggregate e-commerce payment volumes in 2020, whereas debit cards and bank transfers represented 28% and 27%, respectively. We believe the prevalence of local payment methods creates a fragmented payment system in emerging market countries, which hampers global merchants' ability to expand in these new markets. We see an opportunity to continue growing and acquiring new clients by solving the existing complexities that result from using alternative local methods through our *One dLocal* model.

Table of Contents

We believe our opportunity is driven in large part by the following favorable trends:

*Increasing globalization of commerce*

Fueled by fast-paced changes in technology and the increased mobility of goods, services, people, and capital, globalization continues to be a driving force in the world economy. In particular, over the past few decades globalization has greatly changed economies, societies, and the way business is conducted. According to Bloomberg, cross-border trade involving developing or emerging economies constituted 53% of global trade in 2017, an approximate 10 percentage points increase over the past 20 years. Such rapid expansion has created new opportunities for businesses to grow and extend their reach, resulting in a significant increase in multi-country flows of funds, which requires a robust financial technology infrastructure, systems, and processes to support cash flows for pay-ins and pay-outs.

A shift in consumer expectations has further accelerated the pace of globalization, as consumers increasingly expect to be able to make purchases or receive funds anytime, anywhere, and using their preferred method of payment.

In addition, as global merchants broaden their geographic footprint in search of more scale and growth, they are faced with the challenge of operating in a multi-jurisdictional environment where they must ensure appropriate compliance with local regulatory, FX, and tax frameworks, and deal with the diverse set of available or preferred local payment methods of end users. Maintaining compliance with these regulatory and market standards can be costly, burdensome, and often hard to address without the help of a partner such as dLocal with the adequate know-how, technology, and level of connectivity to the broad local payment infrastructure.

*Continued rise of the digital economy*

Technology has revolutionized the way we interact with one another and the way we consume information, entertainment, goods, and services. As a result, the digital economy has become a massive web of interconnected stakeholder and supply chains, spanning across a wide range of easily accessible products and services. The growing accessibility of the internet, as well as the rising adoption of smartphones, have been important trends in developed and emerging market countries. In 2020, smartphone penetration levels for Turkey, Brazil, and Mexico reached 61%, 80%, and 75% respectively. According to AMI, 80 million Nigerians are estimated to come online in the next five years. As a result of these growing trends, e-commerce penetration has experienced an accelerated expansion. Global e-commerce as part of overall payments volume grew at a 17% CAGR from 2014 to 2019, according to Insider Intelligence. Likewise, e-commerce among the core emerging countries we operate in grew 27% in 2020, while global GDP contracted 3.5% during the same year. We believe the penetration of the internet should continue to increase over time.

E-commerce has been a primary beneficiary of shifts in purchasing behavior during the COVID-19 pandemic. Consumer preferences for contact-free solutions are reshaping the way companies interact with their clients. Multiple industry observers and market participants (including Insider Intelligence and Euromonitor) believe this increase in digital commerce has the potential to become permanent, driving a two to three-year acceleration in adoption levels. Turkey, Brazil, and India are expected to grow at a CAGR of 39%, 30%, and 17% from 2020-2024, according to AMI, further emphasizing the rapid rise of digitalization in emerging markets during the next years.

Large, digitally-native enterprises are capitalizing on this opportunity, serving consumers globally who are eager to use the internet for consumption and connectivity, driving their ability to continue to take market share from legacy market participants which have experienced varying degrees of success in their attempt to go online. We believe that as the digital economy continues to expand globally, particularly in emerging markets, dLocal is

6

**Table of Contents**

well-positioned to serve the needs of key participants due to our inherent emphasis on e-commerce and our shared appreciation for technology and product innovation.

### Middle class in emerging markets continues to expand

On the back of continued economic growth, the middle class in emerging markets has been increasing its level of spending and online transaction frequency. This group is eager to consume global goods and services previously unavailable due to lack of access or spending constraints, leading to higher growth rates for goods and services in emerging markets, as well as the associated methods used to pay for them. This is driving an average expected annual GDP growth from 2021 through 2025 to 4.9% for emerging market economies (more than three times the expected growth for developed markets in the same period), according to *Oxford Economics via Refinitiv Datastream*. Global merchants wishing to capitalize on these changing economic demographics may seek to accelerate their entrance or further their penetration into emerging markets, which we believe may benefit technology and payments providers such as dLocal.

Research by Next Big Future suggests the global middle class would surpass 4 billion people by the end of 2020. According to this same research, the global middle class is growing by 120 to 160 million people every year, mostly in emerging markets, and is expected to reach 5.3 billion people by 2030. As a result, a growing emerging markets aspirational middle class should continue to gain disposable income over time, raising their expectations of convenience and customer experience, as well as their consumption of global merchants' products and services.

### Cross-border payments in emerging markets are fragmented and poised for growth

While e-commerce is now mainstream, cross-border transactions still present unique challenges due to low approval rates, poor predictability of timing, low transparency, volatile exchange rates, dynamic regulatory requirements, and significant complexity that comes from having to settle transactions across multiple parties and currencies without a consistent regulatory and tax framework or an integrated payments infrastructure.

Furthermore, while developed countries have made significant progress, emerging markets still lack a coherent interoperability between regulatory and technical payments systems. According to Statista, the proportion of cross-border e-commerce transactions relative to total e-commerce transactions was significantly higher in developed versus emerging economies. For example, in 2019, as a share of all e-commerce transactions, cross-border e-commerce transactions accounted for 30% in Belgium, 27% in Ireland, and 18% in Austria. By contrast equivalent shares in India, Mexico, and Brazil were only 18%, 22%, and 6%, respectively. This presents a strong e-commerce growth opportunity as developing countries continue to make progress towards improving their infrastructure.

Facing differing local regulations, fragmented standards, inefficient infrastructure, and high fixed costs, we believe that service providers focusing on cross-border payment solutions will seek to balance the need for local expertise with the increasing merchant expectation of a single, digital, and global experience. In this context, we believe that strong cross-border business partnerships between global merchants and service providers are important and will continue to gain importance. Integrated payments solutions are the future, replacing disparate players operating in silo, requiring incremental connection between participants which further increases friction in the payments value chain.

### Global enterprise merchants are establishing local presence in selected emerging markets

In order to complement operations that may have initially been run from abroad, some of the largest global merchants are seeking to establish local presence in certain large emerging markets (e.g., Didi in Brazil).

7

Table of Contents

Accordingly, once established locally these merchants also need to facilitate pay-outs to local vendors, employees, and contractors, and pay-ins from local customers via their preferred method of payment. Even with the ability to send and receive funds in local currency (through the establishment of local bank accounts), merchants still face what we believe to be fragmented payments ecosystems and market-specific regulatory environments, presenting complexities similar to those in cross-border transactions, which we believe generate sub-par results on acceptance rate, fraud and other relevant payment features.

As global merchants selectively expand their local presence in emerging markets, the demand for integrated digital payment capabilities becomes even more relevant, benefitting participants with broad presence and solutions, such as dLocal, that we believe can provide a simplified offering, broader connectivity, and better performance compared to legacy payments providers. We have observed this trend first-hand, and evolved with many of our merchants as they expanded our relationship to include our local-to-local solutions in one or more countries in addition to the cross-border solutions they continue to process through our platform (in the same or other countries).

### *Highly complex and evolving local regulatory and tax environments*

The challenges that merchants face are further exacerbated by the increasing impact of regulation in the payments market globally. Systemic stress to global markets, such as that experienced during the 2008 financial crisis, has emphasized the need for policymakers to enhance and strengthen financial systems to make them more resilient, more secure, and better prepared to handle future shocks. Furthermore, the increase in fraud and cyberattacks continues to push regulators to increase scrutiny across the payments value chain. Regulators have also been concerned with the higher cost of services charged by legacy payments providers driving the creation of new APMs such as the PIX in Brazil. However, while we believe that most countries and jurisdictions share and understand this need, the effort to make necessary changes has been largely localized in nature, particularly in emerging markets. As a result, local regulatory frameworks are complex, unique, and constantly changing.

Ensuring adherence to and compliance with these regulatory and tax requirements are costly and burdensome for global merchants, often deterring or limiting their entry to certain jurisdictions, particularly in emerging markets. This presents an attractive opportunity for service providers such as dLocal that have local expertise to offer robust, up-to-date, and integrated capabilities that comply with regulatory, FX, and tax frameworks across emerging markets.

### Our Competitive Strengths

The following strengths and advantages are at the core of our strategy:

### *One single API, one single platform to connect to emerging markets*

dLocal's value is derived from the simplicity of our fully cloud-based proprietary platform, accessible through a single direct API, that enables global merchants to potentially reach nearly two billion internet users in the emerging markets we serve (excluding China). Traditional payments providers serving these markets are often burdened with disparate legacy technology systems that have been stitched together over time. This limits pricing transparency and leads to reconciliation and refund management complexities, a sub-optimal user experience, lower conversion rates, and subpar system availability, as well as increased levels of fraud and compliance issues. Conversely, dLocal offers a modern and flexible technology stack that is purpose-built to meet our global merchants' high performance and scalability expectations, as demonstrated in our ability to increase our TPV by 15 times over the last four years.

dLocal's platform provides rapid, reliable, and convenient support for pay-in and pay-out transactions, including cross-border and local-to-local in each case. We deliver a seamless, transparent, and integrated

8

Table of Contents

experience for global merchants while ensuring secure and compliant transactions. Our platform has been designed to make it simple for our merchants to add payment methods, products, and new markets in an expeditious manner, all through a single point of integration and one contract. Our single API addresses the requirements of our merchants, ranging from back-end integration to an easy-to-integrate checkout module where dLocal handles the payment process. We increase the payments conversion rates through automatic retries, fallback transaction capabilities, easy management of each transaction through our API or dashboard, and user and account automatic validation, combined with broad connectivity to local financial institutions and local payment methods.

Our founding management team built dLocal's state-of-the-art platform from the ground up. It is designed to serve multiple functions in the payments value chain. dLocal combines payment processing and FX management with compliance, tax, and fraud management capabilities into one intuitive, fully integrated platform. We provide global merchants increased transparency and valuable insight into their cross-border and local-to-local payments flows, enabling them to provide an enhanced user experience for their end users. The features that power dLocal's platform enhance the processing systems in each of the emerging markets we serve, while at the same time standardizing payments offerings across multiple countries. Our dynamic routing feature leverages the full breadth of dLocal's connections with our more than 350 acquiring company partners to maximize approval rates. Our fraud prevention module helps our merchants to detect risky patterns and prevent fraud. Our security features are very relevant to our merchants as we handle highly sensitive transaction and user information. Refund and dispute management, currency exchange management, reporting and reconciliation for automatic settlements of funds, among other capabilities, round out our comprehensive suite of solutions.

We have made significant investments in product development and software design through the engineering expertise of 165 full-time equivalents (including employees and contractors) focused solely on technology. These investments have enabled us to efficiently expand our platform solutions and capabilities, enhance our payments infrastructure, rapidly deploy technology updates, and embrace high-security standards for our business and technology. As an example, we enhance our platform constantly and deploy system updates typically on a daily basis that instantly become available to all our merchants, in contrast with legacy players, which normally deploy such updates a limited amount of times per year. We believe that our capabilities are highly differentiated and hard to replicate, strengthening our overall competitive advantage.

### *Direct integration with our global, blue-chip enterprise client base*

Our goal is to establish direct integration with our merchants which allows us to better understand their needs, reduce our response time, collaborate efficiently, and provide a superior payments experience. In doing so, we build relationships that are difficult and costly for competitors to replace or replicate. We also partner selectively with PSPs to which we offer our services and "last-mile" connectivity to local payment methods in emerging markets, thus allowing us to reach certain long-tail merchants to which we may not otherwise directly connect. Since its inception, dLocal has focused on enabling our clients to access a cloud-based digital payments infrastructure in emerging markets that offers a similar level of standards, functionality, and payments experience as that available in developed markets. This includes the ability to execute recurring payments, facilitate payment in installments, allow customer refunds, or split payments even when local providers do not support this functionality. We recognize the need for our merchants to carry out commerce in emerging markets in a seamless and secure manner. Accordingly, we have set up a platform designed to provide a comprehensive, enterprise-grade solution to enhance their operations in these markets.

Our commitment to these standards has allowed us to build a portfolio of merchants that includes some of the largest companies in the world, including Didi, Amazon, Microsoft, Spotify, Mailchimp, Wix, Wikimedia and Kuaishou, among many others. Furthermore, we have a strong track record of successfully acquiring new merchants and growing these relationships over time, cross-selling solutions in additional geographies or

9

Table of Contents

payment methods beyond the initial contracted services. On average, our global merchants used dLocal's platform in nearly six different countries and 44 payment methods in 2020 and in five countries and 35 payment methods in 2019, in each case for merchants with at least US$6 million of annual TPV on our platform. Such merchants comprised 92% of our TPV in 2020 and 93% in 2019.

As we continue to strengthen the relationship with our global merchants, we are well positioned to capitalize on their own incremental penetration in emerging markets and the growth of their business, which we expect to be a driver of our future growth.

### Our product portfolio and data-driven value added services

Our platform includes a rich catalogue of multiple products, capabilities, and value-added services focused on helping global enterprise merchants to get paid and make payments in emerging markets in a safe and efficient manner, minimizing friction, and increasing conversion rates and end user satisfaction. We believe dLocal is well positioned as a valuable "one stop shop" for global merchants looking to consolidate their emerging market transaction services with one trusted partner through one contract.

We provide merchants with proprietary fraud management tools built on machine learning algorithms and rules-based technology to help identify potentially problematic activity and execute transactions with increased levels of security. In addition, we offer tax and compliance capabilities that streamline regulatory compliance by helping merchants stay up-to-date with complex and frequently changing local laws and regulations, and FX management and multi-currency collection and settlement capabilities to address their needs in cross-border transactions.

Our innovative, technology-focused, and data-driven approach also allows us to be nimble in adjusting products and solutions to respond to specific client needs. We offer our clients a comprehensive merchant dashboard that gives them visibility into key information and provides valuable tools that can be accessed through a secure, individually-tailored interface. We believe that this results in an enhanced level of transparency and understanding of their operations, enabling global merchants to adapt user interfaces, enhance the payments experience, and ultimately conduct more effective and efficient decision-making. Our visibility into the payments value chain, along with our deep connectivity with, and understanding of, emerging markets, allows us to gather data on end user behavior, which can then be used to generate actionable insights for merchants to better serve and engage with their end users and optimize their systems and settings to achieve higher authorization levels and minimize friction. We believe this ultimately leads to a smoother payments experience without compromising risk management and fraud detection.

### Deep connectivity with local partners in emerging markets

dLocal offers its global merchants comprehensive access to a broad payments ecosystem through our *One dLocal* model in the emerging markets where we have a presence. dLocal's strategic relationships with over 600 local payment methods (some of which are financial institutions) create a broad and effective acceptance network for our payments solutions. We have ongoing dialogue with many local regulators, exchanges, and tax authorities in different countries, as well as direct integration with certain tax payment systems, which enables us to optimize operations and adapt quickly and efficiently to regulatory changes.

Given the relevance of APMs and local financial institutions in emerging markets, we believe it is critical for merchants to have the ability to accept the widest variety of payment methods and have the broadest possible reach in order to maximize conversion rates and reduce transaction friction with end users. Through our *One dLocal* model, we offer access to a large number of locally issued cards (under banners such as Visa, Mastercard, Diners, Verve, Elo and Naranja) and other APMs in each market, such as UPI in India, MPESA in Kenya, Ovo in Indonesia, and Boleto and PIX in Brazil.

Table of Contents

Establishing and facilitating our breadth of connectivity requires knowledge of the market-specific regulatory frameworks and requirements, local knowledge and connections with different market participants, as well as having the right licenses in place. We believe dLocal is well positioned to continue broadening our network of APM partners and local financial institutions, ensuring our merchants can always rely on our connectivity to reach the end users they target.

### *Client-centric mindset drives agile innovation and rapid deployments*

Our focus on merchants' demands drives us to develop solutions that address the multiple and complex issues they face in emerging markets. dLocal operates in an agile manner, guided by our intrinsic focus on innovation to build solutions tailored to address the ever-evolving needs of our merchants. Whenever helpful, we provide merchants with a safe environment to rapidly test and iterate new solutions ahead of broad deployment. We believe that our agility and focus on solving the payment-related problems of our merchants in an effective and efficient manner minimizes wasted resources and differentiates us from our competitors. For example, in 2019, as a result of rapidly evolving changes to the regulatory framework, we filed with the regulator to become a licensed payment processor in Brazil. This provided us with the ability to partner with one of the largest ride-hailing companies in the world due to our ability to create in Brazil a local-to-local payment solution that allowed thousands of its drivers to receive payments from and its customers to make payments to the merchant, which we believe is difficult to replicate by other providers.

We have also created broad solutions with feature-rich capabilities that assist multiple merchants operating in the same market. We often create these products in response to a specific merchant need, which we can then replicate across our entire platform, thus benefiting other merchants operating in the same countries at minimal added costs. For example, we developed a differentiated tool to streamline tax withholdings in Argentina. At the time, the Argentinian government had made changes in tax policy, giving merchants little time to react. Our solution, which was built and launched rapidly across our entire platform, assisted all our merchants operating in the country to comply with evolving regulatory changes.

We recognize that our success is directly correlated with the success of our merchants. It is our responsibility to provide a secure, reliable service for them to drive payments volume through our platform. This makes us highly attuned to our merchants' needs. We offer what we believe to be superior customer service, with 24/7 support and direct accessibility to a team of software engineers. We typically deploy daily updates for our platform, constantly enhancing our offering, while legacy players do so only a few times per year. Similarly, our customer support team stands ready to address issues at any time, in any time zone. We strive to promptly resolve our merchants' problems, often before they arise, differentiating us from competing platforms, which we believe have longer response times.

We firmly believe in the importance of working alongside our merchants. In collaborating closely through our multiple touch points (including technology, operations, sales, account management, and product support), we aim to better serve them. This creates a cooperative environment, helping us work well together on product innovation and market expansion. Our merchants are our best partners in developing new solutions, in many instances helping us test them in secure and live environments, iterating, learning, and applying insights to new product releases that we then make generally available to our entire merchant base at the moment of launch.

### *Attractive business model that delivers strong financial performance*

Our technology-driven business model creates significant opportunities for scale and operating efficiencies. We benefit from strong relationships with our existing merchants, many of whom benefit directly from strong secular trends such as the increasing adoption of e-commerce. In addition, many of our global merchants offer subscription-based models that provide greater visibility into the TPV processed through our platform. This all

11

Table of Contents

translates into the expanding performance of our annual merchant cohorts over time. Furthermore, our asset-light structure drives our ability to deliver strong margins and generate cash flow. Our business model has proven to be resilient, even through the recent COVID-19 pandemic. In fact, the COVID-19 pandemic has accelerated the digitalization of commerce, which has benefited some of our global merchants. For the three months ended March 31, 2021, our revenues grew by 123.7% compared to the three months ended March 31, 2020, and we reported an Adjusted EBITDA Margin of 44.3%. For 2020, our revenues grew by 88.4% compared to 2019, and we reported an Adjusted EBITDA Margin of 40.3%.

We have built our platform and all of its capabilities to last. We believe we will continue to drive growth and profitability through our investment in expanding our existing business into new countries, developing new products and capabilities, and attracting new global merchants into our platform, allowing us to remain ahead of the competition.

### *Technology-oriented, execution-driven management team fostering an entrepreneurial culture*

We are devoted to fostering an entrepreneurial culture, built upon a commitment to offer a superior value proposition for our merchants. We were proudly born out of Uruguay, which forced us to think big and be global since inception. This is largely reflected in our presence in 29 countries and the expanding geographic diversity of our team of over 300 professionals in 20 countries as of December 2020. We are mission driven and are focused on creating innovative solutions, launching new products, and adding new functionalities, always seeking to ensure the best possible execution and to continue supporting the growth of our merchants. Delivering a superior technology infrastructure is a key pillar of our management team's focus, as evidenced by the fact that three of our current key executives have served in senior technology roles within dLocal at some point during their tenures.

Talent development and the retention of dLocal's culture are key business imperatives. We also believe fostering diversity and inclusion are critical for business success, as they lead to stronger teams and better outcomes for our merchants, employees, and the communities we serve. Our management team has strong expertise and experience in emerging markets, which we believe is a competitive advantage to maintain the high levels of agility and adaptability that the market demands. We continue to expand globally and have assembled an experienced team that includes several members who have worked together for many years (even prior to dLocal's foundation), and which is supported by compliance, tax, finance, operations, regulatory, and other functional experts and payments and technology leaders.

### Our Growth Strategy

dLocal has a clearly defined and readily executable growth strategy to become the online payments infrastructure of choice in emerging markets. We will continue to focus on serving our diversified base of global enterprise merchants, especially in attractive industry verticals such as retail, streaming, ride-hailing, financial institutions, advertising, SaaS, travel, e-learning and gaming. We are focused on the following strategic pillars for growth, all of which build on each other and further enhance the power of our value proposition:

### *Grow with our existing enterprise merchant base and deepen our relationships with them*

Our clients include some of the world's leading global merchants. Increased adoption of e-commerce and online modes of payment in emerging markets have delivered significant growth for global merchants in recent years. Given the nature of our business model, the TPV that flows through our platform drives our overall revenue. As global merchants continue to benefit from these strong secular trends, we believe this will translate into larger transaction volumes and additional revenue for dLocal from the solutions we offer and the countries where we serve them today.

Table of Contents

We have a strong track record of account management, cross-selling merchants, and expanding their use of our services, which will help us broaden their use of our platform across both additional solutions (e.g., offering pay-out solutions to a pay-in-only merchant) and countries (e.g., activating our platform in India for a merchant currently only engaging with us in Latin America). We believe that our continuous investments in enhancing the merchant experience (both for the merchants and for their end users) and our strong problem-solving culture will help us deliver superior service, leading our merchants to increase the percentage of their overall volume routed to dLocal.

We measure our success in growing and deepening our relationships with our existing merchants by means of our cohort performance in terms of TPV, countries and payment methods per merchant, as well as with our NRR. In 2020, the TPV derived from the cohort of enterprise merchants that began using our products in 2019 grew by 209% in 2020. Our NRR was 171% for the year ended December 31, 2020 and the revenue growth attributable to new merchants was 17%. Excluding the effect in 2019 of a warrant with a merchant, the NRR would have been 159%. For the three months ended March 31, 2021 and 2020, our NRR was 186% and 216% (or 139% excluding the effect of the warrant), respectively, and our growth attributable to new merchants was 38%.

### Increase number of global merchant clients

Our dedicated sales team continues to develop new global merchant relationships with the intent to be on-boarded and provide them our solutions and capabilities across one or multiple emerging markets. Furthermore, we will continue to benefit from the ability to reference our existing clients to recommend our platform, helping us gain traction with new global merchants. To further expand our merchant base, we have developed a robust sales process with a proven track-record of winning competitive requests for proposals, or RFPs. Global merchants typically conduct a rigorous bidding and due diligence process before choosing and on-boarding their preferred PSP, evaluating candidates across many factors primarily including approval rates, technical capabilities, security, fraud management capabilities, payments experience, and price (including price transparency). The process from the initial RFP to final integration can take several months and typically involves multiple functional areas of the merchant, including payments infrastructure, operations, legal, compliance, and tax departments. For example, the combined RFP and on-boarding processes can take in general between two months to just over two years. Since 2016 through 2020, we have successfully added on average nearly six new pay-in merchants per month and one new pay-out merchant per month. We may also seek to expand our merchant base through selective acquisitions of cross-border payment processing companies.

### Expand our global reach

We believe that the online global payments market is massive and remains underserved, particularly in emerging markets, where dLocal is focused. We have made significant investments to develop a flexible and extensible platform that can adapt to the specific needs of new local markets we enter. We seek to continue to leverage the scalability of our technology to broaden our geographic footprint.

We believe our playbook for expanding into new emerging markets is difficult to replicate. We have developed a systematic approach to understand the local regulatory and tax frameworks, obtain all necessary licenses and required approvals, and establish relationships and connectivity with key partners (including APMs and local financial institutions). We have typically been able to set up operations in new local markets we enter in less than six months. We tailor our strategy based on the consumption and behavioral trends specific to a market, and typically develop a local presence (for example, through a locally based country manager) to provide relevant solutions and deliver high level of customer service for our current and future merchants. Once we establish an initial presence in a new market, our merchants can begin to route their existing payments volume in that market to our platform without additional integration required, driving a meaningful and rapid return on our investment.

13

Table of Contents

Our global expansion strategy follows the needs of our merchants by prioritizing markets with the most attractive opportunities and where our merchants face the most complex payments, compliance, and regulatory challenges. For example, we entered and began processing transactions in Egypt at the specific direction of one of the largest social media platforms in the world, which is also one of our largest clients. Capitalizing on our ability and commitment to expand geographically, in 2020 we established a presence in multiple new countries including Egypt, Bangladesh, Panama, and Bolivia. We aspire to eventually establish a presence in all relevant emerging markets where global merchants require a differentiated technology and payments partner as we see this as a key competitive advantage going forward.

### *Broaden the breadth of our products*

We believe we are in the early stages of a financial technology revolution that is addressing increasingly complex payments challenges. Our technology-first DNA and problem-solving culture have fostered a strong track record of repeatedly delivering new and relevant solutions and capabilities for global merchants in emerging markets.

We have developed multiple new solutions for our merchants since our inception and are well-positioned to continue to innovate and be at the forefront of developments in payments technology. Pay-out is an example of a solution that we added at the request of one specific merchant during the Olympic Games in Rio de Janeiro. After developing the baseline solution, we quickly adapted it to work across our entire platform for our entire merchant base.

Another example is the recently developed issuing-as-a-service initiative, currently in beta testing, which will enable merchants to create their own payment ecosystem. In order to address a growing demand for a branded card experience, we intend to offer merchants the ability to issue pre-paid cards to their end users. End users will be able to conveniently add balance in local currency through cards, cash deposits, bank transfers, funding from merchants, and P2P payments and use the balance for products or services from the issuing merchants or other unaffiliated transactions.

Our privileged position as a trusted partner to over 330 merchants gives us ongoing visibility into their needs and requirements. We are well poised to capitalize on the opportunity to address new use cases as they emerge in an agile manner, broadening our overall total addressable market, and offering greater value for global merchants in whatever emerging markets they choose to enter.

### Our One dLocal Model

Our *One dLocal* model combines our proprietary technology, intellectual property, capabilities, and business processes to create a differentiated go-to-market approach. It offers access to more than 2 billion consumers in 29 emerging markets through one direct API, one platform and one contract. We have a core aspiration to make the complex world of emerging market payments as simple as possible for our merchants through our model, unlike what we believe is the standard for other solutions. Merchants can then access all of the markets we serve using one integrated set of technologies governed by one overarching contract. The inherent simplicity of this model, combined with our platform's extensive capabilities and benefits, including what we believe are higher conversion rates and lower fraud, creates a highly compelling value proposition for our global enterprise merchants.

dLocal's founding management team built our cloud-based payment platform from the ground up. It was designed to provide an improved payments experience for our merchants with a strong focus on scalability, security, and performance. Our single platform enables merchants to experience the same standard of functionality and client interface that they have come to expect in developed markets as they enter into or further

14

Table of Contents

***We rely on manual processes in our operations to conduct our business.***

Presently, several of our functions are performed using a number of different information systems that are not integrated. In part because of this, we rely on operations that are performed by individuals rather than automated systems and processes in the operation of all our IT, operations, and treasury-related activities. Accordingly, our treasury functions, for instance, require us to perform many manual reconciliations and other manual steps, which result in a high risk of errors, including errors in the pay-out amount to the beneficiaries, duplicate payments to our merchants in settlement transactions or to our merchant beneficiaries in our payout transactions and errors in our fees, foreign exchange rates, withholding and other tax calculations, which could involve material amounts. Manual steps also increase the probability of control deficiencies and material weaknesses.

Until these systems are fully migrated and implemented with automated replacement systems, we must depend on existing technology platforms that require more manual or duplicate processing. If we do not adequately manage and evolve our financial reporting and managerial systems and processes, our ability to manage or grow our business may be harmed. Our ability to successfully implement our goals and comply with regulations, including those adopted under the Sarbanes-Oxley Act of 2002, requires an effective planning and management system and process. We will need to continue to improve existing, and implement new, operational and financial systems, procedures and controls to manage our treasury operations and business effectively in the future. See also "—If we fail to manage our growth effectively, our business could be harmed."

***If we fail to establish and maintain proper and effective internal controls over financial reporting, our results of operations and our ability to operate our business may be harmed.***

After this offering, we will be subject to the Sarbanes-Oxley Act, which requires, among other things, that we establish and maintain effective internal controls over financial reporting and disclosure controls and procedures. As an "emerging growth company", we choose to rely on an exemption from the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002, as amended, or the Sarbanes-Oxley Act, in the assessment of our internal control over financial reporting. Under the SEC's current rules, starting in 2022 we will be required to perform system and process evaluation and testing of our internal controls over financial reporting to allow management to assess the effectiveness of our internal controls. Our testing may reveal deficiencies in our internal controls that are deemed to be material weaknesses or significant deficiencies and render our internal controls over financial reporting ineffective. For example, we identified a material weakness in connection with the preparation of our consolidated financial statements for the year ended December 31, 2019. See "—We have identified material weaknesses in our internal control over financial reporting and, if we fail to remediate such deficiencies (and any other ones) and to maintain effective internal controls over financial reporting, we may be unable to accurately report our results of operations, meet our reporting obligations and/or prevent fraud." We expect to incur additional accounting and auditing expenses and to spend significant management time in complying with these requirements. If we are not able to comply with these requirements in a timely manner, or if we or our management identifies material weaknesses or significant deficiencies in our internal controls over financial reporting that are deemed to be material weaknesses, the market price of our Class A common shares may decline, and we may be subject to investigations or sanctions by the SEC, or other regulatory authorities. In addition, we may be required to expend significant management time and financial resources to correct any material weaknesses that may be identified or to respond to any regulatory investigations or proceedings.

***We have identified material weaknesses in our internal control over financial reporting and, if we fail to remediate such deficiencies (and any other ones) and to maintain effective internal controls over financial reporting, we may be unable to accurately report our results of operations, meet our reporting obligations and/or prevent fraud.***

Prior to this offering, we were a private company with limited accounting personnel and other resources to address our internal control over financial reporting and procedures. Our management has not completed an

49

Table of Contents

assessment of the effectiveness of our internal control over financial reporting and our independent registered public accounting firm has not conducted an audit of our internal control over financial reporting. In connection with the preparation of our consolidated financial statements for the year ended December 31, 2019, we identified a number of control deficiencies that in the aggregate, comprise a material weakness in our internal control over financial reporting as of December 31, 2019. A material weakness is a deficiency, or combination of control deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim consolidated financial statements will not be prevented or detected on a timely basis.

We did not effectively design controls addressing the risk of material misstatement. Specifically, in certain cases we did not design controls at a sufficient level of precision to identify potential material misstatements. These material misstatements contributed to a number of control deficiencies that in the aggregate, comprise a material weakness in the design and maintenance of effective controls with respect to the accounting for leases, financial instruments, share-based payments, credit expected losses, provisions for contingencies, revenues from contracts with customers, intangible assets and financial reporting in hyperinflationary economies, as well as classification errors in several areas of our consolidated statement of financial position and consolidated statement of comprehensive income. These control deficiencies resulted in the restatement of our consolidated financial statements as of December 31, 2019. Accordingly, our management has determined that these control deficiencies constitute a material weakness.

As of December 31, 2020, we are in the process of implementing a remediation plan designed to improve our internal controls over financial reporting and to remediate the control deficiencies that resulted in the material weakness, including performing a risk-assessment process on a regular basis to identify, design, implement and re-evaluate our control activities related to internal control over financial reporting. We cannot assure you that the measures we have taken to date, and the actions we may take in the future, will be sufficient to remediate the control deficiencies that led to our material weakness in our internal controls over financial reporting or that they will prevent potential future material weaknesses. In addition, neither our management nor an independent registered public accounting firm has performed an evaluation of our internal controls over financial reporting in accordance with the provisions of the Sarbanes-Oxley Act because no such evaluation has been previously required. Had we or our independent registered public accounting firm performed an evaluation of our internal controls over financial reporting in accordance with the provisions of the Sarbanes-Oxley Act, additional material weaknesses may have been identified. If we are unable to successfully remediate our existing material weakness, or identify and remediate any future, material weaknesses in our internal control over financial reporting, the accuracy and timing of our financial reporting may be adversely affected, and consequently we may be unable to timely file periodic reports in compliance with securities laws and applicable stock exchange listing requirements, investors may lose confidence in our financial reporting and our share price may decline as a result.

***Any factors that reduce cross-border trade in goods or services or make such trade more difficult could harm our business.***

Cross-border trade of goods and/or services (*i.e.*, transactions where the merchant and consumer are in different countries) is an important source of our revenues and profits. Cross-border transactions generally provide higher revenues and operating income than similar transactions that take place within a single country or market. In certain markets, cross-border trade represents our primary (and in some instances our only) source of revenue.

Cross-border trade may be negatively impacted by various factors including regional or international tensions, trade wars or international conflict of any kind, foreign currency exchange rate fluctuations and the interpretation and application of laws of multiple jurisdictions in the context of cross-border trade and foreign exchange. Moreover, governmental authorities in certain countries may determine to block some or all of our merchants, which could significantly disrupt our operations in such countries. Any factors that increase the costs

50

Table of Contents

of cross-border trade for us, our customers or their end users or that restrict, delay, or make cross-border trade more difficult or impractical, such as trade policy or higher tariffs, could reduce our cross-border transactions and volume, negatively impact our revenues and profits, and harm our business.

*Exchange controls and other restrictions on the movement of capital out of certain jurisdictions or otherwise affecting our settlement transactions or our subsidiaries' ability to pay dividends or make other payments to us may have a material adverse effect on our results of operations and financial condition.*

We are subject in certain jurisdictions where we have operations, such as Argentina, India, South Africa, Egypt, Nigeria and Morocco, to the risk that regulatory authorities in or outside such jurisdictions may impose exchange controls or restrictions on the movement of capital, including on transactions involving transfers of funds from such jurisdictions, as well as restrictions on repatriation of funds or repatriation of profits on subsidiaries from such jurisdictions, which may restrict the amount of funds that can be transferred or dividends that can be paid upstream to us from such jurisdictions. For example, in certain jurisdictions, such as South Africa, Egypt, Nigeria and Morocco, we must obtain regulatory approval prior to the repatriation of funds from these jurisdictions. We are in the process of obtaining applicable approvals in these jurisdictions, though there can be no assurance that such approvals will be obtained in a timely manner, or at all, or that we will timely obtain approvals in jurisdictions where we may seek to operate in the future. In addition, the Argentine economy has experienced balance of payment deficits and shortages in foreign exchange reserves, and the government has responded by restricting the ability of companies to convert local currencies into foreign currencies and imposing other exchange controls. From time to time, we net funds, which could be challenged by regulators due to foreign exchange controls. These restrictive exchange control measures prevent or severely restrict the access to exchange for foreign currencies, such as U.S. dollars and the ability to remit them out of the country (which measures include prior approval by the local central bank, which may be denied at its discretion) and also restrict the ability to hold foreign currency in cash within the relevant jurisdiction. If we are unable to transfer such amounts from such jurisdictions when and as needed, we will remain subject to foreign exchange risk relating to such retained funds denominated in local currencies (including merchant funds held by us), to the extent we cannot convert such funds into other currencies (whether as a result of foreign exchange restrictions in such jurisdictions, or any restrictions on transferring funds out of such jurisdictions), which may adversely impact our ability to settle such transactions and subject us to significant foreign exchange risk, which could have a material adverse effect on our results of operations, liquidity and financial condition. See "—We are exposed to fluctuations in foreign currency exchange rates," and "—Our working capital needs may grow in excess of our cash generation capabilities, which may cause a decline in our cash and cash equivalents." Moreover, as a holding company, we require dividends and other payments from our subsidiaries to meet cash requirements.

In addition, repatriations of cash from our subsidiaries may be subject to withholding, income and other taxes in various applicable jurisdictions. If our subsidiaries are unable to pay dividends and make other payments or transfers of funds to us when needed, we may be unable to satisfy our obligations, which would have a material adverse effect on our business, financial condition and operating results. See also "—Complex and enhanced regulatory oversight in the banking and financial services industry could adversely affect our operations or our relationships with our banking partners."

*We may pursue strategic acquisitions or investments. The failure of an acquisition or investment to produce the anticipated results, the inability to integrate an acquired company fully, or potential contingencies related to any acquisition, could harm our business.*

Although our core strategy focuses on organic growth, we may pursue strategic acquisitions, including with part of the proceeds of this offering, but there can be no assurance that we will be able to find suitable targets or that we will be able to complete acquisitions upon terms, including purchase price, that we find acceptable.

We may from time to time acquire or invest in complementary companies or businesses, which may subject us to additional risks. The success of an acquisition or investment will depend on our ability to make accurate

Table of Contents

assumptions regarding the valuation, operations, growth potential, integration and other factors related to that business and the transaction structure. We cannot assure you that acquisitions or investments will produce the results that we expect at the time we enter into or complete a given transaction or that we may not be subject to additional contingencies, including additional tax liability, in respect of certain transactions. Furthermore, we may not effectively integrate these acquisitions with our current business, including their personnel, financial systems and operating procedures, or be able to retain their key customers, in each case especially if they operate in different platforms. The costs of integrating any acquired business may harm our operating results. Moreover, unforeseen operating difficulties may arise and may result in the diversion of our capital and our management's attention from other business issues and opportunities. In addition, we may acquire businesses or assets that may not be fully compliant with applicable regulatory regimes. If we fail to integrate acquisitions successfully or inadequately diligence and obtain appropriate indemnity coverage for such acquisitions, we could be subject to unforeseen costs, reputational damage and our business could suffer. In March 2021, we signed an agreement with an effective date as of April 1, 2021 to acquire certain assets (primarily merchant agreements) from a payment service provider that provides local payment services in certain emerging markets in Latin America. See note 31 to our audited consolidated financial statements. We have applied for an exemption from associated taxes arising from the transaction in Malta. In addition, we are in the process of novating the merchant contracts between such merchants and our affiliates, though there can be no assurance that all of the merchant customers will agree to novate their contracts with our affiliates. Until these contracts are novated, they may be subject to increased regulatory oversight risk, which could lead to fines or penalties for the current payment provider in respect of such contracts, which could adversely affect the assets we are acquiring, thus indirectly affecting us. We may also in the future be involved in potential conflicts with the selling shareholders of acquired companies, which could adversely affect our business.

### *Our failure to manage our client funds properly could materially harm our business.*

Our ability to manage and account accurately for our client funds requires a high level of internal processes and controls, including maintaining customer funds in separate bank accounts held at leading banks, and segregated from our proprietary funds, including as required pursuant to applicable regulations in the jurisdictions in which we operate. As our business continues to grow and we expand our service offerings, we must continue to strengthen our internal controls accordingly. Our success requires significant confidence from our customers in our ability to handle large and growing transaction volumes and amounts of client funds. Any failure to maintain the necessary controls or to manage the assets underlying our client funds accurately could severely diminish client use of our services and/or result in penalties and fines, which could materially harm our business.

### *Our ability to protect our intellectual property rights, which are important to our success, is limited.*

We believe the protection of our intellectual property, including our trademarks, domain names and trade secrets, is critical to our success. We seek to protect our intellectual property rights by relying on applicable laws and regulations, as well as a variety of administrative procedures. We also rely on contractual restrictions to protect our proprietary rights, both with our employees in the development of new services and technologies and when offering or procuring products and services, including through confidentiality agreements with our employees and parties with whom we conduct business.

However, contractual arrangements and other steps we have taken to protect our intellectual property may not prevent third parties from infringing or misappropriating our intellectual property or deter independent development of equivalent or superior intellectual property rights by others. Trademarks, domain name and trade secret protection may be expensive or difficult to assert and may require litigation. Protecting our intellectual property rights and other proprietary rights may be expensive and time-consuming and we may not be successful in every jurisdiction. Also, we may not be able to discover or determine the extent of any unauthorized use of our proprietary rights.

Table of Contents

As the number of products in the software industry increases and the functionalities of these products further overlap, and as we acquire technology through acquisitions or licenses, we may become increasingly subject to infringement claims, including patent, copyright, and trademark infringement claims. We may be required to enter into litigation to determine the validity and scope of the patents or other intellectual property rights of others. The ultimate outcome of any allegation is uncertain and, regardless of the outcome, any such claim, with or without merit, may be time-consuming, result in costly litigation, divert management's time and attention from our business, require us to stop offering our services, or require us to pay substantial amounts to satisfy judgments or settle claims or lawsuits or to pay substantial royalty or licensing fees, or to satisfy indemnification obligations that we have with some of our clients. Our failure to obtain necessary license or other rights, or litigation or claims arising out of intellectual property matters, may harm our business.

### The costs and effects of pending and future litigation, investigations or similar matters, or adverse facts and developments related thereto, could materially affect our business, financial position and results of operations.

We are, and may be in the future, party to legal, arbitration and administrative investigations, inspections and proceedings arising in the ordinary course of our business or from extraordinary corporate, intellectual property, tax or regulatory events, involving our clients, suppliers, consumers, as well as competition, government agencies (including central banks) and tax authorities, particularly with respect to civil, tax, financial, foreign exchange, and labor claims (including employee lawsuits). Our indemnities may not cover all claims that may be asserted against us, and any claims asserted against us, regardless of merit or eventual outcome, may harm our reputation. Furthermore, there is no guarantee that we will be successful in defending ourselves in pending or future litigation or similar matters under various laws. Should the ultimate judgments or settlements in any pending litigation or future litigation or investigation significantly exceed our capacity to pay or applicable indemnity rights, they could have a material adverse effect on our business, financial condition and results of operations and the price of our Class A common shares. Further, even if we adequately address issues raised by an inspection conducted by an agency or successfully defend our case in an administrative proceeding or court action, we may have to set aside significant financial and management resources to settle issues raised by such proceedings or to those lawsuits or claims, which could adversely affect our business, as well as cause us reputational harm in case such issues become public. See "Business—Legal proceedings."

### We could incur certain labor liabilities in connection with the outsourcing of certain of our operations to independent contractors, which could have an adverse effect on our business and results of operations

We outsource a number of activities related to our business to independent contractors in order to adapt to different market customs and practices and to maintain a flexible cost base. As of March 31, 2021, dLocal had approximately 60 independent contractors. Although we have implemented policies regarding compliance with labor and social security obligations by our contractors, we cannot assure that our contractors will abide by their obligations or that local authorities in each market where we have operations will not impose additional labor related taxes or charges in connection with the contracts we have in force with such contractors, nor that contractors will not initiate legal actions to seek indemnification from us based on applicable labor laws and court ruling in the jurisdictions in which we engage independent contractors for a portion of our operations. If we were to incur material labor liabilities in connection with outsourcing certain operations to independent contractors, such liabilities could have an adverse effect on our financial condition and our results of operations.

### We may be subject to unexpected claims and liabilities and reputational risk arising from our former operations as a division of AstroPay.

dLocal began as a division of AstroPay. Prior to August 1, 2018, we operated as a division of AstroPay, a global payment solutions provider with operations in emerging markets. On August 1, 2018, our business was separated from the business of AstroPay and its affiliated entity, Directa24, pursuant to a separation agreement. While we operated our business as a distinct division of AstroPay prior to the separation (and the separation

53

Table of Contents

agreement includes a mutual discharge provision related to claims against each other), we may still be subject to unexpected claims and liabilities relating to, arising out of or resulting from the separation, including, but not limited to, liabilities arising from the carve-out of our operations from AstroPay, and/or claims from third parties as a result of our status as a legacy operation of AstroPay. Moreover, while the separation agreement sets forth certain non-compete and non-solicitation agreements for both parties, these provisions shall lapse the earlier of (1) two years from the consummation of a change of control transaction which constitutes a sale of 100% of the issued share capital of either party or (2) three years from the consummation of any other change of control transaction of either party. Therefore, we are subject to competition from AstroPay and its affiliated entity Directa24 in certain industry verticals and may become subject to competition across all industry verticals in the future upon the expiration of such non-compete and non-solicitation clauses. In addition, we are subject to reputational risk related to our prior operations as a division of AstroPay and potential misattribution of our operations to those of AstroPay.

AstroPay and Directa24 process payments mainly for merchants operating in online gambling, forex, binary options or adult entertainment verticals. Their main markets are Brazil, India and Latin America generally. These activities do not have a clear legal framework in these jurisdictions and could be considered illegal in some of the jurisdictions, thereby exposing those companies to potential civil and criminal sanctions in one or more of the territories where they operate in the foreseeable future. Our controlling shareholders are the same controlling shareholders of AstroPay and Directa24. In addition, prior to January 1, 2016, our chief executive officer was the chief executive officer of AstroPay and currently holds a 1% equity interest in AstroPay.

Merchant customers or the market generally may continue to associate our operations with the operations of AstroPay. We may also be perceived to be associated with AstroPay and/or Directa24 due to partial overlap of our existing shareholder group with the shareholders of AstroPay. Finally, certain of our directors and officers were formerly associated with AstroPay and/or Directa24 and/or continue to hold an ownership interest in AstroPay and/or Directa24, and their prior association with and current interest in AstroPay and/or Directa24 may be imputed to us. Any perceived reputational shortcomings of AstroPay and/or Directa24 may reflect poorly on us, whether or not justified, which could have an adverse effect on our reputation and adversely affect our business, financial condition and results of operations.

### *Our use of open-source software could negatively affect our ability to sell our services and subject us to possible litigation.*

Our platform incorporates and relies upon the use and development of open-source software and we intend to continue our use and development of open-source software in the future. Such open-source software is generally licensed by its authors or other third parties under open-source licenses and is typically freely accessible, usable and modifiable. Pursuant to such open-source licenses, which generally consist of GNU General Public Licenses (GPU) and GNU Lesser General Public Licenses (LGPL), we may be subject to certain conditions, including requirements that we offer our proprietary software that incorporates the open-source software for no cost, among other requirements. If an author or other third party that uses or distributes such open-source software were to allege that we had not complied with the conditions of one or more of these licenses, we could be required to incur significant legal expenses defending against such allegations and could be subject to significant damages, enjoined from the sale of our solutions that contained or are dependent upon the open-source software and required to comply with the foregoing conditions, which could disrupt the distribution and sale of some of our solutions. Litigation could be costly for us to defend, have a negative effect on our operating results and financial condition or require us to devote additional research and development resources to change our platform. The terms of many open-source licenses to which we are subject have not been interpreted by courts. As there is little or no legal precedent governing the interpretation of many of the terms of certain of these licenses, the potential impact of these terms on our business is uncertain and may result in unanticipated obligations regarding our solutions and technologies. Any requirement to disclose our proprietary source code, lack of availability of or updates to open-source software or payments of damages for breach of contract could be

54

Table of Contents

harmful to our business, results of operations or financial condition, and could help our competitors develop services that are similar to or better than ours.

In addition to risks related to license requirements, use of open-source software can lead to greater risks than use of third-party commercial software, as open-source licensors generally do not provide warranties, controls on the origin or development of the software, or remedies against the licensors. Many of the risks associated with usage of open-source software cannot be eliminated and could adversely affect our business.

Although we believe that we have complied with our obligations under the various applicable licenses for open-source software, it is possible that we may not be aware of all instances where open-source software has been incorporated into our proprietary software or used in connection with our solutions or our corresponding obligations under open-source licenses. We do not have open-source software usage policies or monitoring procedures in place. We rely on multiple software programmers to design our proprietary software and we cannot be certain that our programmers have not incorporated open-source software into our proprietary software that we intend to maintain as confidential or that they will not do so in the future. To the extent that we are required to disclose the source code of certain of our proprietary software developments to third parties, including our competitors, in order to comply with applicable open-source license terms, such disclosure could harm our intellectual property position, competitive advantage, results of operations and financial condition. In addition, to the extent that we have failed to comply with our obligations under particular licenses for open-source software, we may lose the right to continue to use and exploit such open-source software in connection with our operations and solutions, which could disrupt and adversely affect our business.

### *If we lose key personnel our business, financial condition and results of operations may be adversely affected.*

We are dependent upon the ability and experience of our president, our chief executive officer, our chief financial officer, our chief operations officer and our chief technology officer, who have substantial experience with our operations, the rapidly changing payment processing industry, and emerging markets. It is possible that the loss of the services of one or a combination of our senior executives or key managers, including key executive officers, could have a material adverse effect on our business, financial condition, and results of operations.

### *In a dynamic industry like ours, the ability to attract, recruit, develop and retain qualified employees is critical to our success and growth. If we are not able to do so, our business and prospects may be materially and adversely affected.*

Our business functions at the intersection of rapidly changing technological, social, economic and regulatory developments that require a wide-ranging set of expertise and intellectual capital. In order for us to successfully compete and grow, we must attract, recruit, develop and retain the necessary personnel who can provide the needed expertise across the entire spectrum of our intellectual capital needs. While we have a number of our key personnel who have substantial experience with our operations, our management team has no previous experience in working in a publicly-held company. In addition, we must also develop our personnel to provide succession plans capable of maintaining continuity in the midst of the inevitable unpredictability of human capital. However, the market for qualified personnel is competitive, and we may not succeed in recruiting additional personnel or may fail to effectively replace current personnel who depart with qualified or effective successors, particularly in the technology business. We must continue to hire additional personnel to execute our strategic plans. Our effort to retain and develop personnel may also result in significant additional expenses, including option grants, which could adversely affect our profitability. We cannot assure that qualified employees will continue to be employed or that we will be able to attract and retain qualified personnel in the future. Failure to retain or attract key personnel could have a material adverse effect on our business, financial condition, and results of operations.

55

Table of Contents

### MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion of our financial condition and results of operations should be read in conjunction with our consolidated financial statements as of and for the years ended December 31, 2020 and 2019 and the notes thereto, included elsewhere in this prospectus, as well as the information presented under "Presentation of Financial and Other Information," "Summary Financial and Other Information" and "Selected Financial and Other Information."*

*The following discussion contains forward-looking statements that involve risks and uncertainties. Our actual results and the timing of events may differ materially from those expressed or implied in such forward-looking statements as a result of various factors, including those set forth in "Cautionary Statement Regarding Forward-Looking Statements" and "Risk Factors."*

**Overview**

dLocal is focused on making the complex simple, redefining the online payments experience in emerging markets. Through one direct API, one technology platform, and one contract, which we collectively refer to as the *One dLocal* model, we enable global enterprise merchants to get paid (pay-in) and to make payments (pay-out) online in a safe and efficient manner. Merchants on our platform consistently benefit from improving acceptance and conversion rates, reduced friction, and improved fraud prevention, leading to enhanced potential interaction with nearly 2 billion combined internet users in the countries we serve (excluding China). Our proprietary, fully cloud-based platform has the ability to power both cross-border and local-to-local transactions in 29 countries as of the date of this prospectus (which includes seven new countries where we have recently made our services available but have not yet processed volume). Our solutions are built to be both payment method-agnostic and user friendly. We enable global merchants to connect with over 600 local payment methods (some of which are financial institutions) across our different geographies, thus expanding their addressable markets. Furthermore, our proprietary technology architecture is highly scalable and flexible, allowing us to constantly and rapidly innovate in response to market demand, expand to new countries and enhance our value proposition for our merchant clients. Agility is in our DNA. We believe our product offering makes us the most comprehensive online payments infrastructure currently available for global enterprise merchants operating across emerging markets.

We are an enterprise-focused company, targeting large global merchants that operate in different verticals and geographies. Our key verticals include retail, streaming, ride hailing, financial institutions, advertising, SaaS, travel, e-learning and gaming. We have built our global platform from the ground up to be accessible through a single direct API and to meet the rapidly evolving needs of these fast-growing global merchants. We believe simplicity, scalability, transparency, agility and innovation are keys to our continued success. We partner with over 330 merchants, including leading global enterprises such as Amazon, Didi, Microsoft, Spotify, Mailchimp, Wix, Wikimedia and Kuaishou. In addition, we cater to the needs of leading marketplaces to help their SMB clients and partners expand their geographic reach. Our global merchants benefit from maintaining direct relationships with their end users while facilitating a faster, safer, more reliable and compliant payments experience. On average, our global merchants used dLocal's platform in nearly six different countries and 44 payment methods in 2020 and in five countries and 35 payment methods in 2019, in each case for merchants with at least US$6 million of annual TPV on our platform. Such merchants comprised 92% of our TPV in 2020 and 93% in 2019. As a result, we believe that dLocal has become a trusted partner forging resilient relationships with global enterprise merchants.

We benefit from an attractive business model with improving economies of scale. We are often subject to rigorous vetting processes with global enterprise merchants that invest significant time and resources in the selection, diligence, and on-boarding of technology and payments providers. This on-boarding process can often take several months as these merchants assess our technological capabilities, ability to comply with their data

87

Table of Contents

security protocols, and adherence to regulatory, tax and compliance requirements. However, once we establish a direct connection (meaning there are no third party intermediaries between us and the merchant in the payment flow and technical integration), global merchants have the ability to access the full breadth of our solutions and the countries where we have a presence instantly through one direct API and one contract. Merchants can also choose to route all or a portion of their applicable pay-in and pay-out volume through us. Our direct connections with merchants serve as a strong competitive advantage and barrier to entry for competing providers, and makes incremental volume that flows through our platform highly margin accretive for dLocal.

Our single integrated platform provides a merchant-friendly alternative to the numerous legacy providers that global merchants were previously forced to rely upon for their payments needs in emerging markets. The breadth of our online payments infrastructure and expertise, allowing merchants to transact in 29 markets as of the date of this prospectus, the direct connections with global merchants, our relationships with APMs, local financial institutions and acquirers, our understanding of the countries in which we operate, and our differentiated compliance, tax, and fraud management capabilities are attributes that in combination are difficult for competitors to replicate and create strong barriers to entry. Our technology DNA (we have been a "technology-first" business from inception), execution-driven culture and agile innovation mindset keep us at the forefront of the industry.

We generate revenue through fees charged to our merchants in connection with payment processing services for cross-border and local payment transactions in emerging markets. These fees are primarily generated on a per approved transaction basis as either a fixed percentage per transaction or a fixed fee per transaction. The fees include an MDR to compensate us for our services, which may include processing; settlement; fraud prevention; split payments; tax, anti-money laundering, and regulatory compliance; among others. We also charge an FX service fee on cross-border payments involving conversion and expatriation of funds to and from various currencies, including the U.S. dollar and the Euro.

Our success-based business model is predicated upon the premise that we only earn revenue when our global merchants are enabled to transact (either get paid or make payments). We are fully focused on our merchant customers and on our desire to provide them the best payment solutions so their users can have a frictionless payment process. Upon initiating the relationship with a global merchant, we establish a flat fee contract as a percentage of transaction value or, in certain instances, as a fixed amount per transaction. In addition, we may require certain merchants to make minimum volume commitments to incentivize the use of our platform at the time of on-boarding and pay for the fixed expenses assumed to maintain the connection.

Our TPV was US$925.9 million and US$388.2 million for the three months ended March 31, 2021 and 2020, respectively, and US$2.1 billion and US$1.3 billion for 2020 and 2019, respectively, representing a growth rate of 138.5% when comparing the three months ended March 31, 2021 to the three months ended March 31, 2020 and a growth rate of 60.3% when comparing 2020 to 2019. Our total revenues were US$40.3 million and US$18.0 million for the three months ended March 31, 2021 and 2020, respectively, and US$104.1 million and US$55.3 million for 2020 and 2019, respectively, representing a growth rate of 123.7% when comparing the three months ended March 31, 2021 to the three months ended March 31, 2020 and a growth rate of 88.4% when comparing 2020 to 2019. Our strong profitability and cash flow generation is due in large part to our solving of the complex payments problems on behalf of our merchants in underserved geographies. Our Adjusted EBITDA Margin was 44.3% and 41.3% for the three months ended March 31, 2021 and 2020, respectively, and 40.3% and 36.3% for 2020 and 2019, respectively. The revenue growth attributable to new merchants was 38% for the three months ended March 31, 2021 when compared to the three months ended March 31, 2020, and 17% for 2020 when compared to 2019. Our NRR was 186% and 216% for the three months ended March 31, 2021 and 2020, respectively, and 171% for the year ended December 31, 2020. Excluding the effect in 2019 of a warrant with a merchant, the NRR for 2020 would have been 159%. The NRR includes the merchants that generated revenues in the same period of the prior year. For the year 2020, 167 merchants were included, and for the three month period ended March 31, 2021 and 2020, 179 and 135 merchants were included, respectively.

Table of Contents

Table of Contents

**Key business metrics**

We review the following key metrics to evaluate our business, measure our performance, identify trends affecting our business, formulate business plans and make strategic decisions:

| | For the Three Months Ended March 31, | | For the Year Ended December 31, | |
|---|---|---|---|---|
| | **2021** | **2020** | **2020** | **2019** |
| | (in thousands of US$) | | | |
| TPV(1) | 925,874 | 388,155 | 2,064,789 | 1,287,713 |
| Revenues | 40,256 | 17,995 | 104,143 | 55,289 |
| Adjusted EBITDA(2) | 17,841 | 7,433 | 41,931 | 20,070 |
| Adjusted EBITDA Margin(3) | 44.3% | 41.3% | 40.3% | 36.3% |

(1)    For information on how we define TPV, see "Presentation of Financial and Other Information— TPV."

(2)    For information on how we define Adjusted EBITDA, see "Presentation of Financial and Other Information— Certain Financial Measures." For a reconciliation of Adjusted EBITDA to our profit for the period, see "Selected Financial and Other Information—Other performance metrics."

(3)    For information on how we define Adjusted EBITDA Margin, see "Presentation of Financial and Other Information— Certain Financial Measures." For a reconciliation of Adjusted EBITDA Margin to our profit for the period, see "Selected Financial and Other Information—Other performance metrics."

*TPV*

We believe that TPV is an indicator of the success of our global merchants, the satisfaction of their end users, and the scale and growth of our business. As our global merchants increase their transaction volume on our platform, our TPV will also grow. Our revenue depends significantly on the total value of transactions processed through our platform.

dLocal's TPV growth is directly impacted by secular trends, including the ongoing shift to digital payments, the growth of our merchants' business in emerging markets, as well as the continued traction gained by e-commerce. Furthermore, a large, growing, and increasingly complex payments ecosystem continues to drive demand for an integrated and comprehensive online payments infrastructure such as dLocal's.

Our ability to maintain and expand strong relationships with existing global merchants, as well as to attract new ones into our platform, also drives our TPV. For the year ended December 31, 2020, global merchants who were on-boarded and have transacted on our platform for more than two years generated 80% of our TPV. From 2016 through 2020, we have successfully added on average nearly six new pay-in merchants per month and one new pay-out merchant per month.

In the three months ended March 31, 2021, we recorded a TPV of US$925.9 million, representing a growth of 138.5% when compared to the three months ended March 31, 2020. In the year ended December 31, 2020, we recorded a TPV of US$2.1 billion, representing a year-over-year growth of 60.3%, despite the global challenges posed by the COVID-19 pandemic. Furthermore, we grew TPV at a 93% CAGR from 2018 to 2020.

89

**Table of Contents**

The following chart sets forth the evolution of our TPV for the periods indicated.



**TPV (in US$ millions)**

Pay-in TPV is generated in transactions where we enable global merchants to receive payments from their customers located in emerging markets for the sale of goods or services. We process the payments locally in the emerging markets where the merchants' consumers are located and after expatriating the funds we settle the payments in the jurisdiction and currency of preference of our global merchants, which is typically in North America, Europe or China, and generally in U.S. dollars or Euros. We refer to these transactions as cross-border. However, when the merchants have a local presence in the countries where their consumers are located, we offer our merchants the possibility to settle transactions in the local currencies of such countries, which we call local-to-local transactions.

Pay-out TPV is generated in transactions where we enable global merchants to make payments, both cross-border and local-to-local, to their vendors, contractors, partners, drivers, apartment renters, marketplace sellers, and refund recipients, some of which can be paid in their partners' (i.e., the ultimate recipients') preferred method for receipt of payment by type of account or type of method, such as transfer to bank accounts or payment to digital wallets, while the merchant retains control over the overall interface. While the volume generated from our marketplace solution is primarily from pay-out transactions, we may also process pay-in volume based on the applicable agreement with the merchant or its sellers.

Pay-in and pay-out transactions (cross-border and local-to-local in both cases) each involve different transaction counterparties, payment flows, and services, as well as distinct overall pricing dynamics.

### *Revenues*

Our revenues are derived on a per approved transaction basis as either a fixed percentage per transaction or a fixed fee per transaction. Revenue is a key metric of focus for our management team as it directly reflects the scale, growth, and trajectory of our business, as well as the strength and structure of our merchant relationships and the stability of our pricing.

Revenues deriving from pay-ins and pay-outs depend on the agreed-upon rates we negotiate with each global merchant, and may ultimately vary, depending on the amount of volume such merchants process, the markets where they use our services, the type of payment methods we facilitate, and whether such payment relates to cross-border or local transactions. We manage our merchant accounts on an overall dollar profitability

Table of Contents

basis, in order to ensure maximizing revenues from each merchant customer, and not particularly on each of the products, payment methods or geographies in which we process payments for them. Revenues may be generated by existing merchants, which we measure by means of our NRR, or from new merchants.

### Adjusted EBITDA

We define Adjusted EBITDA as the profit from operations before financing and taxation for the year or period, as applicable, before depreciation of property, plant and equipment, amortization of right-of-use assets and intangible assets, and further excluding the changes in fair value of financial assets and derivative instruments carried at fair value through profit or loss, impairment gains/(losses) on financial assets, transaction costs, share-based payment non-cash charges, secondary offering expenses, transaction expenses and inflation adjustment. We calculate Adjusted EBITDA Margin as Adjusted EBITDA divided by consolidated revenue.

For the three months ended March 31, 2021, we recorded Adjusted EBITDA of US$17.8 million, equivalent to an Adjusted EBITDA Margin of 44.3%, compared to Adjusted EBITDA of US$7.4 million and Adjusted EBITDA Margin of 41.3% for the three months ended March 31, 2020. For the year ended December 31, 2020, we recorded Adjusted EBITDA of US$42.0 million, equivalent to an Adjusted EBITDA Margin of 40.3%. For the year ended December 31, 2019, the Adjusted EBITDA was US$20.1 million equivalent to an Adjusted EBITDA Margin of 36.3%. See "Presentation of Financial and Other Information—Special Note Regarding Adjusted EBITDA and Adjusted EBITDA Margin." See "Selected Financial and Other Information" for a reconciliation of our Adjusted EBITDA and Adjusted EBITDA Margin to net income.

**Growth from existing and new merchants**

Given the success-based nature of our business model, our growth is driven by our ability to land, retain, and expand our relationships with our merchants. The success of their business in emerging markets directly impacts our performance. Our merchants' own growth, our experience and expertise in upselling and cross-selling new products, and our ability to expand the number of markets in which we serve them, determines our revenue from existing clients. Furthermore, our team's demonstrated ability to add new merchants on an ongoing basis to our platform complements our overall growth.

The below chart presents a summary of our revenue growth by existing and new merchants.

**Revenue growth in 2020 from existing and new merchants (in US$ millions)**



Note: Metrics may not foot to totals shown due to rounding

91

**Table of Contents**

**Quarterly Financial Data (Unaudited)**

The following table sets forth certain of our financial information for the periods indicated:

| | For the Three Months Ended | | | | | | | | |
| | March 31, 2021 | December 31, 2020 | September 30, 2020 | June 30, 2020 | March 31, 2020 | December 31, 2019 | September 30, 2019 | June 30, 2019 | March 31,2019 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | (in thousands of US$) | | | | | |
| Revenues | 40,256 | 34,653 | 30,850 | 20,645 | 17,995 | 17,823 | 15,751 | 13,958 | 7,757 |
| Cost of services | (16,989) | (13,981) | (13,969) | (9,122) | (6,993) | (5,791) | (4,893) | (4,492) | (4,237) |
| **Gross profit** | **23,267** | **20,672** | **16,881** | **11,523** | **11,002** | **12,032** | **10,858** | **9,466** | **3,520** |
| Technology and development expenses | (520) | (750) | (528) | (381) | (346) | (389) | (329) | (284) | (345) |
| Sales and marketing expenses | (1,042) | (830) | (739) | (625) | (658) | (574) | (544) | (491) | (448) |
| General and administrative expenses | (5,762) | (6,526) | (3,469) | (2,658) | (9,535) | (6,098) | (3,119) | (2,777) | (2,107) |
| Net impairment gain/(losses) on financial assets | (54) | (45) | (45) | (45) | 943 | (687) | (40) | (40) | (40) |
| Other operating gain/(loss) | 2,896 | (65) | (2,760) | 12 | (83) | — | — | — | — |
| **Operating profit** | **18,785** | **12,456** | **9,340** | **7,826** | **1,323** | **4,284** | **6,826** | **5,874** | **580** |
| Finance income | 18 | 148 | 219 | 100 | 35 | (6) | 144 | 27 | 114 |
| Finance costs | (463) | (7) | (14) | (43) | (3) | (13) | (7) | (24) | 14 |
| Inflation adjustment | (34) | 4 | 9 | 9 | 16 | 4 | 1 | 3 | 2 |
| **Other results** | **(479)** | **145** | **214** | **66** | **48** | **(15)** | **138** | **6** | **130** |
| **Profit before income tax** | **18,306** | **12,601** | **9,554** | **7,892** | **1,371** | **4,269** | **6,964** | **5,880** | **710** |
| Income tax expense | (1,379) | (1,000) | (932) | (481) | (818) | (671) | (732) | (346) | (472) |
| **Profit for the period** | **16,927** | **11,601** | **8,622** | **7,411** | **553** | **3,598** | **6,232** | **5,534** | **238** |

**Liquidity and Capital Resources**

As of March 31, 2021, we had US$127.5 million in cash and cash equivalents, and as of December 31, 2020, we had US$111.7 million in cash and cash equivalents. We believe that our current available cash and cash equivalents and the cash flows from our operating activities will be sufficient to meet our working capital requirements and capital expenditures in the ordinary course of business for the next 12 months.

Table of Contents

The following table shows the generation and use of cash for the periods indicated:

| | For the Three Months Ended March 31, | | For the Year Ended December 31, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2020 | 2019 |
| | (in thousands of US$) | | | |
| **Cash Flow Data** | | | | |
| Net cash from/(used in) operating activities | 3,395 | (102) | 88,486 | 30,723 |
| Net cash (used in)/from investing activities | (33,244) | (2,778) | 3,650 | 118 |
| Net cash from/(used in) financing activities | 45,828 | (46) | (15,198) | (19,342) |

Our cash and cash equivalents include cash in hand, deposits held at call with banks and other short-term highly liquid financial instruments with original maturities of three months or less. We classify as cash equivalents a financial instrument that can be immediately converted into a known amount of cash and the fair value approximates the carrying value. Cash and cash equivalents are measured at amortized cost and are included in current assets due to their short-term nature. For more information, see note 14, "Cash and cash equivalents" to our unaudited consolidated condensed financial statements included elsewhere in this prospectus.

*Operating Activities*

The vast majority of our operating cash flow represents merchant's funds (corresponding to the line items "Trade and other receivables" and "Trade and other payables" in our Statements of Financial Position) that are held by us for a short period before being paid out to the merchant. Our net cash from operating activities increased by US$3.5 million, from net cash used in operating activities of US$0.1 million in the three months ended March 31, 2020 to net cash from operating activities of US$3.4 million in the corresponding period of 2021, primarily as a result of net cash provided from working capital, which totaled an outflow of US$13.2 million compared to an outflow of US$6.5 million for the three months ended March 31, 2021 and 2020, respectively. The decrease in inflow from changes in working capital was mainly driven by an increase in the balance of "Trade and other payables," which increased US$7.6 million in the three months ended March 31, 2021, as compared with a decrease of US$12.6 million in the three months ended March 31, 2020 and was partially offset by an increase in the balance of "Trade and other receivables" of US$22.1 million in the three months ended March 31, 2021, as compared with a decrease of US$6.0 million in the three months ended March 31, 2020.

Our net cash from operating activities increased by US$57.8 million, from US$30.7 million in 2019 to US$88.5 million in 2020, primarily as a result of net cash provided from working capital, which totaled an inflow of US$90.7 million compared to an inflow of US$32.4 million for the years December 31, 2020 and 2019, respectively. The increase in inflow from changes in working capital was mainly driven by an increase in the balance of "Trade and other payables," which increased US$90.4 million in 2020, as compared with an increase of US$20.3 million in 2019 and was partially offset by an increase in the balance of "Trade and other receivables," which increased US$47.4 million in 2020, as compared with an increase of US$11.0 million in 2019.

*Investing Activities*

Our net cash used in investing activities increased by US$30.5 million from US$2.8 million in the three months ended March 31, 2020 to cash used in investing activities of US$33.2 million in the three months ended March 31, 2021, mainly due to a US$38.7 million increase in advanced payments for asset acquisition and an increase of US$0.6 million of additions to intangible assets, partially offset by a US$9.2 million increase in net collections of debt and other instruments classified as financial assets at fair value through profit or loss.

Our net cash from investing activities increased by US$3.5 million from US$0.1 million in 2019 to cash from investing activities of US$3.7 million in 2020, mainly due to a US$5.5 million increase in net collections of

103

Table of Contents

debt and other instruments classified as financial assets at fair value through profit or loss and US$0.2 million of interests collected from financial instruments, partially offset by an increase of US$1.5 million of additions to intangible assets and a US$0.7 million increase in acquisitions of property, plant and equipment.

*Financing Activities*

Our net cash from financing activities increased by US$45.9 million, from US$46 thousand in the three months ended March 31, 2020 to US$45.8 million in the three months ended March 31, 2021, mainly due to a US$46.3 million increase from proceeds related to the issuance of shares. Also, in the three months ended March 31, 2021, we recorded an increase in restricted cash for US$149.4 million, offset by the proceeds received from transactions between shareholders in the same amount.

Our net cash used in financing activities decreased by US$4.1 million, or 21.4%, from US$19.3 million in 2019 to US$15.2 million in 2020, mainly due to a US$9.2 million decrease in repayment of loans advanced by shareholders which was partially offset by a US$5.0 million increase in higher dividends paid to shareholders. See "Dividends and Dividend Policy."

### *Indebtedness*

As of March 31, 2021, we had no long-term indebtedness. As of December 31, 2020 and 2019, we had US$17 thousand and US$219 thousand, respectively, in lease liabilities. As of such dates, we did not have any other long-term indebtedness.

### Capital Expenditures

For the three months ended March 31, 2021 and 2020 we made capital expenditures of US$1.3 million and US$0.7 million, respectively. For the years ended December 31, 2020 and 2019, we made capital expenditures of US$3.9 million and US$1.7 million, respectively. Total capital expenditures as a percentage of revenue were 3.2% and 4.0% in the three months ended March 31, 2021 and 2020, respectively, and 3.7% and 3.1% in 2020 and 2019, respectively. These capital expenditures mainly include expenditures related to capitalized software development and investments in computer hardware.

### Tabular Disclosure of Contractual Obligations

The following table shows a summary of our contractual obligations as of December 31, 2020:

| | Total | Less than 1 year | 1-3 years | 3-5 years | More than 5 years |
|---|---|---|---|---|---|
| | | | Payments Due By Period as of December 31, 2020 | | |
| | | | (US$ millions) | | |
| Lease liabilities | 0.2 | 0.2 | — | — | — |
| **Total** | **0.2** | **0.2** | — | — | — |

### Off-Balance Sheet Arrangements

Other than as set forth above, we did not have any off-balance sheet arrangements as of March 31, 2021 nor as of December 31, 2020.

### Critical Accounting Estimates and Judgments

Our consolidated financial statements are prepared in conformity with IFRS as issued by IASB. In preparing our consolidated financial statements, we make assumptions, judgments and estimates that can have a significant

Table of Contents

**Our History and Evolution**



We started our journey in 2016 as a technology-first company seeking to disrupt online payments and to unlock opportunities for global enterprise merchants in emerging markets. We believe that we were among the first providers to recognize that, while large global merchants want to grow their business by selling their products and services online in emerging markets, they did not have the right online payments infrastructure to do so efficiently.

118

Table of Contents

Since our inception, we have harbored global ambitions. We started with a single product to support a single payment method in one market, specifically, pay-in cross-border payments in Brazil. Our early success empowered us to expand to other emerging markets, leading to our presence today in 29 countries including Mexico, Argentina, Colombia, and Chile in Latin America; India and Indonesia in Asia; and Egypt, Nigeria, and South Africa in Africa.

From the outset, our founding management team leveraged its technical expertise and entrepreneurial acumen to construct our flexible, scalable platform from scratch. The addition of strong commercial and financial talent complemented their technical proficiency, which has allowed dLocal to scale the business. Over the years, we have been able to continuously and rapidly introduce new solutions and capabilities in response to our global merchant's dynamic needs and payments ecosystems, further develop and enhance our technology platform, and evolve our business model.

Today, dLocal is a key enabler of online commerce in emerging markets serving different high-growth, technology-related verticals across key sectors in the economy. In addition to pay-in cross-border solutions, we have successfully developed fast-growing pay-out solutions, as well as local-to-local capabilities for both pay-in and pay-out transactions. We have also developed marketplace capabilities, having on-boarded one of the world's largest e-commerce platforms in 2018 as our first marketplace merchant. Our roster of market-leading global enterprise merchants and their reliance on our platform are the strongest testament to the strength of our overall value proposition.

We benefit from the support of our investors, including our strategic shareholders, General Atlantic and Mastercard, and the opportunities our scalable platform offers us. Moreover, Sebastián Kanovich and Jacobo Singer, our CEO and President, respectively, and members of our founding management team hold a meaningful combined ownership in dLocal and are deeply committed to our continued success. See "Principal and Selling Shareholders" and "Management". With this support and commitment, we intend to continue expanding into new markets, developing new products, and retaining and expanding our merchant base while growing their overall volume processed through our platform, all of which are drivers that will continue to propel our growth in the years to come.

**Our Market Opportunity**

The global payments industry is experiencing a rapid, secular shift towards digital payment methods, particularly driven by the growing prevalence of online and mobile channels. In 2020, consumers and businesses worldwide made over 454 billion purchase transactions on global network cards, according to Nilson Report. The share of e-commerce as a percentage of total global retail payments volume expanded to 21% in 2020, compared to 16% in 2019, according to Digital Commerce 360, aided by the accelerated shift to online purchasing during the ongoing COVID-19 pandemic.

In order to capitalize on this trend, global merchants continue to seek international expansion, thus raising their need to facilitate payment transactions from a wide array of methods and channels across what we believe to be complex and fragmented payments ecosystems. We believe that global enterprise merchants recognize the growing importance of emerging market economies as a key driver of growth. According to the International Monetary Fund, or the IMF, in 2019 emerging markets represented 57% of aggregate global GDP (measured on a per person basis), a significant increase from 43% in 2000. Emerging markets are expected to continue growing faster than developed markets overall.

However, global merchants face many challenges when trying to gain access or further penetrate emerging markets. Banking penetration remains low in these countries, falling below 20% of the adult population in some cases, according to AMI. As opposed to developed economies where card-based transactions relying on international card schemes are prevalent, local card, bank transfer-based payment methods, digital wallet, and cash-like payments, such as using Boleto in Brazil or UPI in India, and making payments at Oxxo in Mexico, are

119

Table of Contents

the predominant payment methods for end users in emerging markets. Furthermore, in order to gain access to emerging markets, merchants also need to:

- adhere to local compliance, regulatory, and tax frameworks,
- offer transparency and security for their end users,
- address inherent fraud risk while maximizing acceptance and conversion,
- gain insights from their transaction data, and
- identify and engage with partners that can scale as their emerging markets operations expand.

Through the *One dLocal* model, we address these needs.

The payments industry is complex, cumbersome, and varies in structure in each country. In many instances the interaction between parties varies substantially from jurisdiction to jurisdiction. For example, a payments service provider, or PSP, may compete with other providers in one market and collaborate in another (under a sub-acquirer relationship or otherwise). This results in different unit economics for PSPs in each market largely depending on the services offered and the role that they play in the payments value chain. This complexity has created the demand for next-gen providers that integrate directly with global merchants and act as a single point of interaction that can engage with a large ecosystem of participants, offer them integrated solutions, and thus limit disintermediation.

We believe we have a large market opportunity in pay-out transactions, for both cross-border and local-to-local payments, which is currently underserved by what we believe to be a fragmented set of industry participants, most of them legacy payments companies.

According to AMI, there is an estimated US$1.2 trillion in total e-commerce pay-in and pay-out volume in the countries in which we operate, excluding China. Of the estimated US$428 billion pay-in volume for 2020, 86% corresponded to local-to-local transactions, and only 14% corresponded to cross-border transactions. Overall, pay-in volume is expected to grow up to US$1.1 trillion by 2024, implying a CAGR of 27% from 2020 to 2024, according to AMI. AMI also expects the share of pay-outs *vis-a-vis* pay-ins to increase in the coming years on the back of strong tailwinds associated with an expected recovery in the next 24 months from the COVID 19 pandemic, which fueled a rise in remote work and initially dampened travel, ride hailing and remittances, but which are expected to recover following the pandemic.

120

Table of Contents

The chart below shows 2020 pay-in and pay-out volumes and the projected growth of the total pay-in volume in the countries in which we currently operate, excluding China:

**Payment volumes in the countries in which we currently operate, excluding China (in US$ trillions)**



Payments in emerging markets are still dominated by local payment methods. Whereas in the United States and Europe, credit and debit cards are widely held and used online, this is not the case in emerging markets where, according to AMI, banking penetration can fall below 20% of the adult population and cash-based payment methods, local digital wallets, and bank transfers are prevalent. According to AMI, local payment methods represented 83% of total e-commerce expenditure in 2020 in the 14 core markets analyzed by them. In Brazil, for instance, according to AMI, internationally-enabled credit cards only represented 10% of the aggregate e-commerce payment volumes, whereas domestic-only credit cards and cash-based methods represented 55% and 14% of the aggregate e-commerce payment volumes in 2020, respectively, and the remaining 21% were alternative payment methods. Similarly, in India, internationally-enabled credit cards only represented 30% of the aggregate e-commerce payment volumes in 2020, whereas debit cards and bank transfers represented 19% and 14%, respectively. In Nigeria, internationally-enabled credit cards only represented 13% of the aggregate e-commerce payment volumes in 2020, whereas debit cards and bank transfers represented 28% and 27%, respectively. We believe the prevalence of local payment methods creates a fragmented payment system in emerging market countries, which hampers global merchants' ability to expand in these new markets. We see an opportunity to continue growing and acquiring new clients by solving the existing complexities that result from using alternative local methods through our *One dLocal* model.

We believe our opportunity is driven in large part by the following favorable trends:

### *Increasing globalization of commerce*

Fueled by fast-paced changes in technology and the increased mobility of goods, services, people, and capital, globalization continues to be a driving force in the world economy. In particular, over the past few decades globalization has greatly changed economies, societies, and the way business is conducted. According to Bloomberg, cross-border trade involving developing or emerging economies constituted 53% of global trade in 2017, an approximate 10 percentage points increase over the past 20 years. Such rapid expansion has created new opportunities for businesses to grow and extend their reach, resulting in a significant increase in multi-country

121

Table of Contents

flows of funds, which requires a robust financial technology infrastructure, systems, and processes to support cash flows for pay-ins and pay-outs.

A shift in consumer expectations has further accelerated the pace of globalization, as consumers increasingly expect to be able to make purchases or receive funds anytime, anywhere, and using their preferred method of payment.

In addition, as global merchants broaden their geographic footprint in search of more scale and growth, they are faced with the challenge of operating in a multi-jurisdictional environment where they must ensure appropriate compliance with local regulatory, FX, and tax frameworks, and deal with the diverse set of available or preferred local payment methods of end users. Maintaining compliance with these regulatory and market standards can be costly, burdensome, and often hard to address without the help of a partner such as dLocal with the adequate know-how, technology, and level of connectivity to the broad local payment infrastructure.

### Continued rise of the digital economy

Technology has revolutionized the way we interact with one another and the way we consume information, entertainment, goods, and services. As a result, the digital economy has become a massive web of interconnected stakeholder and supply chains, spanning across a wide range of easily accessible products and services. The growing accessibility of the internet, as well as the rising adoption of smartphones, have been important trends in developed and emerging market countries. In 2020, smartphone penetration levels for Turkey, Brazil, and Mexico reached 61%, 80%, and 75% respectively. According to AMI, 80 million Nigerians are estimated to come online in the next five years. As a result of these growing trends, e-commerce penetration has experienced an accelerated expansion. Global e-commerce as part of overall payments volume grew at a 17% CAGR from 2014 to 2019, according to Insider Intelligence. Likewise, e-commerce among the core emerging countries we operate in analyzed by AMI grew 27% in 2020, while global GDP contracted 3.5% during the same year. We believe the penetration of the internet should continue to increase over time.

E-commerce has been a primary beneficiary of shifts in purchasing behavior during the COVID-19 pandemic. Consumer preferences for contact-free solutions are reshaping the way companies interact with their clients. Multiple industry observers and market participants (including Insider Intelligence and Euromonitor) believe this increase in digital commerce has the potential to become permanent, driving a two to three-year acceleration in adoption levels. Turkey, Brazil, and India are expected to grow at a CAGR of 39%, 30%, and 17% from 2020-2024, according to AMI, further emphasizing the rapid rise of digitalization in emerging markets during the next years.

Large, digitally-native enterprises are capitalizing on this opportunity, serving consumers globally who are eager to use the internet for consumption and connectivity, driving their ability to continue to take market share from legacy market participants which have experienced varying degrees of success in their attempt to go online. We believe that as the digital economy continues to expand globally, particularly in emerging markets, dLocal is well-positioned to serve the needs of key participants due to our inherent emphasis on e-commerce and our shared appreciation for technology and product innovation.

### Middle class in emerging markets continues to expand

On the back of continued economic growth, the middle class in emerging markets has been increasing its level of spending and online transaction frequency. This group is eager to consume global goods and services previously unavailable due to lack of access or spending constraints, leading to higher growth rates for goods and services in emerging markets, as well as the associated methods used to pay for them. This is driving an average expected annual GDP growth from 2021 through 2025 to 4.9% for emerging market economies (more than three times the expected growth for developed markets in the same period), according to *Oxford Economics via Refinitiv Datastream*. Global merchants wishing to capitalize on these changing economic demographics may

Table of Contents

seek to accelerate their entrance or further their penetration into emerging markets, which we believe may benefit technology and payments providers such as dLocal.

Research by Next Big Future suggests the global middle class would surpass 4 billion people by the end of 2020. According to this same research, the global middle class is growing by 120 to 160 million people every year, mostly in emerging markets, and is expected to reach 5.3 billion people by 2030. As a result, a growing emerging markets aspirational middle class should continue to gain disposable income over time, raising their expectations of convenience and customer experience, as well as their consumption of global merchants' products and services.

### Cross-border payments in emerging markets are fragmented and poised for growth

While e-commerce is now mainstream, cross-border transactions still present unique challenges due to low approval rates, poor predictability of timing, low transparency, volatile exchange rates, dynamic regulatory requirements, and significant complexity that comes from having to settle transactions across multiple parties and currencies without a consistent regulatory and tax framework or an integrated payments infrastructure.

Furthermore, while developed countries have made significant progress, emerging markets still lack a coherent interoperability between regulatory and technical payments systems. According to Statista, the proportion of cross-border e-commerce transactions relative to total e-commerce transactions was significantly higher in developed versus emerging economies. For example, in 2019, as a share of all e-commerce transactions, cross-border e-commerce transactions accounted for 30% in Belgium, 27% in Ireland, and 18% in Austria. By contrast equivalent shares in India, Mexico, and Brazil were only 18%, 22%, and 6%, respectively. This presents a strong e-commerce growth opportunity as developing countries continue to make progress towards improving their infrastructure.

Facing differing local regulations, fragmented standards, inefficient infrastructure, and high fixed costs, we believe that service providers focusing on cross-border payment solutions will seek to balance the need for local expertise with the increasing merchant expectation of a single, digital, and global experience. In this context, we believe that strong cross-border business partnerships between global merchants and service providers are important and will continue to gain importance. Integrated payments solutions are the future, replacing disparate players operating in silo, requiring incremental connection between participants which further increases friction in the payments value chain.

### Global enterprise merchants are establishing local presence in selected emerging markets

In order to complement operations that may have initially been run from abroad, some of the largest global merchants are seeking to establish local presence in certain large emerging markets (e.g., Didi in Brazil). Accordingly, once established locally these merchants also need to facilitate pay-outs to local vendors, employees, and contractors, and pay-ins from local customers via their preferred method of payment. Even with the ability to send and receive funds in local currency (through the establishment of local bank accounts), merchants still face what we believe to be fragmented payments ecosystems and market-specific regulatory environments, presenting complexities similar to those in cross-border transactions, which we believe generate sub-par results on acceptance rate, fraud and other relevant payment features.

As global merchants selectively expand their local presence in emerging markets, the demand for integrated digital payment capabilities becomes even more relevant, benefitting participants with broad presence and solutions, such as dLocal, that we believe can provide a simplified offering, broader connectivity, and better performance compared to legacy payments providers. We have observed this trend first-hand, and evolved with many of our merchants as they expanded our relationship to include our local-to-local solutions in one or more countries in addition to the cross-border solutions they continue to process through our platform (in the same or other countries).

123

Table of Contents

### Highly complex and evolving local regulatory and tax environments

The challenges that merchants face are further exacerbated by the increasing impact of regulation in the payments market globally. Systemic stress to global markets, such as that experienced during the 2008 financial crisis, has emphasized the need for policymakers to enhance and strengthen financial systems to make them more resilient, more secure, and better prepared to handle future shocks. Furthermore, the increase in fraud and cyberattacks continues to push regulators to increase scrutiny across the payments value chain. Regulators have also been concerned with the higher cost of services charged by legacy payments providers driving the creation of new APMs such as the PIX in Brazil. However, while we believe that most countries and jurisdictions share and understand this need, the effort to make necessary changes has been largely localized in nature, particularly in emerging markets. As a result, local regulatory frameworks are complex, unique, and constantly changing.

Ensuring adherence to and compliance with these regulatory and tax requirements are costly and burdensome for global merchants, often deterring or limiting their entry to certain jurisdictions, particularly in emerging markets. This presents an attractive opportunity for service providers such as dLocal that have local expertise to offer robust, up-to-date, and integrated capabilities that comply with regulatory, FX, and tax frameworks across emerging markets.

## Our Competitive Strengths

The following strengths and advantages are at the core of our strategy:

### One single API, one single platform to connect to emerging markets

dLocal's value is derived from the simplicity of our fully cloud-based proprietary platform, accessible through a single direct API, that enables global merchants to potentially reach nearly two billion internet users in the emerging markets we serve (excluding China). Traditional payments providers serving these markets are often burdened with disparate legacy technology systems that have been stitched together over time. This limits pricing transparency and leads to reconciliation and refund management complexities, a sub-optimal user experience, lower conversion rates, and subpar system availability, as well as increased levels of fraud and compliance issues. Conversely, dLocal offers a modern and flexible technology stack that is purpose-built to meet our global merchants' high performance and scalability expectations, as demonstrated in our ability to increase our TPV by 15 times over the last four years.

dLocal's platform provides rapid, reliable, and convenient support for pay-in and pay-out transactions, including cross-border and local-to-local in each case. We deliver a seamless, transparent, and integrated experience for global merchants while ensuring secure and compliant transactions. Our platform has been designed to make it simple for our merchants to add payment methods, products, and new markets in an expeditious manner, all through a single point of integration and one contract. Our single API addresses the requirements of our merchants, ranging from back-end integration to an easy-to-integrate checkout module where dLocal handles the payment process. We increase the payments conversion rates through automatic retries, fallback transaction capabilities, easy management of each transaction through our API or dashboard, and user and account automatic validation, combined with broad connectivity to local financial institutions and local payment methods.

Our founding management team built dLocal's state-of-the-art platform from the ground up. It is designed to serve multiple functions in the payments value chain. dLocal combines payment processing and FX management with compliance, tax, and fraud management capabilities into one intuitive, fully integrated platform. We provide global merchants increased transparency and valuable insight into their cross-border and local-to-local payments flows, enabling them to provide an enhanced user experience for their end users. The features that power dLocal's platform enhance the processing systems in each of the emerging markets we serve, while at the same time standardizing payments offerings across multiple countries. Our dynamic routing feature leverages the full breadth of dLocal's connections with our more than 350 acquiring company partners to

124

Table of Contents

maximize approval rates. Our fraud prevention module helps our merchants to detect risky patterns and prevent fraud. Our security features are very relevant to our merchants as we handle highly sensitive transaction and user information. Refund and dispute management, currency exchange management, reporting and reconciliation for automatic settlements of funds, among other capabilities, round out our comprehensive suite of solutions.

We have made significant investments in product development and software design through the engineering expertise of 165 full-time equivalents (including employees and contractors) focused solely on technology. These investments have enabled us to efficiently expand our platform solutions and capabilities, enhance our payments infrastructure, rapidly deploy technology updates, and embrace high-security standards for our business and technology. As an example, we enhance our platform constantly and deploy system updates typically on a daily basis that instantly become available to all our merchants, in contrast with legacy players, which normally deploy such updates a limited amount of times per year. We believe that our capabilities are highly differentiated and hard to replicate, strengthening our overall competitive advantage.

### *Direct integration with our global, blue-chip enterprise client base*

Our goal is to establish direct integration with our merchants which allows us to better understand their needs, reduce our response time, collaborate efficiently, and provide a superior payments experience. In doing so, we build relationships that are difficult and costly for competitors to replace or replicate. We also partner selectively with PSPs to which we offer our services and "last-mile" connectivity to local payment methods in emerging markets, thus allowing us to reach certain long-tail merchants to which we may not otherwise directly connect. Since its inception, dLocal has focused on enabling our clients to access a cloud-based digital payments infrastructure in emerging markets that offers a similar level of standards, functionality, and payments experience as that available in developed markets. This includes the ability to execute recurring payments, facilitate payment in installments, allow customer refunds, or split payments even when local providers do not support this functionality. We recognize the need for our merchants to carry out commerce in emerging markets in a seamless and secure manner. Accordingly, we have set up a platform designed to provide a comprehensive, enterprise-grade solution to enhance their operations in these markets.

Our commitment to these standards has allowed us to build a portfolio of merchants that includes some of the largest companies in the world, including Didi, Amazon, Microsoft, Spotify, Mailchimp, Wix, Wikimedia and Kuaishou, among many others. Furthermore, we have a strong track record of successfully acquiring new merchants and growing these relationships over time, cross-selling solutions in additional geographies or payment methods beyond the initial contracted services. On average, our global merchants used dLocal's platform in nearly six different countries and 44 payment methods in 2020 and in five countries and 35 payment methods in 2019, in each case for merchants with at least US$6 million of annual TPV on our platform. Such merchants comprised 92% of our TPV in 2020 and 93% in 2019.

As we continue to strengthen the relationship with our global merchants, we are well positioned to capitalize on their own incremental penetration in emerging markets and the growth of their business, which we expect to be a driver of our future growth.

### *Our product portfolio and data-driven value added services*

Our platform includes a rich catalogue of multiple products, capabilities, and value-added services focused on helping global enterprise merchants to get paid and make payments in emerging markets in a safe and efficient manner, minimizing friction, and increasing conversion rates and end user satisfaction. We believe dLocal is well positioned as a valuable "one stop shop" for global merchants looking to consolidate their emerging market transaction services with one trusted partner through one contract.

We provide merchants with proprietary fraud management tools built on machine learning algorithms and rules-based technology to help identify potentially problematic activity and execute transactions with increased

125

Table of Contents

levels of security. In addition, we offer tax and compliance capabilities that streamline regulatory compliance by helping merchants stay up-to-date with complex and frequently changing local laws and regulations, and FX management and multi-currency collection and settlement capabilities to address their needs in cross-border transactions.

Our innovative, technology-focused, and data-driven approach also allows us to be nimble in adjusting products and solutions to respond to specific client needs. We offer our clients a comprehensive merchant dashboard that gives them visibility into key information and provides valuable tools that can be accessed through a secure, individually-tailored interface. We believe that this results in an enhanced level of transparency and understanding of their operations, enabling global merchants to adapt user interfaces, enhance the payments experience, and ultimately conduct more effective and efficient decision-making. Our visibility into the payments value chain, along with our deep connectivity with, and understanding of, emerging markets, allows us to gather data on end user behavior, which can then be used to generate actionable insights for merchants to better serve and engage with their end users and optimize their systems and settings to achieve higher authorization levels and minimize friction. We believe this ultimately leads to a smoother payments experience without compromising risk management and fraud detection.

### *Deep connectivity with local partners in emerging markets*

dLocal offers its global merchants comprehensive access to a broad payments ecosystem through our *One dLocal* model in the emerging markets where we have a presence. dLocal's strategic relationships with over 600 local payment methods (some of which are financial institutions) create a broad and effective acceptance network for our payments solutions. We have ongoing dialogue with many local regulators, exchanges, and tax authorities in different countries, as well as direct integration with certain tax payment systems, which enables us to optimize operations and adapt quickly and efficiently to regulatory changes.

Given the relevance of APMs and local financial institutions in emerging markets, we believe it is critical for merchants to have the ability to accept the widest variety of payment methods and have the broadest possible reach in order to maximize conversion rates and reduce transaction friction with end users. Through our *One dLocal* model, we offer access to a large number of locally issued cards (under banners such as Visa, Mastercard, Diners, Verve, Elo and Naranja) and other APMs in each market, such as UPI in India, MPESA in Kenya, Ovo in Indonesia, and Boleto and PIX in Brazil.

Establishing and facilitating our breadth of connectivity requires knowledge of the market-specific regulatory frameworks and requirements, local knowledge and connections with different market participants, as well as having the right licenses in place. We believe dLocal is well positioned to continue broadening our network of APM partners and local financial institutions, ensuring our merchants can always rely on our connectivity to reach the end users they target.

### *Client-centric mindset drives agile innovation and rapid deployments*

Our focus on merchants' demands drives us to develop solutions that address the multiple and complex issues they face in emerging markets. dLocal operates in an agile manner, guided by our intrinsic focus on innovation to build solutions tailored to address the ever-evolving needs of our merchants. Whenever helpful, we provide merchants with a safe environment to rapidly test and iterate new solutions ahead of broad deployment. We believe that our agility and focus on solving the payment-related problems of our merchants in an effective and efficient manner minimizes wasted resources and differentiates us from our competitors. For example, in 2019, as a result of rapidly evolving changes to the regulatory framework, we filed with the regulator to become a licensed payment processor in Brazil. This provided us with the ability to partner with one of the largest ride-hailing companies in the world due to our ability to create in Brazil a local-to-local payment solution that allowed thousands of its drivers to receive payments from and its customers to make payments to the merchant, which we believe is difficult to replicate by other providers.

126

Table of Contents

We have also created broad solutions with feature-rich capabilities that assist multiple merchants operating in the same market. We often create these products in response to a specific merchant need, which we can then replicate across our entire platform, thus benefiting other merchants operating in the same countries at minimal added costs. For example, we developed a differentiated tool to streamline tax withholdings in Argentina. At the time, the Argentinian government had made changes in tax policy, giving merchants little time to react. Our solution, which was built and launched rapidly across our entire platform, assisted all our merchants operating in the country to comply with evolving regulatory changes.

We recognize that our success is directly correlated with the success of our merchants. It is our responsibility to provide a secure, reliable service for them to drive payments volume through our platform. This makes us highly attuned to our merchants' needs. We offer what we believe to be superior customer service, with 24/7 support and direct accessibility to a team of software engineers. We typically deploy daily updates for our platform, constantly enhancing our offering, while legacy players do so only a few times per year. Similarly, our customer support team stands ready to address issues at any time, in any time zone. We strive to promptly resolve our merchants' problems, often before they arise, differentiating us from competing platforms, which we believe have longer response times.

We firmly believe in the importance of working alongside our merchants. In collaborating closely through our multiple touch points (including technology, operations, sales, account management, and product support), we aim to better serve them. This creates a cooperative environment, helping us work well together on product innovation and market expansion. Our merchants are our best partners in developing new solutions, in many instances helping us test them in secure and live environments, iterating, learning, and applying insights to new product releases that we then make generally available to our entire merchant base at the moment of launch.

### Attractive business model that delivers strong financial performance

Our technology-driven business model creates significant opportunities for scale and operating efficiencies. We benefit from strong relationships with our existing merchants, many of whom benefit directly from strong secular trends such as the increasing adoption of e-commerce. In addition, many of our global merchants offer subscription-based models that provide greater visibility into the TPV processed through our platform. This all translates into the expanding performance of our annual merchant cohorts over time. Furthermore, our asset-light structure drives our ability to deliver strong margins and generate cash flow. Our business model has proven to be resilient, even through the recent COVID-19 pandemic. In fact, the COVID-19 pandemic has accelerated the digitalization of commerce, which has benefited some of our global merchants. For the three months ended March 31, 2021, our revenues grew by 123.7% compared to the three months ended March 31, 2020, and we reported an Adjusted EBITDA Margin of 44.3%. For 2020, our revenues grew by 88.4% compared to 2019, and we reported an Adjusted EBITDA Margin of 40.3%.

We have built our platform and all of its capabilities to last. We believe we will continue to drive growth and profitability through our investment in expanding our existing business into new countries, developing new products and capabilities, and attracting new global merchants into our platform, allowing us to remain ahead of the competition.

### Technology-oriented, execution-driven management team fostering an entrepreneurial culture

We are devoted to fostering an entrepreneurial culture, built upon a commitment to offer a superior value proposition for our merchants. We were proudly born out of Uruguay, which forced us to think big and be global since inception. This is largely reflected in our presence in 29 countries and the expanding geographic diversity of our team of over 300 professionals in 20 countries as of December 2020. We are mission driven and are focused on creating innovative solutions, launching new products, and adding new functionalities, always seeking to ensure the best possible execution and to continue supporting the growth of our merchants. Delivering superior technology infrastructure is a key pillar of our management team's focus, as evidenced by the fact that

127

[Table of Contents](#)

*Dispute management*

dLocal offers dispute management capabilities for all transactions that are processed through our platform. In the event of a dispute, we immediately notify our merchants through our API, the Merchant Dashboard, or via email. Once notified, merchants can provide all required information and documentation to address the dispute. dLocal then proceeds to process all required information and work with payment processors, acquirers, and other financial institutions, as applicable, for the resolution of the dispute, while ensuring the merchant is informed of updates at each step.

*Refunds*

dLocal has created a solution for merchants to send refunds to their customers for any transaction with any payment method, including many APMs that do not have a refund feature. In cases where there is no refund available for the original payment method, we create a bank transfer to the end user. Merchants can send their customers' banking information directly to dLocal, through our API or the Merchant Dashboard. Alternatively, dLocal can contact the end user directly to complete the refund process.

*Subscriptions and recurring payments*

dLocal provides merchants with the ability to set up recurring payments with cards and digital wallets, among others, which is ideal for merchants offering subscription-based models. We have built several merchant-friendly features on our platform to support this use case. Tokenization of cards and digital wallets, verification capabilities and retry features give our merchants a full suite of options to improve their recurring services and boost approval rates. As an example, when verifying a card, dLocal creates a transaction with the smallest amount allowed in the applicable country and immediately cancels the transaction. This verification feature reduces complexity for merchants given there are different rules for card verification in each country and minimize impact for end users as the transaction is immediately cancelled to avoid any chargeback from unrecognized payments.

*Installments*

dLocal also allows users in emerging markets to complete their payment with installments. Credit is extended for a given transaction and end users can pay in several installments in an agreed-to period of time. This capability is risk-free for the merchant and enables a customizable checkout.

*Direct alternative payment methods (APMs)*

We understand that APMs have a wide range of different payment flows across all countries. Our merchants often want to fully-brand the experience for their customers, eliminating the need to redirect end users to the APM of their choice and transition them to a third party user interface. Accordingly, we offer the "Direct APMs" solution that can integrate APMs through our API into the merchants' check-out so merchants can avoid losing users while redirecting and delivering a better overall branding experience.

*Checkout*

dLocal is able to build localized and branded check-out experiences for merchants that are fully connected to our platform through the same API and support a full range of payment methods across a wide range of devices and software environments. Merchants can integrate our checkout capabilities on a modular basis in a rapid, efficient, and effective manner, tailored to their specific needs while maintaining full control over their relationship with their customers.

*Smart Fields*

All merchants that handle credit card information are required to be PCI Compliant. Smart Fields simplify the compliance requirements for merchants, isolating sensitive information in a secure one-element iframe. With

139

Table of Contents

Smart Fields, merchants become SAQ A compatible, which ensures PCI Compliance. Merchant can also minimize friction and control the user experience by securely collecting all card payment information on their website, without the need for any redirection to a dLocal branded checkout. We provide a comparatively simple solution that gives merchants full card acceptance capabilities.

### Our merchant base

Since our founding, dLocal has been focused on the goal of building an online payments infrastructure that connects global enterprise merchants with end users in emerging markets and allows them to seamlessly conduct business. To that end, over 330 global merchants, including brand names such as Didi, Amazon, Microsoft, Spotify, Mailchimp, Wix, Wikimedia and Kuaishou, across multiple verticals including retail, streaming, ride-hailing, financial institutions, advertising, SaaS, travel, e-learning and gaming have turned to dLocal as a trusted partner for online payment acceptance or disbursement in emerging markets. We are replacing a complex patchwork of legacy offerings that in many instances cannot deliver the comprehensive level of functionality required to process large volumes and maximize end-user satisfaction, or fail to comply with local regulatory and tax frameworks.

As our global merchants expand in the countries where we establish a presence, we believe that we are well positioned to gain a higher percentage of their transaction volumes as we continue to demonstrate the value of our platform, innovate new and relevant capabilities, cross-sell our existing solutions, and extend our global footprint. Furthermore, we have a robust pipeline of target global enterprise merchants, which we will continue to actively pursue, that we believe will benefit from our solutions, driving future expansion of our overall merchant base.

While the vast majority of our volume is concentrated in global enterprise merchants, dLocal continues to selectively work with leading PSPs, especially where they are complementary and deliver relationships that are not targeted by dLocal directly. In those instances, PSPs leverage our connections to access "last-mile" connectivity to local payment methods, while dLocal gains increased distribution of our services.

dLocal's client concentration continues to decrease as we add new merchants and increase the volume processed for existing merchants outside of our top 10 in processed volume. For the three months ended March 31, 2021 and 2020, dLocal's top 10 merchants represented 62% and 69% of total revenue, respectively, and 64% and 70% for the years ended December 31, 2020 and 2019, respectively. We monitor our merchant base on a regular basis, consistently looking for ways to improve the sustainability of our relationships and to enhance the level of connectivity we have with each of our merchant clients.

### Merchant case studies

#### Global social media platform

Our partnership with one of the largest social media platforms started in 2016 as an indirect relationship through a PSP. The merchant gained appreciation for our platform and the value of our offerings through continued engagement. In 2018, we were asked to facilitate a cross-border local cash payment method (*Pago Express*) in Paraguay. This allowed us an opportunity to establish a direct connection with the merchant. We underwent a rigorous and lengthy on-boarding process, proving along the way that the reliability and security of our platform could meet this merchant's exceptionally high standards. When completed, our single direct API instantly gave the merchant access to all of the solutions and payment methods that dLocal offers across all the markets where we have a presence. It did not take long for the merchant to recognize that dLocal could be the right partner to help it address many more of the rapidly evolving payments needs in emerging markets.

One such need was processing *real*-denominated transactions in Brazil using Boleto. While the merchant had initially engaged one of our competitors (a global payments processor) to assist with this particular payment

140

Table of Contents

method, it had become challenging given that vendor's inability to fully resolve the complexities and requirements to process such transactions, especially mobile-based ones. Given our existing direct connection with the merchant and our ability to provide a differentiated Boleto pay-in solution, we were asked to begin to process this particular payment method for pay-ins. The result was an increased overall conversion of Boleto transactions for the merchant, as well as improved speed, reliability, accuracy, and transparency. Driven by the success of this engagement, this merchant's usage of our solutions expanded rapidly in Brazil and several other countries in the region, including Mexico, Colombia, and Peru, and across multiple payment methods and solutions.

Our relationship with this social media platform has recently expanded to countries outside of Latin America. For example, we were recently selected as their primary payments partner in Nigeria and Egypt given the strength of our differentiated offerings and reputation. This merchant is seeking to grow their volume and connectivity to local payment methods in these and other countries in Africa. We consider they have chosen dLocal based on our existing relationship and requested we establish an initial presence in these key markets.

Today, this merchant is one of our largest and deepest client relationships, with total TPV growing over 10 times between 2019 and 2020. We serve multiple business lines, including their core platform and adjacent social media and messaging applications. We support cross-border and local-to-local pay-in transactions for this merchant in 10 countries using 36 local payment methods, including cash and card-based methods, bank transfers, and most recently e-wallet solutions. Our monthly processing volume has grown over the course of our relationship due to the continued expansion of service offerings and geographic coverage, as well as this merchant's underlying strong business growth.

The following chart shows the TPV, total payment methods and countries served for this merchant during the periods indicated:



141

Table of Contents

*Global online video streaming platform*

We provide our solutions to one of the largest online video streaming platforms in the world. Our relationship began in December 2018 as the merchant was quickly expanding in Argentina and was in search of additional solutions to process cross-border pay-in transactions for its local subscribers. Given our established presence and experience operating in the country with other well-known merchants, we were initially asked to help process local card-based payment methods, adding redundancy to two existing international payments partners, while expanding the number of supported local payment methods.

From the start, we were fully aware of the high expectations, level of sophistication, and overall reputation of this merchant, which in the industry was considered the "gold standard" in credit card acquiring. During the diligence, on-boarding and integration process, we were able to demonstrate the robustness of our technology and functionality, the reliability of our customer service, and our overall connectivity and ease of use. Upon finalizing the technological integration, we believe we were able to exceed the merchant's initial expectations, proving we were a payments partner that could execute on the most complex assignments while delivering high quality performance.

Soon after commencing processing pay-in transactions in Argentina, we helped to provide local credit card acceptances that this merchant's existing payment processing partners had not been able to provide. This fact, along with improved conversion rates and fraud management, led to a rapid increase in flow of overall volume to dLocal and the termination of this merchant's relationship with one of our competitors, which was unable to meet its standards.

As this merchant continued to grow in Latin America, and given the access to all of our solutions and markets afforded through our single direct API, it has increasingly turned to dLocal as its preferred payments partner of choice in the region. Soon we were providing similar cross-border pay-in transaction support for multiple other countries in the region, including Chile and Peru. We have since also expanded our services to Africa, all while scaling our offering to accommodate the merchant's rapidly growing subscriber base and transaction volumes in each country. This merchant has also increasingly relied on dLocal to provide innovative payment solutions in specific markets. For example, we recently transitioned a challenging physical gift card purchase program in Mexico to a highly successful digital model supported by Oxxo, one of the country's largest convenience store chains. The success of that particular digital gift card solution has translated into a differentiated capability for all of our enterprise merchants operating in Mexico. We are now working to adapt and expand that same capability to other countries.

We now serve this merchant in six different countries, including Argentina, Peru, Chile, Colombia, Nigeria, and Mexico. We provide a mix of solutions, including cross-border and local-to-local pay-in's. In addition, we have grown monthly transaction processing volume nearly three-fold since our relationship began, with significant further upside supported by the growing expansion of the merchant in emerging markets, as well as its increasing adoption of additional local payment methods and markets that we support.

142

**Table of Contents**

The following chart shows the TPV, total payment methods and countries served for this merchant during the periods indicated:



*Global e-commerce platform*

We began conversations with one of the largest global e-commerce platforms in 2018. At that time, the merchant was looking to enhance its ability to process cross-border local currency payments in certain countries in Latin America. However, like many global enterprise merchants, the merchant wanted to limit the high costs and complexity of setting up the direct connections on its own. After conducting an extensive request for proposal, or RFP, and due diligence process spanning over one year, which even required participants to demonstrate product design capabilities, dLocal was selected as the merchant's preferred payments partner based in part on the inherent effectiveness of and simple access to our platform. Through dLocal, the merchant gained instant access to more end users in many of the emerging countries it was actively targeting, all through a single direct API.

Following an intensive on-boarding process, we launched cross-border local card processing in Chile in early 2019. Later that year, we rolled out our installments capabilities in Chile and then went live in Argentina and Colombia. The versatility of our platform, our proven results on acceptance and conversion, as well as our ability to support cross-border and local pay-in and pay-out transactions, allowed us to strengthen the relationship and rapidly increase the volume we process for this merchant. Today we support pay-in transactions for a wide range of local payment methods for the merchant's online video streaming service offering. We also facilitate pay-in transactions for the exports division of this merchant's core U.S. e-commerce platform, inclusive of installment functionality, which is in high demand from local customers and generally leads to higher average ticket sizes. Beyond pay-in transactions, we also support pay-out transactions for the merchant's Brazil-based e-commerce marketplace, helping it to collect, consolidate, and settle funds for their U.S. and China-based sellers, a solution that we believe strongly differentiates us from most of our competitors.

We are a payments partner to this large global e-commerce platform in five markets, including Chile, Argentina, Colombia, Brazil, and Paraguay, our most recent launch. We have experienced robust TPV growth from this merchant, due in part to the strength of our multi-faceted relationship. We will also seek to continue scaling with this merchant's growing needs and are planning to support near term expansions into additional emerging countries within and outside of Latin America, particularly in Africa.

143

**Table of Contents**

The following chart shows the TPV, total payment methods and countries served for this merchant during the periods indicated:



*Global ride hailing services provider*

Our relationship with one of the world's largest ride hailing providers began in 2018. The merchant had recently entered Brazil and was seeking a provider to process payments and navigate the local consumer and regulatory landscapes throughout Latin America. It was particularly focused on pay-out transactions as a means to extend payments to drivers in Brazil, a functionality that was not supported by certain key international competitors at that time, given the need to obtain an "*arranjo de pagamentos*" license to facilitate payments into drivers' bank accounts. We were able to obtain such a license, allowing us to serve this ride hailing services merchant, as well as other merchants seeking similar pay-out solutions in the region. Soon thereafter we conducted our on-boarding and integration process and commenced processing local pay-out transactions for the merchant's Brazil-based drivers in November 2018.

We quickly expanded similar pay-out offerings to Chile and Colombia by mid-2019, connecting over 70 local payment methods by the end of the year. We also expanded our relationship to support pay-out transactions for couriers and restaurants using the merchant's growing food delivery platform. Given our proven ability to enhance acceptance and conversion, we also displaced one of its incumbent payments providers when we began processing local-to-local pay-in transactions in Mexico. Most recently, we have started to provide split payments functionality, a complex process in which the proceeds from riders' fares are split between the merchant, the drivers, and any required tax retention, and then settled with each party independently and through their preferred or required bank account. This feature alone has allowed us to deepen our relationship with this merchant, as we believe it demonstrates our ability to innovate and address some of the most cumbersome elements of the payments transaction process.

144

Table of Contents

Today, we serve this merchant in nine countries, including Brazil, Chile, Colombia, Ecuador, Mexico, Argentina, Peru, Panama, and Costa Rica. We support local-to-local and cross-border pay-in and pay-out transactions across numerous card and cash-based payment methods. We partner with both ride hailing and food delivery counterparts and recently launched a collections solution to support cash-based alternative payment methods in several emerging countries. We look forward to continuing to expand our relationship with this global ride hailing services provider across emerging markets all over the world.

The following chart shows the TPV, total payment methods and countries served for this merchant during the periods indicated:



## Our Technology

We have designed and built from scratch a highly differentiated, modern technology stack (hosted in multiple AWS servers) with enhanced capabilities that can be accessed through a single API, which provides merchants what we believe to be a comprehensive, superior experience for all of their online payment needs in the countries where we have a presence. Our front-end functionality enables merchants to deliver a full suite of features that are relevant across a wide variety of verticals, while our back-end infrastructure provides merchants with the ability to conduct more secure and compliant business with less friction.

### *Key benefits of our infrastructure*

We offer a platform with feature-rich, fully-integrated solutions. It has been built with the goal of addressing the specific needs our merchants face in each market. Although our infrastructure addresses complex problems, we simplify them by offering a seamless experience and providing one single, consistent view, aimed at giving merchants the peace of mind to allow them to focus on running their business.

- **Scalable.** Our platform is scalable and extensible, with the ability to support incremental payment volumes and merchants as we continue to grow. We have been able to efficiently enter and scale in

145

Table of Contents

new countries, build a global payments infrastructure, and expand our portfolio of pay-in and pay-out solutions, both cross-border and local-to-local. We have also been able to support a fast-growing base of merchants and transaction volumes without compromising the payments experience.

- **Reliable.** Our platform is fully cloud-based and integrated across our global infrastructure, with multiple third-party data centers collectively serving the countries in which we operate. Our platform was developed with the aim of enabling rapid and reliable flow of funds, supporting multiple pay-in and pay-out methods of payment, either cross-border or local-to-local. Our platform is available 24/7 and has experienced consistent availability since our inception.
- **Flexible.** Our platform has been designed to be flexible and to handle shifts in merchant and end user preferences and to support the rapid development, testing, and deployment of new capabilities and functionalities.
- **Secure.** Security is core to our business. Our platform is designed to be safe and to provide uniform security as a result of significant investments in our fully integrated fraud and risk monitoring capabilities. Furthermore, the functionality of our fraud management and overall security capabilities has allowed us to remain largely independent of third-party software providers, allowing us to heighten the level of security we provide. We believe that the security and protections that our platform offers caters to the trust and reliability which merchants increasingly seek as they select a partner of choice.
- **Compliant.** We operate in a highly regulated industry that requires us to have a robust footprint of licenses and appropriate registrations and designations. Our technology and processes are fully compliant with PCI DSS and other relevant PCI standards. We believe we hold all material required licenses or applicable exemptions in the various countries in which we operate, providing further assurance to our merchants of our ability to deliver a fully compliant offering.

### *Technology strategy*

Our technology strategy is driven by our focus on addressing our merchants' needs. Our technology and commercial teams are in constant communication to ensure we have a deep and timely understanding of the opportunities and the challenges that global merchants face in any given market that we serve. Once we understand their needs, we prioritize their resolution and seek to collaborate directly with our merchants to develop, test, and optimize relevant solutions in an agile manner. In many instances, we achieve this through an iterative process in a sandbox environment geared towards continuous improvement, helping our merchants innovate safely and enabling them to have control over the design process without risk of unnecessary friction or loss of data. In other situations, we facilitate beta testing for merchants that desire and value real-time customer feedback as they seek to enhance their overall payments experience. Once our newly developed capabilities or functionalities are fully completed and live, we make them instantly available for use to all of our merchants. This allows us to constantly enhance the value proposition of our platform.

The strength of our strategy also rests in our ability to attract and retain talent with deep technological, product, and payments-industry acumen. We believe our "technology-first" mentality, our continued investment in developing innovative industry solutions, and the increasing recognition of our brand will allow us to maintain and enhance our talent base of technologists. As of March 31, 2021, 45% of our employees held engineering or technology-related roles.

### *Research and development*

Innovation is at the core of our culture. We have a deeply talented employee base of highly-qualified engineers dedicated to the development, improvement and evolution of our online payment platform capabilities as well as product development. We consistently invest in developing new feature functionality to enhance and maintain the relevance and value of our solutions. Furthermore, we are an agile organization, capable of rapidly reacting to a fast-paced payments and regulatory environment which is constantly evolving. dLocal seeks to

146

**Table of Contents**

**Class A Common shares**

# d·local

# DLocal Limited

**PROSPECTUS**

*Global Coordinators*

**J.P. Morgan**   **Goldman Sachs & Co. LLC**   **Citigroup**   **Morgan Stanley**

*Joint Bookrunners*

**BofA Securities**   **HSBC**   **UBS Investment Bank**

**June 2, 2021**

Through and including June 27, 2021 (the 25th day after the date of this prospectus), all dealers effecting transactions in these securities, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the dealers' obligation to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.