1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                             :

PAULETTE LAURENZI,             : 23-CV-07501  (NGG)
                             :
        Plaintiff,             :
                             :
                             : United States Courthouse
    -against-              : Brooklyn, New York
                             :
                             : June 10, 2024, Monday
                             : 2:00 p.m.
DLOCAL LIMITED AND MARTIN   :
ESCOBARI,                    :
        Defendants.        :
                             :
                             :

- - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR PRE-MOTION CONFERENCE
BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
UNITED STATES SENIOR DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Plaintiff:    POMERANTZ LLP
                       600 Third Avenue, Floor 20
                       New York, New York 10016
                  BY:   MURIELLE STEVEN WALSH, ESQ.
                       JARED RABINOWITZ, ESQ.

For the Defendants   DAVIS POLK & WARDWELL, LLP
DLocal Limited and     450 Lexington Avenue
Martin Escobari:      New York, New York 10017
                  BY:   ANTONIO PEREZ-MARQUES, ESQ.
                       CRAIG BERGMAN, ESQ.

Official Court Reporter:  Michele Lucchese, RPR, CRR
                   Email:  MLuccheseEDNY@gmail.com

Proceedings recorded by computerized stenography.  Transcript produced by Computer-aided Transcription.

Proceedings                                                2

THE COURTROOM DEPUTY:  Civil cause for a pre-motion conference.

Beginning with the plaintiffs, please note your appearances.

MS. STEVEN:  Good morning, Your Honor.

Murielle Steven Walsh from the Pomerantz firm on behalf of the lead plaintiffs.

MR. RABINOWITZ:  Jared Rabinowitz, also from the Pomerantz firm on behalf of lead plaintiffs.

THE COURT:  Good afternoon.

MR. PEREZ-MARQUES:  Good afternoon, Your Honor.

Antonio Perez-Marques from Davis Poke & Wardell for defendants DLocal Limited and Martin Escobari.

MR. BERGMAN:  Good afternoon, Your Honor.

Craig Bergman also from Davis Poke & Wardell for defendants DLocal and Mr. Escobari.

THE COURT:  Welcome.  Please be seated.

All right.  So this is securities class action and perhaps it would be useful for me to just hear from plaintiff's counsel as to why we are here.

MS. STEVEN:  Sure.  Should I use the podium?

THE COURT:  Speak right from there.  Stay seated. This is the post COVID world.  Just speak the microphone so I can hear and the court reporter can hear as well.  Thank you.

MS. STEVEN:  Thank you, Your Honor, for your time.

Proceedings                                           3

This action alleges violations of Section 11 of the 33 Act and it's Section 10b-5 of the Securities Exchange Act. It arises from statements made by the company DLocal, as well as several its executives.  DLocal is a company -- it's a payment processing company that is headquartered in Uruguay and engages in cross-border transactions, as well as local to local business.

THE COURT:  So we have venue in the United States for this?

MS. STEVEN:  Yes.  The company went public via IPO on June 2, 2021.

THE COURT:  I see.  Go ahead.

MS. STEVEN:  Which gives rise to the Section 11 claim, of course.

At the time of the IPO, the company sold itself to U.S. investors as being a company that was rapidly growing in the payment processing market.  In fact, it's numbers blew away its competitors.  And it also claimed that it is rapidly expanding in the industry.

In the IPO, DLocal raised about 82 million in proceeds, net of all fees.  And by contrast, the individual defendants sold hundreds of millions of dollars in the IPO, shortly after the IPO and then again after a secondary offering.

The Complaint alleges several buckets of

Proceedings                                4

misstatements with respect to the registration statement, in particular, the Complaint alleges that the company failed to disclose that leading up to the IPO, in the four or five quarters leading up to the IPO, the company had been experiencing a negative trend of declining take rates.

Now, take rates are a very important operating metric for the company.  It is the same thing as a gross profit margin.

And while the defendants take issue as to whether or not this information was important and need to be discussed analysts have a very different perspective on that.  Our Complaint cites to several analysts who pointed to the company's growing take rates as evidence of its future success, present and future success.

THE COURT:  So, technically, how does the take rate get established?

MS. STEVEN:  So take rates are calculated by calculating the revenue divided by total processing value. So, basically, it shows what the company is taking from all of its transactions that it is processing.

THE COURT:  So it's like a commission.

MS. STEVEN:  Yeah.  Yeah, there's different fee structures.  There's fixed and there's variable, which is one of the reasons the take rate is so important because it gives investors, you know, a ballpark idea of how much money the

company is actually making on all these payments that it is processing for its customers.

THE COURT:  Who decides which form of take rate will be charged to the customer?  Is that a contractual agreement?

MS. STEVEN:  I believe it's negotiated, yes.  So it can vary from customer to customer.  And that's also part of the case here.

Not to diverge too much into another subject matter, but at the time of the IPO the company's customers were shifting their transactions with the company from using DLocal for cross-border transactions to more of the local-to-local transactions.  And the local-to-local transactions are a much lower take rate, a much lower profit margin.

THE COURT:  And local to local was in Argentina, you said?

MS. STEVEN:  Yeah.

THE COURT:  Rather than cross border?

MS. STEVEN:  Rather than cross border, right.  Correct.

So this was a trend that the company was experiencing right before the IPO.  We did not disclose the decline in the take rates at the time of the IPO, and this information would have been very important to investors because the declining take rates belie the company's representation that it was a continually growing company.

And, in fact, the defendants do not dispute that this trend existed.  Under item 303, a negative trend that's reasonably expected to impact the company's performance must be disclosed.

THE COURT:  And they failed to disclose, you claim?

MS. STEVEN:  And they failed to disclose them.  And the defendants claim the information was available at the time of the IPO, but that's a factually incorrect assertion.  The information that investors needed to calculate the decline in the quarterly take rates and the quarters leading to the IPO, it didn't begin to be disclosed until well after the IPO, so the information was simply not available.

THE COURT:  So the disclosures, the formal disclosures made in connection with the IPO did not include that information; is that your position?

MS. STEVEN:  Yes, it is.

THE COURT:  I see.

MS. STEVEN:  The Complaint also alleges that the company, at the time of the IPO, overstated the take rates that it did disclose, as well as its revenues.  The company claimed that between 2019 and 2020 the take rate had increased.  The Amended Complaint relies, in part, on the Muddy Waters' report, which was issued in November of 2022, which conducted a detailed analysis of what Muddy Waters' believed the company's take rates ought to be.  And Muddy

Proceedings                                              7

Waters calculated the take rates to be significantly lower than the 5 percent the company was claiming at the time of the IPO.  Muddy Waters calculated that the take rate was much closer to 1.1 percent for 2020 than the 5 percent.

THE COURT:  That's a big difference.

MS. STEVEN:  It's a big difference.  And it also goes to our allegations about that the company was overstating its revenues at the time of the IPO, because assuming the much lower take rate, you have much lower revenues as well.

Another red flag that the Complaint points to that the company was overstating its revenues at the time of the IPO is the fact that the receivables, the company's trade receivables were growing disproportionately in relation to the company's revenue.  This is a classic red flag in the accounting jargon, that revenues have been overstated because you can't collect cash on revenue that isn't actually -- on revenue that's been fabricated.  So that's another basis for why we believe that the revenues were overstated.

So that's one bucket of the misstatements at issues, Your Honor.  The other bucket of misstatements regard the company's statements about its internal control processes and also about its exposure to regulatory risk in the market that it was dealing in.

THE COURT:  So you're bringing this as a class action.

MS. STEVEN:  Yes.

THE COURT:  And there is an issue as to whether it is too late for to you bring a class action in this case, and I think the defense has focused on that in connection with their application.

Could you speak to that?

MS. STEVEN:  Yes, Your Honor.  So the -- it's our position that -- the defendants are arguing that the Section 11 claim is time-barred because we --

THE COURT:  You're too late.

MS. STEVEN:  It's too late because we brought it up in the Amended Complaint, which is passed the time period. But plaintiffs' position on that is the Statute of Limitations was tolled by the filing of the State Court action which alleges Section 11 claims and which was brought timely.  And the defendants are not raising a Statute of Limitations argument as to the 75 claim.

THE COURT:  And you're Ms. Steven?

MS. STEVEN:  Yes, Your Honor.

THE COURT:  Sir.

MR. PEREZ-MARQUES:  Thank you, Your Honor.  It's Antonio Perez for the defendants DLocal and Martin Escobari.

Perhaps I will start just by I agree with the framing of what the categories of allegation are. Effectively, we have the take rates allegations and the

Argentina allegations, to which plaintiffs gave quite short shrift.

Let me just correct a few points about the take rates. Take rates are not commissions. It's not something that a customer is actually charged. It is a descriptive measure that is used by some in the industry. Just to calculate: For every dollar of payment that a payment processor processes, how much do they actually earn in revenue, which would be gross take rates, or in profit, which would be net take rates.

THE COURT: Where do they get the revenues from? The transaction?

MR. PEREZ-MARQUES: There are different fees that are charged. So, for instance, it could be transaction fees, it could be foreign exchange fees, it could be a spread on the foreign exchange conversion itself. So there are different sources that go into it. But the take rate is just a descriptive measure. For every 100 dollars of payments that you process, how much are you getting as revenue, which would be the gross take rate, how much are you getting as profit, which would be the net take rate. So it is a descriptive measure.

Now, we believe also -- just a small clarification, what they refer to as local to local, that's not just Argentina. Local to local refers generically to any payment

Proceedings                                                    10

that is within a single jurisdiction rather than --

THE COURT:  I see.  So if the transaction is wholly within the United States, that's local to local?

MR. PEREZ-MARQUES:  Exactly.

So within Brazil, within Argentina, within Nigeria, any country, that would be a local-to-local transaction.

Now, we contend -- first of all, as the Court noted, that the Securities Act claims are time-barred.  They were brought more than a year after the Muddy Waters' report.  Plaintiffs have affirmatively taken the position that the Muddy Waters' report revealed what they're now claiming were the misstatements and they brought these allegations in their Amended Complaint more than a year after that.

Their only argument in response is that they get the benefit of *American Pipe* tolling.  But Supreme Court, in *China Agritech*, held very clearly that that *American Pipe* tolling only applies to later individual actions, not to successive class actions.  So as a class action, this case does not get the benefit of *American Pipe* tolling under *China Agritech*.  And that is a matter of Supreme Court precedent.  So we believe their Securities Act claims are time-barred.

With respect to the take rate allegations, first of all, it's not a metric that the company reports in its securities filings.  It's not a GAAP measure.  It's not a metric that the company includes as one of its key metrics in

its SEC filings.  It's something that analysts sometimes inquire about because they use it to compare payment processors one to another.  But it is not a metric as to which the company itself has published a figure or made any kind of representation as to how their take rates were evolving or progressing or what to expect from take rates going forward.  And, in fact, the post IPO discussions that are quoted by the plaintiffs are consistent in saying effectively one thing, that the company does not manage to take rates because it considers them too volatile.  They bounce around too much as the business mix changes.

Now, there are three reasons that they have failed to state a claim with respect to take rates.  First of all, the supposed decline in take rates, to the extent it existed, was disclosed.  Now, as I explained, the take rates, it's just a fraction.  It's a fraction of either revenue or profit as the numerator over total payment volume as the denominator.  Each of those figures -- revenue, profit, payment volume -- is disclosed in the IPO prospectus.  So anyone who wanted to see what the take rate is and how the take rate had changed only had to do arithmetic.  There are cases saying quite clearly that if an investor could have known the truth simply by doing arithmetic, there's no misstatement.

And what that arithmetic would have shown in this case is that the first quarter of 2021, which was the last

completed quarter before the IPO, the take rate reflected in the IPO prospectus was lower than Q1 2020, so the quarter one year prior, and it was also lower back than the entire fiscal year 2020. So to the extent that there was a decline in take rates, that could be readily seen from the numbers in the IPO prospectus.

Now, what they take issue with --

THE COURT: So why wouldn't it be appropriate, if that were the case, that that would be affirmatively set forth and wouldn't put an average investor in the situation of having to do -- having to do a computation if it's a significant difference?

MR. PEREZ-MARQUES: Well, Your Honor, I'm not sure it is a significant difference.

THE COURT: Five percent to one percent, I mean, that's significant.

MR. PEREZ-MARQUES: That's not the decline that's reflected in the documents. The decline is more modest than that.

THE COURT: I see.

MR. PEREZ-MARQUES: And in terms of a computation, we are talking about division. We are talking about one number divided by another.

But the reason that we believe --

THE COURT: That goes out to the average investor as

well as the institutional investor, doesn't it?

Anybody can buy into the IPO.  So, I mean, plaintiff is basically saying, you know, it should have been disclosed and you're saying it's disclosed by virtue of the information that was provided; it could be used arithmetically to determine it.

MR. PEREZ-MARQUES:  That is part of our argument, Your Honor, but there are other parts ever of it as well, which is that there is no duty to disclose anything further. This is an omissions argument.  The argument is that the company should have said more about take rates.  But there is no securities law claim in the absence of a duty to disclose on the basis of an omission.  There is no half truth here because the company didn't say anything about the take rates, made no representation.

So they're arguing that there was a material trend under Item 5.D of Form 20-F, which is the analog to 303 under Regulation S-K.  But there is no material trend, as a matter of law for a couple of reasons:  One is these intervening quarters that they say should have been disclosed, first of all, they are higher, they're more favorable than the number that was disclosed.  So investors weren't deprived of anything that would have changed the total mix of information.  All they would have seen is that take rates improved before they got a little bit softer.  So they weren't deprived of anything

meaningful.

And it also means that there is no trend because you're not seeing a straight line decline from quarter to quarter.  What you see is take rates getting better, and then getting a little worse, and then getting a bit worse.  It's a line, as the company has said, is volatile.  And there are cases explaining that when you have a volatile metric like that there is no trend as a matter of law.

There's also an issue with the duration of the supposed trend because what they're talking about, they only have two quarters of allegedly undisclosed declines, in Q3 2020, in Q4 2020.  That's six months.  And there are cases that indicate that that general duration, you know, five months, six months is not enough to constitute a trend as a matter of law.

Second, the reason that there's no duty to disclose anything further is that there is no material risk under item 505, or Reg S-K or item 3-D of Form 20-F, which is its analog in this context.

Declining take rates are not -- the duties to disclose with respect to material risk applies when you are talking about one of the most significant factors that makes an offering speculative or risky.  They haven't pled anything that would suggest that this was among the most significant risks facing this company, or even that it was a risk at all,

because the decision to grow a business by charging less, more volume at lower prices a completely rational business strategy that is entirely consistent with improving performance. And, in fact, during the period that the Complaint relates to, what you see are improving profits, improving revenue with declining take rate. Company's doing better but prices, speaking generally, are lower. That's not a risk to the business. That is a business strategy. And there is no duty to disclose business strategies under the securities laws.

THE COURT: All of this is interesting, but wouldn't be it preferable for the Court to permit discovery on these issues to go ahead and so there would be a clear set of facts upon which to either have the case go forward to a jury or have the case dismissed by summary judgment?

MR. PEREZ-MARQUES: No, Your Honor, not when you have untimely claims under the Securities Act and not when they fail to state claims in their Complaint upon which relief can be granted. That, as the Court well knows, is the issue that would be presented on a motion to dismiss. And under the CSLRA, that is a hurdled that should be cleared and cannot be cleared here but must be cleared in order for the case to proceed to discovery. They have not pled sufficient facts to subject this company to the burden of discovery.

THE COURT: Interesting.

So have you discussed a schedule for the motion?

MR. PEREZ-MARQUES:  We have, Your Honor.  Indeed, the Court entered a scheduling stip earlier in the case, which just had time periods.  So 60 days for open --

THE COURT:  Let's get dates.  I would prefer to get dates.  The idea that you have worked it out is good, but the dates are essential.

MR. PEREZ-MARQUES:  We would submit, per the intervals that the Court previously ordered, August 9th for the opening brief.

THE COURT:  August 9th.  That's fine.  And then?

MR. PEREZ-MARQUES:  Then it would be October 8th for opposition and --

THE COURT:  Hold it, please.

MR. PEREZ-MARQUES:  Yes.

THE COURT:  October 8th is a Tuesday.  Is that agreeable, October 8th?  I usually like Mondays and Fridays. How about October 11th?

MR. PEREZ-MARQUES:  We have no objection to that, Your Honor.  It's their brief.

THE COURT:  Yes.

MS. STEVEN:  That works for plaintiffs.

THE COURT:  Okay.  And then how much time?

MR. PEREZ-MARQUES:  We were asking for 30 days for the reply, which would be November 7th or -- I don't know what it would go to.

Proceedings                                                    17

THE COURT:  November 8th.  Make it November eight.

MR. PEREZ-MARQUES:  Excellent.

THE COURT:  All right.  And the motion will be deemed submitted.

If I require oral argument, we got a good start here.  But if I require oral argument, Mr. Reccoppa will contact the parties.  We will set a date for oral argument.

MR. PEREZ-MARQUES:  Thank you, Your Honor.

THE COURT:  Is there anything else for today from the plaintiff?

MS. STEVEN:  No.  Thank you, Your Honor.

THE COURT:  From the defense?

MR. PEREZ-MARQUES:  Not from us.

MR. BERGMAN:  I don't think so, Your Honor.

THE COURT:  Thanks for coming in.

MR. BERGMAN:  Thank you, Your Honor.

THE COURT:  Have a good day.

(Matter adjourned.)

                *     *     *     *     *

I certify that the foregoing is a correct transcript from the record of the proceedings in the above-entitled matter.


/s/ Michele Lucchese                    June 10, 2024
_____                 _____
Michele Lucchese                        DATE